1

Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

2

3

4

5

6

*Counsel for Plaintiff*

7

8          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA

9

10

| | |
|---|---|
| TRACY JOHNSON, Individually and on behalf of all others similarly situated, | No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | <u>CLASS ACTION</u> |
| SABLE OFFSHORE CORP., JAMES C. FLORES, GREGORY D. PATRINELY, J.P. MORGAN SECURITIES LLC, JEFFERIES LLC, TD SECURITIES (USA) LLC, THE BENCHMARK COMPANY, LLC, JOHNSON RICE & COMPANY, L.L.C., PEP ADVISORY LLC, ROTH CAPITAL PARTNERS, LLC, and TUOHY BROTHERS INVESTMENT RESEARCH, INC., | JURY TRIAL DEMANDED |
| Defendants. | |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Tracy Johnson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Sable Offshore Corp. ("Sable Offshore" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

## NATURE OF THE ACTION

1.    This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Sable Offshore securities between May 19, 2025 and June 3, 2025, inclusive (the "Class Period"), and/or pursuant and/or traceable to the Company's May 21, 2025 secondary public offering (the "SPO"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Act of 1933 and the Securities Exchange Act of 1934 (the "Exchange Act").

---

[1] Unless otherwise specified, all emphasis is added.

1

2. On or about May 21, 2025, Defendants held the SPO, issuing 10,000,000 shares of common stock at $29.50 per share. The Company raised gross proceeds of $295 million.

3. By the commencement of this action, the Company's common stock traded significantly below the SPO price. As a result, investors were damaged.

## JURISDICTION AND VENUE

4. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 771(a)(2) and 77o.

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1331 and §22 of the Securities Act.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), as well as §22(a) of the Securities Act (15 U.S.C. §77v(a)), as the alleged misstatements entered and the subsequent damages took place in this judicial district.

7. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

States mails, interstate telephone communications and the facilities of the national

securities exchange.

## **PARTIES**

8.     Plaintiff, as set forth in the accompanying certification, incorporated

by reference herein, purchased Sable Offshore securities during the Class Period

and/or pursuant and/or traceable to the SPO (defined below) and was economically

damaged thereby.

9.     Pertinent to this complaint, Defendant Sable Offshore operates in the

offshore drilling business, and seeks to extract oil from the Santa Ynez field in

federal waters off the Coast of California. Pertinent to those activities is an offshore

facility owned by Defendants at Las Flores Canyon in Santa Barbara County,

California.

10.     As alluded to below, Sable Offshore's efforts to restart production

have been marred by litigation, amid accusations that the Company has violated

the California Coastal Act (the "Coastal Act"), resulting in environmental harm.

11.     Sable Offshore Corp. is incorporated in Delaware and its principal

executive offices are located at 845 Texas Avenue, Suite 2920, Houston, Texas

77002.

12.     Sable Offshore's common stock trades on the New York Stock

Exchange (the "NYSE") under the ticker symbol "SOC".

3

13.     Defendant James C. Flores ("Flores") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") at all relevant times.

14.     Defendant Gregory D. Patrinely ("Patrinely") served as the Company's Chief Financial Officer ("CFO") at all relevant times.

15.     Defendants Flores and Patrinely are collectively referred to herein as the "Individual Defendants."

16.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

4

(g)    approved or ratified these statements in violation of the federal securities laws.

17.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

18.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Sable Offshore Corp. under *respondeat superior* and agency principles.

19.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is an investment banking firm that acted as an underwriter for the SPO, helping to draft and disseminate the SPO documents. J.P. Morgan, along with Jefferies and TD Cowen (defined below) acted as a joint book-running manager. J.P. Morgan's address is 383 Madison Avenue, New York, New York 10179.

20.    Defendant Jefferies LLC ("Jefferies") is an investment banking firm that acted as an underwriter for the SPO, helping to draft and disseminate the IPO documents. Jefferies' address is 520 Madison Avenue, New York, New York 10022.

21.    Defendant TD Securities (USA) LLC ("TD Cowen") is an investment banking firm that acted as an underwriter for the SPO, helping to draft and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

disseminate the IPO documents. TD Cowen's address is One Vanderbilt Avenue, New York, New York 10017.

22.     Defendant The Benchmark Company, LLC ("Benchmark") is an investment banking firm that acted as an underwriter for the SPO, helping to draft and disseminate the IPO documents. Benchmark's address is 150 East 58th Street, 17th Floor, New York, NY 10155.

23.     Defendant Johnson Rice & Company, L.L.C. ("Johnson Rice") is an investment banking firm that acted as an underwriter for the Company's SPO, helping to draft and disseminate the SPO documents. Johnson Rice's address is 639 Loyola Avenue, Suite 2775, New Orleans, Louisiana 70113-7105.

24.     Defendant PEP Advisory LLC ("Pickering Energy Partners") is an investment banking firm that acted as an underwriter for the SPO, helping to draft and disseminate the SPO documents. Pickering Energy Partners' address is 100 Waugh Drive, Suite 600, Houston, TX 77007.

25.     Defendant Roth Capital Partners, LLC ("Roth Capital Partners") is an investment banking firm that acted as an underwriter for the SPO, helping to draft and disseminate the SPO documents. Roth Capital Partners' address is 888 San Clemente Suite 400, Newport Beach, California 92660.

26.     Defendant Tuohy Brothers Investment Research, Inc. ("Tuohy Brothers") is an investment banking firm that acted as an underwriter for the SPO,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

helping to draft and disseminate the SPO documents. Tuohy Brothers' address is 641 Lexington Avenue, 15 Flr., New York, NY 10022.

27.     The Defendants named in ¶¶ 19-26 are sometimes referred to herein as the as the "Underwriter Defendants."

28.     Pursuant to the Securities Act the Underwriter Defendants are liable for the false and misleading statements in the Prospectus as follows:

(a)     Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the SPO and shared millions of dollars in fees collectively. The Underwriter Defendants arranged a roadshow prior to the SPO during which they, and representatives from Sable Offshore, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from Sable Offshore and the Individual Defendants that Sable Offshore would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)     Representatives of the Underwriter Defendants also assisted Sable Offshore and the Individual Defendants in planning the SPO, and purportedly conducted an adequate and reasonable investigation into the business and

7

operations of Sable Offshore, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the SPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

(d)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Sable Offshore's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the SPO; (ii) the terms of the SPO, including the price at which Sable Offshore securities would be sold; (iii) the language to be used in the Prospectus; what disclosures about Sable Offshore would be made in the Prospectus; and (iv) what responses would be made to the SEC in connection with its review of the Prospectus. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Sable Offshore's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Sable Offshore's existing problems as detailed herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(e)     The Underwriter Defendants caused the Prospectus to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

29.     Sable Offshore, the Individual Defendants, and the Underwriter Defendants, are collectively referred to as "Defendants."

## SUBSTANTIVE ALLEGATIONS

## Materially False and Misleading Statements Issued During the Class Period

30.     On May 19, 2025, before the market opened, the Company issued a press release entitled "Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in June 2025." (the "May 19 Press Release").

31.     The May 19 Press Release stated the following, in pertinent part:

*[Sable Offshore] today announced that as of May 15, 2025, it has restarted production at the Santa Ynez Unit ("SYU") and has begun flowing oil production to Las Flores Canyon ("LFC")*. Additionally, with the completion of the Gaviota State Park anomaly repairs on the Las Flores Pipeline System (the "Onshore Pipeline") on May 18, 2025, Sable has now completed its anomaly repair program on the Onshore Pipeline as specified by the Consent Decree, the governing document for the restart and operations of the Onshore Pipeline.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Seven of the eight sections of the Onshore Pipeline have been successfully hydrotested. Sable will complete the final hydrotest in order to meet the final operational condition to restart the Onshore Pipeline as outlined in the Consent Decree. Sable expects to fill the ~540,000 barrels of crude oil storage capacity at LFC by the middle of June 2025 and subsequently recommence oil sales in July 2025.

32.     The May 19 Press Release further stated:

On May 15, 2025, Sable initiated the flow of oil production from six wells on Platform Harmony of the SYU to LFC at a rate of ~6,000 barrels of oil per day.

33.     The May 19 Press Release quoted Defendant Flores as stating the following:

*[Sable Offshore] is proud to have safely and responsibly achieved first production at the Santa Ynez Unit*[.] The impressive well tests from Platform Harmony confirm the prolific nature of the Santa Ynez Unit reservoir after being dormant for ten years. *SOC is excited about our development plan and prospects for the future*. This milestone achievement is a result of a tremendous amount of effort from all of Sable's employees, contractors, Board of Directors, stakeholders, and suppliers. We are very grateful for the cooperation and partnership from our local community and

10

regulatory bodies as we seek to provide energy security to the State of California.

34. After the release of the May 19 Press Release, Sable Offshore stock climbed from a closing price of $28.86 per share on May 16, 2025 to $33.02 per share on May 19, 2025, a 14.4% climb in share price.

35. The statements in ¶¶ 31-33 were materially false and misleading at the time they were made because, contrary to Defendants' representations, Sable Offshore had not resumed commercial production off the coast of California.

36. Defendants then used the share price appreciation following the May 19 Press Release to conduct a secondary public offering (or "SPO") at a higher offering price per share than would have otherwise been possible.

37. On April 22, 2025, Sable Offshore Corp. filed with the SEC a Registration Statement on Form S-3 (the "Registration Statement"), which was signed by Defendants Flores and Patrinely. The Registration Statement noted that the Company might occasionally offer securities (including common or preferred stock, debt securities, warrants, and units) to the investing public, stating the following:

We may offer and sell up to $1,500,000,000 in the aggregate of the securities *identified above from time to time in one or more offerings*. This prospectus provides you with a general description of the securities.

11

*Each time we offer and sell securities, we will provide a supplement to this prospectus that contains specific information about the offering and the amounts, prices and terms of the securities*. The supplement may also add, update or change information contained in this prospectus with respect to that offering. You should carefully read this prospectus and the applicable prospectus supplement before you invest in any of our securities.

38.    On May 1, 2025, the SEC declared the Registration Statement effective.

39.    On May 21, 2025, Sable Offshore announced that it would conduct a secondary public offering.

40.    On May 22, 2025, Sable Offshore filed with the SEC a prospectus on Form 424B5 (the "Prospectus"), specifying that the Company was offering 8,695,654 shares of common stock at $29.50 per share, higher than the last closing price before the May 19 press release.

41.    The Prospectus was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

42.    The Prospectus contained the following statement in the "Recent Evens" section:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

***On May 15, 2025, Sable initiated oil production from six wells on Platform Harmony at SYU and began flowing oil production to Las Flores Canyon ("LFC") at an initial rate of approximately 6,000 barrels of oil per day***. Sable has tested approximately 30% of the 32 producing wells on Platform Harmony with the remaining Harmony Platform wells to be tested over the course of the next several days. ***Sable expects to initiate production from the additional 44 wells on Platform Heritage and the additional 26 wells on Platform Hondo in July 2025 and August 2025, respectively***. The initial production rates as our wells are brought back into production have been higher than the rate of sustained production at such wells, but are expected to decline from initial highs, as production rates from wells typically decline over time. See "Risk Factors—Risks Associated with our Operations."

On May 18, 2025, Sable completed anomaly repairs on Line 324 (formerly known as Line 901), which extends from the Las Flores Station on the California coast to the Gaviota Pump Station in Santa Barbara County, California, and Line 325 (formerly known as Line 903), which extends from the Gaviota Pump Station to Pentland Station in Kern County, California, the point of sale. With the completion of such repairs, Sable has now completed its anomaly repair program on the Onshore Pipeline as specified by a Consent Decree that Plains entered into with various governmental

13

agencies in 2020 (the "*Consent Decree*"), the governing document for the restart of the Onshore Pipeline.

43.     The statement in ¶ 42 was materially false and misleading at the time it was made because Sable Offshore had not started production at the Santa Ynez Unit.

44.     The statements contained in ¶¶ 31-33, 42 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants represented that Sable Offshore Corp. had restarted oil production off the coast of California when it had not; and (2) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all times.

**THE TRUTH BEGINS TO EMERGE**

45.     On May 23, 2025, Eleni Kounalakis, the Lieutenant Governor of California and chair of the California State Lands Commission wrote a letter (the "May 23 Letter") to Sable Offshore's Vice President of Environmental & Government Affairs, Steve Rusch.

14

46.    Upon information and belief, the May 23 Letter was not published on the internet for the general public to view until May 28, 2025.

47.    The May 23 Letter stated the following, in part:

I am writing to express my serious concerns regarding Sable Offshore Corp.'s [May 19 Press Release, as discussed above], which you sent to Commission staff on the same day. *The press release appears to mischaracterize the nature of recent activities, causing significant public confusion and raising questions regarding Sable's intentions*.

*Your press release also implies that Sable has restarted operations at the Santa Ynez Unit (SYU). However, Commission staff has informed me that the limited volume oil flows are the result of well-testing procedures required by the Bureau of Safety and Environmental Enforcement prior to restart.* These activities *do not constitute a resumption of commercial production* or a full restart of the SYU. Characterizing testing activities as a restart of operations *is not only misleading but also highly inappropriate – particularly given that Sable has not obtained the necessary regulatory approvals to fully resume operations at SYU*.

I am also concerned that as Exxon's designated operator, Sable was required to communicate with Commission staff before initiating any oil flow through the offshore pipeline, even in this limited capacity. *Sable's failure*

15

*to clearly and timely communicate these activities to the Commission undermines trust of Sable's motives, demonstrates a lack of understanding of the significant concerns held by many regarding the resumption of activities*, and raises serious questions about Sable's willingness to be a transparent operator.

Commission staff's letter dated May 9, 2025, *made clear that failure to comply with applicable regulatory requirements or to resolve any outstanding regulatory issues could constitute a breach of the Commission's leases*. Any attempt to restart commercial operations at the SYU without final regulatory approvals *may place the company in violation of its lease terms and jeopardize the status of Sable's holdover lease*.

As Chair of the State Lands Commission, it is my expectation that Sable will resolve all pending legal challenges and litigation with other state agencies prior to the full restart of operations. *The willful disregard for the directives of regulatory agencies does not engender trust or confidence in Sable's willingness to serve as a responsible partner, and could weigh significantly into considerations on the future assignment of the SYU leases from Exxon to Sable*.

48.     On May 28, 2025, during market hours, KEYT, a local news organization in Santa Barbara, California (a subsidiary of News-Press & Gazette

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Company), published an article entitled "Santa Barbara County Judge issues preliminary injunction against Sable Offshore as the company announces completion of pipeline tests." The article stated the following, demonstrating that Sable Offshore's claim to have restarted production in California was false:

Sable Offshore announced that it has completed all required hydrotesting of onshore pipelines necessary to transport oil across Santa Barbara County, *but the Houston-based company suffered a setback regarding repair work on along the coast in court Wednesday*.

The announcement of pipeline work comes as representatives of Sable Offshore and the California Coastal Commission met Wednesday about the pending litigation between the two entities.

\*     \*     \*

Wednesday morning, Santa Barbara County *Judge Thomas Anderle granted a preliminary injunction requested by the California Coastal Commission against Sable Offshore for alleged violations of The California Coastal Act*.

The injunction *could impact Sable's ability to do future repairs or maintenance until its legal battle with the state regulator is settled*.

Linda Krop with the Environmental Defense Center **questioned Sable's assertions that it has completed all necessary repairs in an interview Wednesday with Your News Channel.**

She shared that this is **the first time a judge has ruled that Sable Offshore is violating the law instead of state regulators and environmental groups**.

Krop, whose organization opposes restarting oil production and has been involved in multiple lawsuits related to the project, **says Sable's attorney told the judge that granting the injunction would harm the company**.

"If Sable really has completed all the repairs, they would be fine with this injunction," argued Krop. "The injunction only applies to repairs on the pipeline. So why does Sable care about this injunction if it's really completed the repairs?"

\*       \*       \*

A California Coastal Commission spokesperson sent a statement in response to Your News Channel's inquiries stating, "**Sable has consistently ignored California law, as confirmed by the court's decision today [Wednesday] to halt work on this aging oil pipeline in Santa Barbara**. **This fly-by-night oil company has repeatedly abused the public's trust, racking up millions of dollars in fines and causing environmental damage along the treasured Gaviota Coast**."

18

49.     On May 28, 2025, during market hours, Investing.com published an article entitled "Sable Offshore Corp stock sinks following court injunction." It stated the following:

Shares of Sable Offshore Corp (NYSE:SOC) tumbled 14% after the **California Coastal Commission was granted a preliminary injunction against the company's pipeline repair and maintenance activities within the coastal zone in unincorporated Santa Barbara County**. The court's decision, which aligns with the Coastal Act's **strict regulations on coastal development, has raised concerns about potential project delays and additional costs for Sable Offshore.**

**The legal proceedings stem from allegations that Sable Offshore Corp did not obtain the necessary coastal development permits (CDPs) for their ongoing repair and maintenance work on the Las Flores Pipelines**. Despite Sable's claims that the work was authorized under existing permits from the County of Santa Barbara, **the court found a prima facie case for the Coastal Commission, indicating that the activities constituted a violation of the Coastal Act**.

The injunction **stops Sable from continuing any development** associated with the return to service of the Las Flores Pipelines CA-324 and CA-325 unless they secure a new, operative CDP or other form of Coastal Act

19

authorization. The company had resumed repair and maintenance activities earlier in February 2025, following confirmation from the County that the activities were authorized under existing permits.

The court's ruling highlights the ongoing tension between regulatory compliance and operational progress within the energy sector. Sable Offshore Corp's stock movement reflects investor concerns over the potential impact of regulatory hurdles on the company's ability to complete essential maintenance work and resume operations.

50.     On this news, the price of Sable Offshore common stock fell by $5.04 per share, or 15.3%, to close at $27.89 per share on May 28, 2025.

51.     On June 4, 2025, before the market opened, Sable Offshore filed a current report on Form 8-K with the SEC. It stated, in pertinent part, the following:

On June 3, 2025, a Santa Barbara County Superior Court Judge granted *ex parte* requests from plaintiffs in *Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al.* (25CV02244) and *Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection, et al.* (25CV02247) ***for temporary restraining orders prohibiting Sable Offshore Corp. ("Sable") from restarting transportation of oil through the Las Flores Pipeline System pending the hearing on an order to show cause*** regarding a preliminary injunction

scheduled for July 18, 2025. ***Sable is exploring all possible avenues available to address these preliminary rulings***. Sable is now targeting August 1, 2025 for first sales due to this delay.

52.    On this news, the price of Sable Offshore stock fell by $0.94 per share, or 3.91%, to close at $23.10 on June 4, 2025.

53.    As of the date of the filing of this Complaint, Sable stock was trading below the SPO price.

54.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"), as well as those who purchased the Company's securities pursuant and/or traceable to the Prospectus. Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

56.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

57.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

23

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

61.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

62.    Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and

24

Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

63.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

68.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

69.     Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

70.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

71.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information

which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

72.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

73.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## **COUNT II**

### **Violations of Section 20(a) of the Exchange Act**

### **Against the Individual Defendants**

74.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

76.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

77.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

78.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**<u>Count III</u>**
**For Violations of Section 11 of the Securities Act**
**<u>Against All Defendants</u>**

29

79.     Plaintiff incorporates all the foregoing by reference.

80.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

81.     The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

82.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

83.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were true and without omissions of any material facts and were not misleading.

84.     By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

85.     Plaintiff acquired the Company's securities pursuant to the Prospectus.

86.     At the time of their purchases of Sable Offshore securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

87.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Prospectus that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the SPO. It is therefore timely.

## COUNT IV
### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

88.     Plaintiff incorporates all the foregoing by reference.

89.     By means of the defective Prospectus, Defendants promoted, solicited, and sold Sable Offshore securities to Plaintiff and other members of the Class.

90.     The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased the Company's securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

31

91.    Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired Sable Offshore securities.

92.    By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Sable Offshore securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

93.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Prospectus should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the SPO. It is therefore timely.

## COUNT V
### Violations of Section 15 of the Securities Act
### Against the Individual Defendants

94.    Plaintiff incorporates all the foregoing by reference.

32

95.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants.

96.    The Individual Defendants were controlling persons of Sable Offshore by virtue of their positions as directors and/or senior officers of the Company. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of the Company. The Company controlled the Individual Defendants and all of Sable Offshore employees.

97.    The Company and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the SPO to be successfully completed.

98.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the SPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the SPO. It is therefore timely.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.


Dated: 7/28/2025                              **THE ROSEN LAW FIRM, P.A.**
                                             <u>/s/ Laurence M. Rosen</u>
                                             Laurence M. Rosen (SBN 219683)
                                             355 South Grand Avenue, Suite 2450
                                             Los Angeles, CA 90071
                                             Telephone: (213) 785-2610
                                             Facsimile: (213) 226-4684
                                             Email: lrosen@rosenlegal.com

                                             *Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS