1   LATHAM & WATKINS LLP
    Colleen C. Smith (SBN 231216)
2     *colleen.smith@lw.com*
3   12670 High Bluff Drive
    San Diego, CA 92130
4   Telephone: (858) 523-5400

5   Kristin N. Murphy (SBN 268285)
6     *kristin.murphy@lw.com*
    650 Town Center Drive, 20th Floor
7   Costa Mesa, CA 92626
    Telephone: (714) 540-1235
8
9   *Counsel for Defendants Sable Offshore Corp.,*
    *James C. Flores, and Gregory D. Patrinely*

10              **UNITED STATES DISTRICT COURT**
11              **CENTRAL DISTRICT OF CALIFORNIA**

12

13  TRACY JOHNSON, Individually and on
    behalf of all others similarly situated,        Case No. 2:25-cv-06869-SVW-PVC
14
                   Plaintiff,                        **DEFENDANTS SABLE OFFSHORE**
15                                                   **CORP., JAMES C. FLORES, AND**
                                                     **GREGORY D. PATRINELY'S**
16         v.                                        **NOTICE OF MOTION AND**
                                                     **MOTION TO DISMISS AMENDED**
17  SABLE OFFSHORE CORP., JAMES C.                   **CLASS ACTION COMPLAINT;**
    FLORES, GREGORY D. PATRINELY,                    **MEMORANDUM OF POINTS AND**
18  J.P. MORGAN SECURITIES LLC,                      **AUTHORITIES**
    JEFFERIES LLC, TD SECURITIES
19  (USA) LLC, THE BENCHMARK                         <u>CLASS ACTION</u>
    COMPANY, L.L.C., JOHNSON RICE &
20  COMPANY, L.L.C., PEP ADVISORY                    Judge: Hon. Stephen V. Wilson
    LLC, ROTH CAPITAL PARTNERS,                      Hearing Date: January 5, 2026
21  LLC, and TUOHY BROTHERS                          Time: 1:30 p.m.
    INVESTMENT RESEARCH, INC.,
22
                   Defendants,
23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

CASE NO. 2:25-cv-06869
MOTION TO DISMISS AMENDED
CLASS ACTION COMPLAINT

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on January 5, 2026, at 1:30 p.m., or at such later date and time as the Court may order, in the Courtroom of the Honorable Stephen V. Wilson, Courtroom 10A, United States District Court, Central District of California, located at the First Street Courthouse, 350 W. 1st Street, 10th Floor, Los Angeles, California 90012, Defendants Sable Offshore Corp., James C. Flores, and Gregory D. Patrinely will, and hereby do, move for an Order dismissing the Amended Class Action Complaint (the "Complaint," Dkt. No. 71). This Motion is made pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act, on the grounds that the Complaint fails to state a claim upon which relief can be granted.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on November 17, 2025, and is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Request for Judicial Notice, Declaration of Kristin N. Murphy, and exhibits thereto, the Court's record on this matter, the arguments of counsel, and other evidence and argument that may be presented prior to the Court's decision.


Dated: November 24, 2025


**LATHAM & WATKINS LLP**

By:  */s/ Kristin N. Murphy*
　　　Kristin N. Murphy (SBN 268285)
　　　650 Town Center Drive, 20th Floor
　　　Costa Mesa, CA 92626
　　　Telephone: (714) 540-1235
　　　Email: kristin.murphy@lw.com

Colleen C. Smith (SBN 231216)
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Email: colleen.smith@lw.com

*Counsel for Defendants*
*Sable Offshore Corp., James C.*
*Flores, and Gregory D. Patrinely*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................ 1

II.   BACKGROUND ............................................................... 3

    A.    Sable Purchases and Repairs Oil-Related Assets in Santa Barbara ...................................................................... 3

    B.    Legal Battles Emerge About Restarting the Onshore Pipelines ..................................................................... 4

    C.    Sable Begins Flowing Oil and Updates Its Investors ......................... 5

    D.    Sable Suffers Unexpected Setbacks in Its Operational Progress ..................................................................... 7

    E.    A Short Seller-Affiliated Organization Publishes a Report and Sable Issues a Press Release .............................. 8

III.  LEGAL STANDARD........................................................... 9

IV.   ARGUMENT .................................................................. 9

    A.    Plaintiffs Fail to Plead Falsity.......................................... 10

        1.    Statements About the Resumption of Oil Flow Are Not Pleaded as False (Statements 1, 2, 5, 6, and 8)................ 10

        2.    Statements About the Repair Status Are Not Pleaded as False (Statements 3 and 10).................................. 12

        3.    Projections About Future Production Are Protected by the Statutory Safe Harbor and Are Not Pleaded as False (Statements 4 and 9) .................................. 13

        4.    Sable's Opinions Are Not Actionable (Statements 7, 11, 12, 13)................................................... 14

    B.    Plaintiffs Fail to Plead Scienter........................................ 15

        1.    Plaintiffs Fail to Plead a Plausible Motive .............................. 16

        2.    Plaintiffs Fail Plead Specific Facts Showing Intent to Defraud or Deliberate Recklessness.................................. 16

3.      The Non-Culpable Inference Is More Compelling.................. 18

C.      Plaintiffs Fail to Plead Loss Causation ................................................ 19

1.      No Loss Causation from the Letter on May 28, 2025 ........................................................................ 20

2.      No Loss Causation from Court and Local Government Developments on May 28, June 3, and November 4, 2025............................................. 22

3.      No Loss Causation on October 31 and November 3, 2025 ........................................................................ 23

V.      CONCLUSION .................................................................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anshen v. Facebook*,
2017 WL 5635021 (C.D. Cal. Oct. 4, 2017) ........................................................ 19

*Blehm v. DC Shoes, Inc.*,
2006 WL 8455574 (S.D. Cal. Feb. 24, 2006) ...................................................... 17

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .............................................................................. 15

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................................. 1

*Espy v. J2 Glob.*,
99 F.4th 527 (9th Cir. 2024) ............................................................................... 21

*Hamano v. Activision Blizzard, Inc.*,
2019 WL 7882076 (C.D. Cal. Oct. 17, 2019) ............................................... 17, 18

*Hershewe v. JOYY Inc.*,
2021 WL 6536670 (C.D. Cal. Nov. 5, 2021) ...................................................... 25

*Hoang v. ContextLogic, Inc.*,
2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) .................................................... 23

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ......................................................................... 21, 24

*In re Cisco Sys. Inc. Sec. Litig.*,
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) .................................................... 14

*In re Cloudera, Inc. Sec. Litig.*,
121 F.4th 1180 (9th Cir. 2024) ..................................................................... 10, 25

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ............................................................................ 13

*In re Hansen Nat. Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) .............................................................. 17

LATHAM & WATKINS LLP
ATTORNEYS AT LAW

iii

CASE NO. 2:25-cv-06869
MOTION TO DISMISS AMENDED
CLASS ACTION COMPLAINT

*In re Herbalife, Ltd. Sec. Litig.*,
  2015 WL 12732428 (C.D. Cal. Mar. 27, 2015) ................................................ 21

*In re Illumina, Inc. Sec. Litig.*,
  2025 WL 2739655 (S.D. Cal. Sept. 26, 2025) .......................................... 19, 23

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) ................................................................... 9, 24

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ....................................................................... 15

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) .................................................................. 12, 18

*In re Sorrento Therapeutics, Inc. Sec. Litig.*,
  97 F.4th 634 (9th Cir. 2024) ......................................................................... 11

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) ....................................................... 14

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) ....................................................... 17

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) ........................................................................ 19

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ................................................................. 19, 24

*Markette v. XOMA Corp.*,
  2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) ............................................. 15

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ........................................................................ 9

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ................................................................. 19, 22

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ......................................................... 16, 18, 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ...................................................................................... 15

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ................................................................ 9, 19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ................................................ 10, 12, 13

*Prodanova v. H.C. Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) .......................................................... 16, 19

*Rok v. Identiv, Inc.*
    2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ........................................ 24

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ............................................................ 14

*Sneed v. Talphera, Inc.*,
    147 F.4th 1123 (9th Cir. 2025) .................................................... 10, 11

*Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
    2011 WL 1253250 (D. Ariz. Mar. 31, 2011) ................................... 12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ...................................................................... 16, 18

*Wallack v. Idexx Laboratories, Inc.*,
    2013 WL 1562523 (S.D. Cal. Apr. 11, 2013) .................................. 20

*Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*,
    321 F. Supp. 3d 1133 (C.D. Cal. 2018), *aff'd sub nom. Castro v.*
    *Mattel, Inc.*, 794 F. App'x 669 (9th Cir. 2020) .............................. 12

*Webb v. SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ................................................ 15, 16, 18

*Wenzel v. Semiconductor Mfg. Int'l Corp.*,
    2021 WL 12312024 (C.D. Cal. Nov. 18, 2021) .............................. 22

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) .......................................................... 10, 13

*Zamir v. Bridgepoint Educ., Inc.*,
    2018 WL 1258108 (S.D. Cal. Mar. 12, 2018) ................................. 17

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................ 25

# STATUTES

15 U.S.C.
    § 78j(b) ........................................................................................................ 9, 25
    § 78t .................................................................................................................. 25
    § 78u-4(b)(1) ...................................................................................................... 12
    § 78u-4(b)(1)(B) .................................................................................................. 9
    § 78u-4(b)(2)(A) .................................................................................................. 9
    § 78u-5(c)(1) ...................................................................................................... 13

49 U.S.C.
    § 60118, subd. (c)(1)(a) ...................................................................................... 5
    § 60118, subd. (d) ................................................................................................ 5

# RULES

Fed. R. Civ. P.
    9(b) ................................................................................................ 12, 17, 19, 20
    12(b)(6) ............................................................................................................... 9

# I.    INTRODUCTION

On May 19, 2025, Sable Offshore announced that it had begun flowing oil from its offshore platform near Santa Barbara, California to its onshore storage and processing facility.  This was an important step in Sable's ongoing effort to re-commercialize an oil field unit that had not transported petroleum for ten years.  While Sable celebrated its achievement in a press release, it also warned investors that it had *not yet* completed required testing for its onshore pipelines and had *not yet* sold commercial quantities of oil from the unit.  This press release included "Disclaimers" that there could be "no assurance" that Sable would achieve necessary approvals to allow the unit "to recommence sales."

Unfortunately, within weeks of issuing the press release, Sable encountered a series of unexpected "significant operational and federal, state, and local regulatory hurdles."  ¶ 25.  In a case involving the California Coastal Commission, a judge issued a preliminary injunction barring future development work (including repairs) on the onshore pipelines; in another case, a judge temporarily restrained the state fire marshal from issuing further authorizations for the onshore pipelines.  Then, in November, the Santa Barbara County Board of Supervisors voted against transferring permits from the unit's prior owner to Sable.  Sable advocated for its property rights in each of these cases and timely updated its investors about the results.  Unsurprisingly, the market reacted negatively to the potential for additional delays, costs, and litigation.

All these developments were bad news for Sable.  But the stock drops they precipitated were not securities fraud.  Securities laws do not "provide investors with broad insurance against market losses."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  Congress enacted the Private Securities Litigation Reform Act ("PSLRA") to bar cases like this one, where investors plead nothing more than fraud-by-hindsight in an effort to recover for the downside risk of their investments.  Here, Plaintiffs fail to meet the required elements of falsity, scienter, and loss causation.

***Falsity.*** Plaintiffs' theory is that Defendants "misled investors about the regulatory hurdles the company faced, the status of its repairs, and its timeline for restarting oil production and recommencing commercial sales." ¶ 37. But the Complaint fails to plead particularized facts establishing that any statement was false or misleading. The Complaint lists statements Defendants made throughout 2025 about developments in Sable's operations and ongoing legal proceedings, but the Complaint does not allege any facts that contradict these statements. Instead, Plaintiffs improperly strip statements from their context, ignore Sable's robust risk disclosures, and read words into the challenged statements to contort their meaning. Other statements can be dismissed for the additional (independent) reasons that they are forward-looking, puffery, or opinions that are not actionable.

***Scienter.*** Plaintiffs' allegations of scienter—that Defendants intended to deceive investors or acted deliberately recklessly—are thinner still. The Complaint's attempt to plead scienter is based on speculation in a dubious third-party media exposé alleging *potential* violations of SEC selective disclosure rules at the end of the Class Period, after which Sable's Board of Directors immediately appointed a Special Committee to investigate. This third-party accusation is insufficient as a matter of law to plead scienter, much less a "strong inference" of scienter, for unrelated statements made months earlier. The Complaint pleads no contemporaneous facts suggesting that any Defendant knew that a statement made was false or misleading, nor does it allege any motive to mislead the market. To the contrary, the pleaded facts show that Sable was engaging with regulators, litigating novel administrative issues, and adjusting its business strategy as circumstances evolved. Viewed holistically, the more cogent inference is non-culpable: Defendants believed in their plans, communicated risks to the market, and reported developments to investors as they occurred.

***Loss Causation.*** Plaintiffs also fail to plead loss causation with the necessary specificity. The Complaint pleads that Sable's stock price dropped after a variety of

regulatory, litigation, and political setbacks, not after any revelation of fraud.

Each of these pleading defects requires dismissal of the Complaint.

## II.    BACKGROUND

### A.    Sable Purchases and Repairs Oil-Related Assets in Santa Barbara

In February 2024, Sable bought three types of oil-related assets from Exxon Mobil located in or near Santa Barbara, California.  ¶ 22; Ex. 1 at 9.[1]

1. Offshore Leases and Other Assets (the Santa Ynez Unit): The Santa Ynez Unit consists of federal oil and gas leases, and includes three offshore drilling platforms in federal waters and related wells, pipelines, and facilities.  ¶¶ 9, 19; *see* Ex. 1 at 10.  These platforms extract oil from beneath the ocean floor.  ¶ 9; Ex. 1 at 10.

2. Onshore Storage & Processing (Las Flores Canyon): Oil produced from the Santa Ynez Unit offshore platforms can then flow via pipeline to the Las Flores Canyon onshore storage and processing facility.  ¶ 39; Ex. 1 at 10.

3. Onshore Pipelines (The Las Flores Pipelines): After processing at Las Flores Canyon, the onshore Las Flores Pipelines are intended to transport oil to inland pipeline infrastructure that further transports the oil to refineries.  ¶¶ 19, 47; Ex. 1 at 10-12.

These three assets are meant to work in concert with each other, as Sable repeatedly disclosed.  *See* ¶¶ 19, 21-22, 47; Ex. 1 at 9-15.

Exxon Mobil loaned Sable $623 million to fund this deal.  ¶ 23.  If Sable did not "Restart Production" by March 1, 2026, Exxon Mobil could retake ownership of the assets.  ¶¶ 22-24; *see also* Ex. 2 at 175 (defining "Restart Production" as "ninety (90) days after. . . production from [the Santa Ynez Unit] Wells").

After the deal closed, Sable undertook repair and maintenance work as needed on the assets.  ¶¶ 26, 34.  Most of Sable's work—and most of Plaintiffs' allegations about that repair work—focused on repairing the onshore pipelines.  *See* ¶¶ 30-34,

---

[1] Cites to "¶" refer to the Complaint, Dkt. 71, unless otherwise stated.  Cites to "Ex." refer to exhibits attached to the Declaration of Kristin N. Murphy.

52-55.  In 2015, one location along the onshore Las Flores Pipelines had ruptured resulting in an oil spill.  *See* ¶ 18.  After that event, the onshore pipelines' prior owner entered into a consent decree with the United States and the State of California ("Consent Decree").  *See id.* ¶¶ 39, 57; Ex. 3.  The Consent Decree provided a path for resuming petroleum transportation through the onshore pipelines.  Ex. 3 at 260-61, 275-282.  As part of Sable's effort to resume petroleum transportation consistent with the Consent Decree's requirements, Sable began repairing certain "anomalies"[2] along the pipelines.  *See* Exs. 3, 4.  Sable subsequently requested (and received) confirmation from Santa Barbara County that its anomaly repair work was covered by existing County permits and that Sable's work did "not . . . require Zoning Clearances."  Ex. 4 at 326-27; *see* ¶¶ 38, 53.

## B.    Legal Battles Emerge About Restarting the Onshore Pipelines

As Sable drew closer to resuming oil production at the Santa Ynez Unit, multiple organizations sued to try to prevent (or postpone) Sable's efforts.  ¶¶ 32-34.  Two cases are alleged in detail in the Complaint:

*The California Coastal Commission Litigation*[3]:    The California Coastal Commission issued notices starting in September 2024 claiming that Sable's repair and maintenance work violated the California Coastal Act.  ¶¶ 26-27.  On February 18, 2025, Sable sought declaratory relief that the Commission lacked authority to issue the notices because, in part, the Commission had previously delegated its authority to regulate these activities along the Las Flores Pipelines to Santa Barbara County, and the County had informed Sable that its "'anomaly repair work' . . . is authorized by [Sable's] existing permits."  ¶ 29; *see also* Ex. 4 at 286-87, 326-327.

---

[2] A pipeline anomaly "refers to a pipeline segment with some deviation from its original configuration."  Ex. 4 at 285.  The Consent Decree required (among other things) that the Las Flores Pipelines' owner "remediate . . . [certain] metal loss anomalies . . . within one year of discovery."  Ex. 3 at 262-63.

[3] *Sable Offshore Corp. v. California Coastal Comm'n*, No. 25CV00974 (Santa Barbara Cnty. Sup. Ct.) ("Coastal Commission Litigation").

_The State Waivers Litigation[4]_:  On April 15, 2025, environmental groups filed two lawsuits against the Office of the State Fire Marshal and others, naming Sable as the real party in interest.  _See_ ¶ 32; Exs. 5-6.  These plaintiffs alleged that the Fire Marshal improperly approved certain "State Waivers"[5] without allowing for sufficient public notice and without conducting an adequate environmental review under the California Environmental Quality Act ("CEQA").  ¶ 32; Exs. 5-6.  The plaintiffs asked the court to enjoin the restart of the onshore pipelines and require more public hearings and CEQA review.  Exs. 5-6.

When the _Los Angeles Times_ asked Sable for comment, a spokesperson stated Sable's "position [that] the lawsuits are without merit and will not impact the project."  ¶ 42.[6]

## C.    Sable Begins Flowing Oil and Updates Its Investors

On May 15, 2025, while the Coastal Commission Litigation and the State Waivers Litigation were in their early stages, Sable began flowing oil production from one of its offshore platforms to its onshore storage at Las Flores Canyon.  _See_ ¶¶ 38-39.  On May 19, 2025, Sable reported this in a press release with a headline starting:  "Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit."  ¶ 38; _see_ Ex. 7 at 428.  Sable reported the flow rate of oil and disclosed projections about the future of its wells.  Ex. 7 at 428.  When Sable resumed production, oil was flowing from the Santa Ynez Unit to Las Flores Canyon "at a rate of ~6,000 barrels of oil per day."  _Id._  Based on Sable's projections, Sable

---

[4] _Env't Def. Ctr v. Cal. Dep't of Forestry & Fire Prot._, No. 25CV02247 (Santa Barbara Cnty. Sup. Ct.); _Ctr. for Biological Diversity v. Cal. Dep't of Forestry & Fire Prot._, No. 25CV02244 (Santa Barbara Cnty. Sup. Ct.) ("State Waivers Litigation").

[5] The Consent Decree required the onshore pipelines' owner to apply for certain State Waivers, which modify generally applicable regulatory standards for hazardous materials pipelines, from the Fire Marshal before resuming petroleum transportation.  Ex. 3 at 260; 49 U.S.C. § 60118, subd. (c)(1)(a), (d).

[6] Plaintiffs also describe later-filed criminal and civil cases about alleged violations of the California Water Code.  ¶¶ 35-36.  Plaintiffs do not explain how these cases are relevant to their allegations.

"expect[ed] to fill the ~540,000 barrels of crude oil storage capacity at [Las Flores Canyon] by the middle of June 2025." *Id.*; ¶ 40. Sable also projected that its second and third offshore platforms would begin production in July and August 2025. Ex. 7 at 428.

In this May 19 press release, Sable also cautioned investors that the onshore Las Flores Pipelines were not yet commercially operable. *See id.* Sable reported that, while it had "completed its anomaly repair program on the Onshore Pipeline[s] as specified by the Consent Decree," ¶ 39, the onshore Las Flores Pipelines had not yet been fully tested, Ex. 7 at 428 (noting only "[s]even of the eight sections of the Onshore Pipeline[s] have been successfully hydrotested"). Sable also told investors that it expected to "complete the final hydrotest" at a future date, and expected to "recommence oil sales in July 2025." ¶ 40; Ex. 7 at 428.

Along with the updates, Sable's May 19 press release contained "Disclaimers" and explanations about how its forward-looking projections could turn out to be incorrect. Ex. 7 at 429-430. Among other risk factors, Sable noted that its results could differ from expectations based on "litigation," "regulatory changes and uncertainties," and its "ability to comply with laws and regulations applicable to [its] business." *Id.* at 429. The press release was clear that Sable had not begun selling oil produced by the Santa Ynez Unit, noting in the first "Disclaimer" titled "Restart Production" that "**[t]he [Santa Ynez Unit] assets discussed in this press release have not sold commercial quantities of [oil] since . . . June of 2015** . . ." *Id.*[7] The Disclaimers also made clear to investors that Sable might *never* be able to re-open the onshore pipelines and transport oil to the point of sale: "**There can be no assurance that the necessary permits will be obtained that would allow the Onshore Pipeline[s] to recommence transportation and allow the [Santa Ynez Unit] assets to recommence sales**." *Id.*

On May 22, 2025, Sable issued a prospectus for a secondary public offering,

---

[7] Emphasis added. All emphasis in quotations of the Complaint has been omitted.

which reiterated statements in the May 19 press release that Sable "initiated oil production from six wells. . . at [the Santa Ynez Unit]" and "began flowing oil production" to Las Flores Canyon. ¶¶ 44-46; *see* Ex. 8 at 443. The prospectus had additional warnings and cautionary statements about risks in Sable's forward-looking projections, and stated that Sable was *not yet* selling or transporting oil through its onshore pipelines. *See, e.g.*, Ex. 8 at 455 ("[T]here is no assurance that we will be successful in satisfying the remainder of the requirements to restart [the onshore pipelines] and recommence oil sales in a timely manner."), 456 ("We are subject to complex federal, state, local and other laws, regulations and permits that could adversely affect . . . our operations."), 458 ("Environmental groups may . . . prevent us from obtaining required approvals to recommence oil sales.").

### D.    Sable Suffers Unexpected Setbacks in Its Operational Progress

On May 23, 2025, Eleni Kounalakis, California Lieutenant Governor and chair of the California State Lands Commission, wrote a letter criticizing Sable. *See* ¶ 49. The letter expressed "serious concerns" that Sable's recent "activities do not constitute a resumption of commercial production" and that Sable had not completed "a full restart" of the Santa Ynez Unit. ¶ 51. It acknowledged that there was a "limited volume [of] oil flows" from wells and reported Kounalakis' understanding that these resulted from "well-testing procedures." *Id*. Nonetheless, she asserted that the May 19 press release was "misleading" and "inappropriate" because Sable had "not obtained the necessary regulatory approvals to fully resume operations." *Id*. The letter cautioned that failing to comply with regulations could "jeopardize the status of Sable's holdover lease" for the offshore Santa Ynez Unit facilities. *Id.*

In the ensuing days, Sable confronted setbacks in its ongoing litigation. On May 28, 2025, the court in the Coastal Commission Litigation issued a preliminary injunction that "stop[ped] Sable from continuing any development associated with the return to service of the Las Flores Pipelines." ¶ 53. On June 3, 2025, the court in the State Waivers Litigation issued a temporary restraining order that "prevent[ed]

1  [the Fire Marshal] from granting further authorizations and preventing Sable from

2  restarting use of the [Las Flores] [P]ipelines." ¶ 55.

3      **E.**    **A Short Seller-Affiliated Organization Publishes a Report and**

4               **Sable Issues a Press Release**

5      Five months later, on October 31, 2025, Hunterbrook Media[8]—an

6  organization that self-identifies as an affiliate of short sellers who seek to profit from

7  corporate misfortunes—published an article about Sable ("Hunterbrook Article").

8  ¶ 59; Ex. 9. The Hunterbrook Article published an allegedly leaked audio recording

9  involving Sable CEO James Flores and a "select group of investors" from October,

10  allegedly concerning Sable's need for an equity infusion, and argued that such

11  "selective disclosures potentially violate" SEC rules. ¶ 67. The Hunterbrook Article

12  disclaimed any "representation regarding the completeness or timeliness" of the

13  information it reported, and it noted that the information it sourced from third parties

14  "has not been independently verified, and its accuracy or completeness is not

15  guaranteed." Ex. 9 at 558.

16      On November 3, 2025, Sable issued a press release with three updates. *See*

17  ¶ 63; *see also* Ex. 10. *First*, Sable announced that its Board of Directors ("Board")

18  formed a Special Committee to "undertake an independent investigation of the

19  allegations contained in" the Hunterbrook Article. ¶ 63; Ex. 10 at 564. *Second*,

20  Sable announced that it amended the loan agreement with Exxon Mobil, and that the

21  amendment would be effective after Sable raised additional capital. *Id.* *Third*,

22  Plaintiffs allege Sable announced that it was "no longer pursuing use of the [onshore]

23  pipelines as its primary course for delivering oil," and would instead pursue an

24  "'Offshore Storage and Treating Vessel' strategy." ¶ 63. Plaintiffs allege that the

25

26

---

27  [8] Hunterbrook Media "generate[s] revenue" by sharing information with its affiliated
fund. *See* About Us, HUNTERBROOK MEDIA, https://hntrbrk.com/about-us/ (last

28  visited Nov. 27, 2025). Its affiliated fund can short sell based on that information,
"yielding significant gains from stock price fluctuations post-publication." *Id.*

1    next day, on November 4, 2025, the Santa Barbara County Supervisors voted to

2    "deny the transfer of permits from ExxonMobil to Sable."  ¶ 64.

3    ## III.    LEGAL STANDARD

4        "To plead a claim under § 10(b) and rule 10b-5, a plaintiff must allege: '(1) a

5    material misrepresentation or omission [falsity]; (2) scienter; (3) a connection

6    between the misrepresentation or omission and the purchase or sale of a security;

7    (4) reliance; (5) economic loss; and (6) loss causation.'"  *In re Nektar Therapeutics*

8    *Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022).   Under the PSLRA, "plaintiffs in

9    private securities fraud class actions face formidable pleading requirements to

10   properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6)."  *Metzler*

11   *Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008).

12   Plaintiffs must "specify each statement alleged to have been misleading [and] the

13   reason or reasons why the statement is misleading" and "state with particularity facts

14   giving rise to a strong inference that the defendant acted with the required state of

15   mind."  15 U.S.C. §§ 78u-4(b)(1)(B), (2)(A).   Similarly, Rule 9(b)'s "heightened

16   pleading requirements" mean that Plaintiffs must allege each element of falsity,

17   scienter, and loss causation with particularity.  *See Or. Pub. Emps. Ret. Fund v.*

18   *Apollo Grp. Inc.*, 774 F.3d 598, 604-05 (9th Cir. 2014).

19   ## IV.    ARGUMENT

20       The Complaint should be dismissed.  Plaintiffs abandoned the central theory

21   from the original complaint, that "Defendants represented that Sable Offshore Corp.

22   had restarted oil production off the coast of California when it had not." Dkt. 1 ¶ 44.[9]

23   Instead, the Complaint now chronicles a set of regulatory and litigation "hurdles"

24   and "setback[s]" Sable encountered after it began flowing oil from the Santa Ynez

25   Unit to storage tanks in May 2025.  ¶¶ 25, 37, 52-53.  But facing and promptly

26   reporting unexpected challenges and developments is not securities fraud.

---

[9] The Complaint also drops all claims under the Securities Act of 1933, and abandons
all claims against the underwriter banks from Sable's secondary public offering.
Although the banks are listed in the case caption, no allegations against them remain.

1

### A.    Plaintiffs Fail to Plead Falsity

2    The PSLRA "prescribes an 'exacting' standard, under which a 'litany of

3    alleged false statements, unaccompanied by the pleading of specific facts indicating

4    why those statements were false,' is insufficient." *In re Cloudera, Inc. Sec. Litig.*,

5    121 F.4th 1180, 1187 (9th Cir. 2024).  "For a statement to be false or misleading, it

6    must 'directly contradict what the defendant knew at that time' or 'omit[] material

7    information.'"  *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th

8    Cir. 2022).  The Court must also "look at 'the context surrounding the statement,'"

9    because "[a] reasonable investor cares about a statement's 'surrounding text,

10    including hedges, disclaimers, and apparently conflicting information.'"  *Sneed v.*

11    *Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025); *see also Police Ret. Sys. of St.*

12    *Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("[T]he context

13    in which the statements were made is key.").

14    Plaintiffs challenge thirteen statements made between May 19 and October

15    31, 2025.  None is actionable because Plaintiffs fail to plead particularized facts that

16    any of the thirteen statements was false or misleading.  Two additional statements

17    (Stmts. 4 and 9) fail to state a claim because they fall within the PSLRA's safe harbor

18    for forward-looking statements.  And five statements (Stmts. 6, 7, 11, 12, 13) are

19    statements of opinion or puffery that are not adequately pleaded as false.

20

21

      1.    Statements About the Resumption of Oil Flow Are Not Pleaded
            as False (Statements 1, 2, 5, 6, and 8)

22    The core of the Complaint relates to Sable's reporting on May 19, 2025 that

23    it had "restarted production at the Santa Ynez Unit" and had "begun flow[ing] oil

24    production to Las Flores Canyon," the onshore storage facility.  *See* ¶¶ 38, 39

25    (Stmts. 1, 2); *see also* ¶ 41 (Stmt. 5) (Sable "is proud to have safely and responsibly

26    achieved first production").  Three days later, on May 22, Sable reiterated in its

27    prospectus that it had "initiated oil production" from the Santa Ynez Unit and "began

28    flowing oil production to Las Flores Canyon" at a rate of about "6,000 barrels of oil

1    per day." *Id.* ¶ 46 (Stmt. 8).

2    Plaintiffs do not allege that any of these statements were inaccurate. There

3    are no allegations that oil was not flowing from Sable's offshore platform to onshore

4    storage, nor allegations that Sable's wells were turned off when Sable said they were

5    on. Instead, Plaintiffs contend that these statements were misleading because

6    "contrary to Defendants' representations, Sable had not resumed *commercial*

7    production." ¶ 48 (emphasis added). But the May 19 press release and May 22

8    prospectus never said that Sable had resumed "commercial production." *See*

9    Exs. 7-8. In fact, Sable said the opposite: "There can be no assurance that . . . the

10   [Santa Ynez Unit] assets" would "recommence sales." Ex. 7 at 429; *see* Ex. 8 at 455

11   ("[T]here is no assurance that we will . . . restart [the onshore pipelines] and

12   recommence oil sales in a timely manner.").

13   Even the title of Sable's press release made this clear by discussing

14   "*Anticipated* Oil Sales," not current sales. ¶ 38 (Stmt. 1) (emphasis added).

15   Plaintiffs cannot credibly contend that investors were tricked into thinking that Sable

16   had "resumed commercial production," ¶ 48, when Sable said clearly that the Santa

17   Ynez Unit had "not sold commercial quantities" of oil for ten years, Ex. 7 at 429.

18   Its May 22 prospectus repeated this message through robust risk factors identifying

19   events that might *delay* the start of commercial production. Ex. 8 at 455 ("The

20   timing of returning wells to production is subject to risks that may cause delays . . ."),

21   458 ("Environmental groups may initiate litigation and . . . delay or prevent us from

22   obtaining required approvals to recommence oil sales.").

23   The Ninth Circuit's recent reminder that a court must examine "the context

24   surrounding the statement" to "decide whether a misstatement or omission can

25   mislead" is especially apt here. *Sneed*, 147 F.4th at 1131. Examining the "hedges"

26   and "disclaimers," as the Court must do, reveals that the Complaint fails to plead

27   that any statements in the May 19 press release and May 22 prospectus about oil

28   flow were false or misleading. *Id.*; *see also In re Sorrento Therapeutics, Inc. Sec.*

*Litig.*, 97 F.4th 634, 641-42 (9th Cir. 2024) (affirming dismissal when "[a] fair reading of the press release and the articles" showed only promising experimental results).

Finally, the portion of the May 19 press release where CEO Flores said that Sable was "very grateful for the cooperation and partnership" of unspecified community members and regulators is not adequately pleaded as false.  *See* ¶ 41 (Stmt. 6), ¶ 48.  It is also inactionable corporate puffery.  Courts regularly dismiss securities fraud claims premised on optimistic statements that cannot be objectively verified—just like Flores's gratitude.  *See Intuitive Surgical*, 759 F.3d at 1060 ("'feel good' speak" is "non-actionable puffing").

### 2. Statements About the Repair Status Are Not Pleaded as False (Statements 3 and 10)

Similarly, Plaintiffs fail to plead any particularized facts contradicting statements in the May 19 press release and May 22 prospectus that Sable had "completed its anomaly repair program on the Onshore Pipeline[s] as specified by the Consent Decree."  ¶ 39 (Stmt. 3); ¶ 47 (Stmt. 11).  Plaintiffs plead the bare conclusion that "Sable had not finished its repairs."  ¶ 48.  That cannot satisfy the PSLRA's requirement that plaintiffs "specify . . . the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), by pleading specific facts to the contrary in compliance with Rule 9(b).  *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876-78 (9th Cir. 2012) (affirming dismissal for failure to plead falsity); *Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 2011 WL 1253250, at *24 (D. Ariz. Mar. 31, 2011) (dismissing claims for failure to plead falsity because a "[r]ote repetition of [a] conclusory allegation" that statements were false "does not satisfy the PSLRA's particularity requirement"); *see also Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1146 (C.D. Cal. 2018) (dismissing "blanket, conclusory" allegations of falsity), *aff'd sub nom. Castro v. Mattel, Inc.*, 794 F. App'x 669 (9th Cir. 2020).

3.    Projections About Future Production Are Protected by the Statutory Safe Harbor and Are Not Pleaded as False (Statements 4 and 9)

Plaintiffs next challenge three of Sable's projections in the May 19 press release and May 22 prospectus: (i) Sable's projection that it "expect[ed] to fill the ~540,000 barrels of crude oil storage capacity at [Las Flores Canyon] by the middle of June 2025"; (ii) that Sable expected to "recommence oil sales in July 2025"; and (iii) that Sable "expect[ed] to initiate production from the [two] additional [offshore platforms] . . . in July 2025 and August 2025." ¶ 40 (Stmt. 4), ¶ 46 (Stmt. 9). Plaintiffs contend that these projections "created the false impression that such completion dates were plausible," but were actually "implausible." ¶ 48.

Sable's projections are forward-looking statements that are not actionable under the PSLRA's statutory safe harbor. 15 U.S.C. § 78u-5(c)(1). The PSLRA provides that forward-looking statements cannot form the basis of a claim if either (A) the statements are identified as forward-looking and accompanied by meaningful cautionary language, *or* (B) "the plaintiff fails to show that the statement was made with actual knowledge that it was false or misleading." *Weston Fam. P'ship*, 29 F.4th at 620. Sable's projections fall within both provisions of the safe harbor.

A "projection is by definition a forward-looking statement." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). And Sable told investors that its "expect[ations]" are "'forward-looking statements' within the meaning of the [PSLRA]" in both its May 2025 press release and prospectus. Exs. 7-8. Sable's projections also included meaningful cautionary statements. Exs. 7-8. Sable stated that "regulatory changes," "litigation," "adverse publicity," and its "ability to comply with laws and regulations" could cause its "[a]ctual results [to] differ materially from those described in the forward-looking statements." Ex. 7 at 429; *see* Ex. 8 at 455. These cautionary statements foreclose liability under Ninth Circuit law. *See, e.g., Intuitive Surgical*, 759 F.3d at 1059 (affirming dismissal of forward-

looking statements accompanied by less specific warnings than Sable's).  Even absent this language, the safe harbor would still apply because Plaintiffs fail to plead "in 'great detail' specific facts sufficient to demonstrate a strong inference that defendants made the forward-looking statements . . . with actual knowledge that they were false."  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1071 (N.D. Cal. 2001); *see infra* § IV.B (failure to plead scienter).

Even without the safe harbor, claims based on Statements 4 and 9 would fail because Plaintiffs have not pleaded any contradictory facts.  Plaintiffs contend that Sable's projections were "implausible because Sable had not finished its repairs, obtained the necessary permits, or resolved outstanding litigation." ¶ 48.  Plaintiffs fail to specify what repairs were unfinished, what permits were missing, or how these related to the challenged projections.  Nor do Plaintiffs explain how "outstanding litigation" undermined Sable's projections. ¶ 48.  When Sable made its projections, no courts had issued rulings on the preliminary injunction or temporary restraining order that could interfere with Sable's future operations.  *See In re Cisco Sys. Inc. Sec. Litig.,* 2013 WL 1402788, at *6 (N.D. Cal. Mar. 29, 2013) (requiring challenged statements to be "false or misleading *when made*"); *see also* ¶¶ 52, 53, 55 (PI and TRO issued on May 28 and June 3).  Even if there were some aspect of the litigation or yet-to-be obtained permits or that might affect Sable's projections, the status of those events was public.  Ex. 8 at 445-448 (May 22, 2025 Prospectus discussing Coastal Commission and State Waivers Litigation); *id.* at 456 (disclosing that "[Sable] may . . . be unable to obtain required permits").  The Complaint cannot plead falsity based on information that the market already knew.  *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162-63 (9th Cir. 2009) ("It is pointless and costly to compel firms to reprint information already in the public domain." (citation omitted)).

4.    Sable's Opinions Are Not Actionable (Statements 7, 11, 12, 13)

The remaining statements—various Sable opinion statements—fare no better.

1    The Supreme Court set forth stringent pleading requirements when a plaintiff alleges

2    that an opinion statement is false or misleading.  *See Omnicare, Inc. v. Laborers*

3    *Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).  To challenge an

4    opinion statement, a plaintiff must allege: (1) that the speaker subjectively did not

5    hold the stated opinion at the time the statement was made; (2) that the statement

6    contained an embedded statement of fact that was false; or (3) the statement omitted

7    a material fact necessary not to make the opinion statement misleading.  *Id*.

8    at 186-91.  This is "no small task for an investor." *Id*. at 194.

9        Statements 7 and 11-13 represent Sable's opinions.  They discuss Sable's

10   assessment of pending litigation (Stmts. 7, 12), its belief that the repair work was

11   authorized by the County's permits (Stmt. 11), and a "belie[f] that the alleged

12   recording" published by Hunterbrook "was . . . altered" (Stmt. 13).  *See Markette v.*

13   *XOMA Corp.*, 2017 WL 4310759, at *4 (N.D. Cal. Sept. 28, 2017) (dismissing

14   opinion statements because they "reflect[d] the speaker's assessment of and

15   judgment about underlying circumstances").  Plaintiffs allege no facts about any

16   speaker's subjective knowledge, identified no false embedded facts within the

17   opinions, and have identified no omitted facts at all.  *See* ¶¶ 42, 48, 57-58, 61-62.

18   Because Plaintiffs fail to meet the pleading standard for opinions under *Omnicare*,

19   these statements should be dismissed.  *See City of Dearborn Heights Act 345 Police*

20   *& Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017).  And

21   even if the Court analyzes these statements under the PSLRA's standard for non-

22   opinion statements, Plaintiffs fail to plead facts that Statements 7 and 11-13 were

23   false or misleading.  *See* ¶¶ 42, 48, 57-58, 61-62.  Claims based on these statements

24   should be dismissed.

25   ### B.    Plaintiffs Fail to Plead Scienter

26       The Complaint should also be dismissed because it fails to plead scienter—

27   that is, "intent to deceive, manipulate, or defraud" or "deliberate recklessness."

28   *Webb v. SolarCity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018); *see In re NVIDIA Corp.*

1    *Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) ("[T]he standard for recklessness is

2    actually much closer to one of intent.").  Plaintiffs must plead a "strong inference"

3    of scienter that is "cogent and at least as compelling as any opposing inference of

4    nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314

5    (2007).  As the Ninth Circuit repeatedly confirms, "[t]he bar set by *Tellabs* is not

6    easy to satisfy." *Webb*, 884 F.3d at 855-56; *see Nguyen v. Endologix, Inc.*, 962 F.3d

7    405, 414 (9th Cir. 2020) ("The PSLRA's 'strong inference' requirement has teeth.").

8                    1.    <u>Plaintiffs Fail to Plead a Plausible Motive</u>

9            Far from pleading a "strong inference" of scienter, the Complaint lacks any

10   cognizable scienter allegations.  As an initial matter, the Complaint does not even

11   attempt to theorize why any Individual Defendant would be inclined to commit, or

12   benefit from, any fraud.  "[T]he lack of a plausible motive certainly makes it much

13   less likely that a plaintiff can show a strong inference of scienter." *Prodanova v.

14   H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021).  The Complaint

15   does not allege that any corporate insider stood "to gain a substantial profit by

16   engaging in deceptive behavior, such as selling shares before the company discloses

17   negative information." *Id.* at 1107.  It alleges no stock sales whatsoever,

18   performance-based compensation, or other benefit tied to any Individual Defendant.

19   Because the Complaint fails to allege a plausible motive, it must be dismissed unless

20   it "otherwise asserts compelling and particularized facts showing fraudulent intent

21   or deliberate recklessness." *Id.* at 1108.  But the Complaint fails to do that, either.

22                    2.    <u>Plaintiffs Fail Plead Specific Facts Showing Intent to Defraud</u>
                            <u>or Deliberate Recklessness</u>
23

24          Instead of pleading particularized allegations supported by confidential

25   employee witness statements, internal reports, or other contemporaneous facts, the

26   Complaint provides boilerplate, generic allegations that could be copied from any

27   complaint.  Specifically, Plaintiff claims that the Individual Defendants were

28   "involved in . . . disseminating the false and misleading statements" and "intended

to deceive Plaintiffs." ¶¶ 13, 81. That falls below the pleading standard even if Plaintiffs were not required to comply with Rule 9(b). Without a cogent theory tying these generalized allegations to intent to mislead or deliberate recklessness for specific statements, "[i]nferring scienter from these sparse allegations would require impermissible speculation." *Hamano v. Activision Blizzard, Inc.*, 2019 WL 7882076, at *3 (C.D. Cal. Oct. 17, 2019) (Wilson, J.).

Fairly read, the face of the Complaint asserts just one theory of scienter: that Hunterbrook's allegation that Flores "*potentially* violate[d] Regulation FD" by "regularly shar[ing] material non-public information with selective investors" is "supportive of scienter." ¶ 67 (emphasis added). A full-page block quote from the Hunterbrook Article does not come close setting forth "particular facts giving rise to a strong inference of scienter" for "each statement" and "*each* defendant." *Blehm v. DC Shoes, Inc.*, 2006 WL 8455574, at *7 (S.D. Cal. Feb. 24, 2006). Plaintiffs do not allege that the Hunterbrook Article matched up in any way to the alleged misstatements earlier in the class period. ¶ 67. Plaintiffs also make no attempt to articulate how Flores, or any Defendant, might benefit from an alleged sharing of non-public information. *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1169 (C.D. Cal. 2007) ("[S]trongly weighing *against* scienter is Plaintiffs' failure to indicate how [individual officer defendants] would benefit personally from the alleged scheme." (emphasis in original)).

Moreover, no case law supports that an amorphous third-party accusation of "potential" violations of SEC rules—from an author who made "[n]o representation regarding the completeness or timeliness of this information," Ex. 9—is sufficient to plead scienter with particularity. Even if the allegations of SEC rule violations came from the SEC itself, that would not be enough. *See Zamir v. Bridgepoint Educ., Inc.*, 2018 WL 1258108, at *17 (S.D. Cal. Mar. 12, 2018) ("[S]everal district courts have found the existence of an investigation, standing alone, insufficient to support scienter."); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162

1    (C.D. Cal. 2007) ("[T]he mere existence of [an] investigation cannot support any

2    inferences of wrongdoing or fraudulent scienter on the part of [a] company or its

3    senior management."). And even if the law were otherwise, the earliest "potential"

4    rule violation alleged in the Hunterbrook Article is September 29, 2025—nearly *four*

5    *months* after all of the challenged statements (save for Sable's statement about the

6    Hunterbrook Article itself). *See* ¶ 67. That Sable's Board immediately formed a

7    Special Committee to investigate the allegations in the Hunterbrook Article further

8    cuts against scienter.

9        Even "speculation" about unpleaded scienter theories cannot save Plaintiffs'

10   Complaint. *See Hamano*, 2019 WL 7882076, at *3. Plaintiffs may argue that one

11   can infer that Statements 1-6 (announcing the flow of oil and projections) were made

12   with scienter because Defendants wanted to raise Sable's stock price before a public

13   offering. *See* ¶ 44. Even if Plaintiffs had pleaded this theory of scienter, it would

14   be foreclosed by Ninth Circuit law. Allegations of "[r]outine corporate objectives

15   such as the desire to obtain good financing" are "not 'specific' or 'particularized'"

16   enough to establish a strong inference of scienter. *Webb*, 884 F.3d at 856. "[T]o

17   hold otherwise would support a finding of scienter for any company that seeks to

18   enhance its business prospects." *Rigel*, 697 F.3d at 884; *Webb*, 884 F.3d at 856

19   ("Surely every company that goes public wants to . . . maintain a high share price

20   afterward in order to finance acquisitions and expand.").

21           3.    The Non-Culpable Inference Is More Compelling

22       When viewed as a whole, the "plausible, nonculpable explanations" far

23   outweigh any possible inference of fraud. *Tellabs*, 551 U.S. at 324. Plaintiffs ask

24   this Court to accept that Sable intentionally misled investors about its progress,

25   timeline, and hurdles it was facing. ¶ 37. But the Ninth Circuit has rejected a theory

26   of scienter based on allegations that defendants knew a milestone was unachievable,

27   or at least unachievable "on the timeline defendants were telling the market," in

28   order to "keep the stock price high for a time and then face the inevitable fallout."

1    *Nguyen*, 962 F.3d at 415.  That theory "does not make a whole lot of sense." *Id.*

2       Even when viewed in the most favorable light, Plaintiffs' pleaded facts show

3 that Sable believed in its plans but faced disappointing, unexpected third-party

4 developments while working in a highly regulated, politically polarizing industry.

5 Sable adjusted its strategy in response to evolving circumstances, as it openly

6 engaged with multiple regulators and litigated novel administrative issues.  At each

7 step, Sable kept investors informed, including advising potential investors of the

8 risks inherent to its business.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407,

9 1425 (9th Cir. 1994) ("[D]etailed risk disclosure[s] . . . negate[] an inference of

10 scienter.")).  Plaintiffs' theory that these facts show an intent to mislead the market

11 is "divorced from common experience." *Prodanova*, 993 F.3d at 1107.

12       **C.**     **Plaintiffs Fail to Plead Loss Causation**

13       Plaintiffs also fail to plead specific facts showing loss causation.  "Rule 9(b)

14 applies to all elements of a securities fraud action, including loss causation." *Anshen*

15 *v. Facebook*, 2017 WL 5635021, at *4 (C.D. Cal. Oct. 4, 2017) (Wilson, J.) (quoting

16 *Apollo*, 774 F.3d at 605)).  Where, as here, Plaintiffs try to show loss causation

17 through a series of purported corrective disclosures, Plaintiffs must plead with

18 particularity that "the defendant's fraud was '*revealed* to the market and *caused* the

19 resulting losses.'" *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014)

20 (emphases in original); *see also Mineworkers' Pension Scheme v. First Solar Inc.*,

21 881 F.3d 750, 753 (9th Cir. 2018) (plaintiffs must "trac[e] the loss back to the very

22 facts about which the defendant lied").

23       The Complaint fails under these standards.  As a threshold matter, the

24 Complaint does not "specify which misrepresentations the [] disclosures supposedly

25 correct, leaving it to Defendants and this Court to guestimate the connection," which

26 on its own is "grounds for dismissal." *In re Illumina, Inc. Sec. Litig.*, 2025 WL

27 2739655, at *3 (S.D. Cal. Sept. 26, 2025); *see* ¶¶ 49-65.

28

There are also fundamental flaws with Plaintiffs' five alleged corrective disclosure dates, which are May 28, June 3, October 31, November 3, and November 4, 2025.  Except for November 3, the Complaint does not allege that Sable issued corrective statements on any of these dates.  It alleges instead that third parties made unproven accusations directed at Sable or the public learned of litigation and local government developments about Sable, and Sable's stock price dropped "on this news."  ¶¶ 54, 56, 60, 65.  None of these dates qualifies as a loss-causing event that could support allegations of securities fraud.

### 1.    No Loss Causation from the Letter on May 28, 2025

Plaintiffs allege that the "truth [began] to emerge" on May 28, 2025, when the public allegedly learned the contents of the May 23 letter from Lieutenant Governor Kounalakis to Sable expressing "serious concerns" about Sable's May 19 press release.  ¶¶ 50-51.[10]  This was not a corrective disclosure.

While critical in tone, this letter did not correct any of Sable's prior statements in the May 19 press release or May 22 prospectus about developments at the Santa Ynez Unit (*see* Stmts. 1-3, 5, 8), Sable's expectations for the future (*see* Stmts. 4, 9), or the fact that Sable had completed anomaly repairs on the onshore pipelines (Stmts. 5, 10).  The letter expressed displeasure with Sable's level of communication with the State Lands Commission, questioned "Sable's intentions" and "lack of understanding," and urged that failure to comply with regulatory requirements could "weigh significantly into considerations on the future assignment of the [Santa Ynez Unit] leases."  ¶ 51.  But the Complaint does not explain as a matter of logic how such criticisms or warnings *corrected* any prior statements in the May 19 press

---

[10] Plaintiffs have not adequately pleaded when the letter became public, such that it could have affected the stock price on May 28.  The Complaint alleges that "on information and belief" the letter was published on May 28, citing no source.  ¶ 50.  "Allegations based on information and belief usually do not satisfy the degree of particularity required under Rule 9(b)." *Wallack v. Idexx Laboratories, Inc.,* 2013 WL 1562523, at *6 (S.D. Cal. Apr. 11, 2013) (internal quotation and citation omitted).

release or May 22 prospectus, as opposed to raising concerns about the reported development that Sable had resumed production at the Santa Ynez Unit. *See Espy v. J2 Glob.*, 99 F.4th 527, 541 (9th Cir. 2024) (third party report's "generalized criticism" of defendants' accounting could not be a corrective disclosure when "untethered from [plaintiff's] allegations in the second amended complaint"); *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12732428, at *7 (C.D. Cal. Mar. 27, 2015) (letters from senator to government "communicating concerns about Herbalife's practices" did not "constitute a corrective disclosure").

Kounalakis claimed that Sable's May 19 press release was "misleading" in "impl[ying] that Sable has restarted operations at the Santa Ynez Unit," because she was informed that Sable's activities were "the result of well-testing procedures" and "not . . . a resumption of commercial production or a full restart of the [Santa Ynez Unit]." ¶ 51. But the press release never stated that there was a "full" restart or resumption of commercial production at the Santa Ynez Unit. *See supra* at II.C, IV.A. Among other things, it disclosed that only *one* of the Santa Ynez Unit's *three* offshore platforms (Platform Harmony) was producing oil, and that it was producing oil "from six wells" of the "32 producing wells at Platform Harmony." Ex. 7 at 428. The press release further disclosed (in sections that the Complaint omits) that Sable "had been *testing* wells on Platform Harmony throughout May 2025" with "remaining Platform Harmony wells projected to be *tested*." *Id.* (emphasis added). In other words, the May 19 press release itself made clear that there had not been a full commercial resumption of production at the Santa Ynez Unit. That the Kounalakis letter reiterated steps required "prior to" full "restart of operations," ¶ 51, provided no new information to the market, *cf. In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) ("A corrective disclosure, though, must by definition reveal new information to the market that has not yet been incorporated into the price.").

2. <u>No Loss Causation from Court and Local Government Developments on May 28, June 3, and November 4, 2025</u>

The Complaint fares no better in trying to turn negative developments on May 28, June 3, and November 4 into corrective disclosures. The Complaint pleads that on these dates, the public learned of court rulings and a county supervisor vote affecting Sable. But a "simple revelation of 'bad news' does not establish loss causation." *Wenzel v. Semiconductor Mfg. Int'l Corp.,* 2021 WL 12312024, at *10 (C.D. Cal. Nov. 18, 2021). Court rulings and a vote by a county board are the ultimate examples of unpredictable events. Plaintiffs cannot rely on these developments to meet their burden to prove that the "defendant's misstatement, as opposed to some other fact, *foreseeably* caused the plaintiff's loss." *First Solar*, 881 F.3d at 753 (emphasis added and internal citation omitted). It was not foreseeable that courts would rule or supervisors would vote as they did, nor do Plaintiffs plead any facts that these events corrected prior Sable statements.

*May 28, 2025*: The Complaint alleges that, on the same day the Kounalakis letter allegedly became public, two articles publicized the court's decision to issue a preliminary injunction in the Coastal Commission Litigation. ¶¶ 52-54. The Complaint itself confirms that neither the preliminary injunction nor the articles discussing it are corrective disclosures. As the Complaint pleads, the injunction was a "setback" in Sable's ongoing "legal battle with the state regulator." ¶ 52; *see* ¶¶ 26-31. It "*stop[ped]* Sable from *continuing* any development." ¶¶ 53 (emphases altered). But it by no means revealed that "Sable Offshore's claim to have restarted production in California was false." ¶ 52. Nor did the issuance of the preliminary injunction reveal as false Sable's statement that it "completed its anomaly repair program on the Onshore Pipeline[s]." *See* Statements 3, 10. As the Complaint pleads, the preliminary injunction "could impact Sable's ability to do *future repairs*." ¶ 52 (emphasis added).

*June 3, 2025*: For similar reasons, a court's issuance on June 3 of a temporary

restraining order in the State Waivers Litigation was not a corrective disclosure. ¶ 55. As the Complaint alleges, the temporary restraining order was merely another adverse development in ongoing litigation between Sable and environmental groups that could lead to lost profits and delays. ¶¶ 32-34. But "[t]o be corrective, the disclosure must 'relate back to the misrepresentation and not to some other negative information about the company.'" *Hoang v. ContextLogic, Inc.*, 2023 WL 6536162, at *27 (N.D. Cal. Mar. 10, 2023).

The Complaint does not plead what alleged misstatements the temporary restraining order corrects. ¶¶ 55-56. But it is apparent that the court ruling against Sable's "claims that the [repair and maintenance] work was authorized under existing permits"—a position that the Complaint admits had "followed confirmation from the County," ¶ 53—did not render false any of Sable's prior statements that it believed the State Waivers lawsuits were "without merit" and that all work had been permitted. *See* Statements 7, 8.

*November 4, 2025*: Finally, the Santa Barbara County Supervisors' vote on November 4, 2025 "to deny the transfer of permits from ExxonMobil to Sable" was not a corrective disclosure. ¶ 64.[11] Plaintiffs in no way allege what earlier misstatements this event supposedly corrected, nor how a vote by government actors could correct a company's statements.

### 3. No Loss Causation on October 31 and November 3, 2025

The news events on October 31 and November 3 were also not corrective disclosures. These came in the last week of the alleged class period, but Plaintiffs fail to specify which challenged statements in the prior six months were corrected. *See Illumina*, 2025 WL 2739655, at *3 (Plaintiffs must make "some attempt to actually link each of the [] corrective disclosures to each Defendant's prior

---

[11] The Complaint fails to plead the timing of the County Supervisors' vote on November 4. ¶ 64. The Complaint also fails to plead that the temporary restraining order was publicized before market close on June 3.

1    misstatement on that topic instead of forcing the Court . . . to speculate how the

2    jigsaw puzzle connects in Plaintiffs' mind.").

3        On October 31, Hunterbrook purported to publish a leaked recording of a call

4    involving CEO Flores and certain investors, in which Flores allegedly discussed

5    Sable's need to raise up to $200 million in additional equity by 2025.  ¶ 59; Ex. 9

6    at 540-542, 552.  The thrust of the Hunterbrook Article was allegations of "selective

7    disclosure from Sable" to certain investors in "potential" violation of SEC rules.

8    *Id.* at 540, 544-545.

9        The Hunterbrook Article is not alleged to have "corrected" any prior

10   misstatements, and it cannot support a theory of loss causation.  The Ninth Circuit

11   has repeatedly rejected corrective disclosures based on third-party articles, like this

12   one, that "included disclaimers from the authors stating that they made 'no

13   representation as to the accuracy or completeness of the information set forth in this

14   article.'"  *BofI*, 977 F.3d at 797; *see* Ex. 9 (same language by Hunterbrook).  It is

15   "not plausible that the market would perceive" the Hunterbrook Article as "revealing

16   false statements," because the nature of the piece "means that investors would have

17   taken its 'contents with a healthy grain of salt.'"  *Nektar*, 34 F.4th at 840 (citing *BofI*,

18   977 F.3d at 797).

19       As the Complaint pleads, the Company's Board promptly formed a Special

20   Committee to investigate the allegations in the Hunterbrook Article on November 3.

21   The act of doing so did not "effectively confirm[]" the Hunterbrook allegations, ¶ 63,

22   nor does it qualify as a disclosure corrective of anything.  It is well-established in

23   the Ninth Circuit that the "announcement of an investigation, without more, is

24   insufficient to establish loss causation," because "it simply puts investors on notice

25   of a *potential* future disclosure of fraudulent conduct."  *Loos*, 762 F.3d at 890; *see*

26   *Rok v. Identiv, Inc.* 2017 WL 35496, at *17-18 (N.D. Cal. Jan. 4, 2017) (disclosure

27   that company had "formed a Special Committee to investigate" a former employee's

28   complaint "does not support loss causation because it merely announced an internal

1    investigation").  In any event, the Complaint pleads no facts tying an investigation

2    into Hunterbrook's allegations to any prior statements about operational activity at

3    the Santa Ynez Unit or any of the other challenged statements.

4         Nor did the purported disclosure of Sable's alleged financing needs in the

5    Hunterbrook Article on October 31, or Sable November 3 press release about

6    amending the Exxon Mobil loan once additional financing was raised, reveal any

7    fraudulent activity to the market.  As the Complaint pleads, the reason for additional

8    equity needs was delays to the project.  *See* ¶ 59.  The Complaint fails to plead how

9    these changing circumstances corrected any prior alleged misstatements.  Similarly,

10   Sable's statement in the November 3 Press Release that it was "actively evaluating

11   and pursuing" an offshore storage and treating strategy for the Santa Ynez Unit,

12   Ex. 10 at 564, did not correct any prior statements.   Sable had previously told

13   investors that offshore storage and treating was one of two options it was

14   considering, the other being transport via onshore pipelines.  Ex. 11 at 570.  The

15   announcement that Sable now viewed offshore storage and treating as its "main

16   path" was a change in business strategy, not a revelation of fraud.  *See Cloudera*,

17   121 F.4th at 1189 ("Statements made at the end of the class period about the

18   challenges [the company] had faced" "do not by themselves 'make the earlier,

19   cheerier statement a falsehood.'").

20   **V.    CONCLUSION**

21        Despite being "long on sound, fury, and speculation," the Complaint is "short

22   on specifics."  *Hershewe v. JOYY Inc.*, 2021 WL 6536670, at *8 (C.D. Cal. Nov. 5,

23   2021).   Quoting Sable's litigation adversaries, political critics, and short-seller

24   skeptics cannot make up for a failure to plead particularized facts showing that any

25   statement was intentionally false or misleading.[12]   The Complaint should be

26   dismissed.

27   _____

28   [12] Because Plaintiffs fail to plead a primary violation of section 10(b), the section
     20(a) claims also fail.  *See* 15 U.S.C. § 78t; *Zucco Partners, LLC v. Digimarc Corp.*,
     552 F.3d 981, 990 (9th Cir. 2009).

1 Dated: November 24, 2025

Respectfully submitted,

2 **LATHAM & WATKINS LLP**

3 By: */s/ Kristin N. Murphy*

4 Kristin N. Murphy (SBN 268285)
650 Town Center Drive, 20th Floor

5 Costa Mesa, CA 92626
Telephone: +1.714.540.1235

6 Email: kristin.murphy@lw.com

7 Colleen C. Smith (SBN 231216)
12670 High Bluff Drive

8 San Diego, CA 92130
Telephone: (858) 523-5400

9 Email: colleen.smith@lw.com

10 *Counsel for Defendants*
*Sable Offshore Corp., James C.*

11 *Flores, and Gregory D. Patrinely*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **<u>CERTIFICATE OF COMPLIANCE</u>**

2    The undersigned counsel of record for Defendants Sable Offshore Corp.,

3  James C. Flores, and Gregory D. Patrinely certifies that this brief contains 25 pages,

4  which:

5    \_\_ complies with the word limit of L.R. 11-6.1.

6    <u>X</u> complies with the page limit set by court order dated August 4, 2025 (Dkt. 10).

7

8  Dated: November 24, 2025        By: *<u>/s/ Kristin N. Murphy</u>*

9              Kristin N. Murphy (SBN 268285)
             650 Town Center Drive, 20th Floor

10             Costa Mesa, CA 92626
             Telephone: +1.714.540.1235

11             Email: kristin.murphy@lw.com

12             Colleen C. Smith (SBN 231216)
             12670 High Bluff Drive

13             San Diego, CA 92130
             Telephone: (858) 523-5400

14             Email: colleen.smith@lw.com

15             *Counsel for Defendants*

16             *Sable Offshore Corp., James C.*
             *Flores, and Gregory D. Patrinely*

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW