Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY JOHNSON, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SABLE OFFSHORE CORP., JAMES C. FLORES, GREGORY D. PATRINELY, J.P. MORGAN SECURITIES LLC, JEFFERIES LLC, TD SECURITIES (USA) LLC, THE BENCHMARK COMPANY, LLC, JOHNSON RICE & COMPANY, L.L.C., PEP ADVISORY LLC, ROTH CAPITAL PARTNERS, LLC, and TUOHY BROTHERS INVESTMENT RESEARCH, INC., <br><br> Defendants. | No. 2:25-CV-06869-SVW <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> CLASS ACTION <br><br> JURY TRIAL DEMANDED |

Lead Plaintiff Jimmy Cleveland White and named plaintiffs Tracy Johnson and Jake Stewart ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Sable Offshore Corp. ("Sable" or the "Company"), media reports, regulatory documents, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

## I. NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Sable securities between May 19, 2025 and November 4, 2025, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## II. JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

---

[1] Unless otherwise specified, all emphasis is added.

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    **PARTIES**

6.    Lead Plaintiff Jimmy Cleveland White purchased Sable securities during the Class Period and was economically damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference herein.

7.    Named plaintiff Tracy Johnson purchased Sable securities during the Class Period and was economically damaged thereby. Her PSLRA certification was previously filed with the Court and is incorporated by reference herein.

8.    Named plaintiff Jake Stewart purchased Sable securities during the Class Period and was economically damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference herein.

9.    Defendant Sable operates in the offshore drilling business and seeks to extract oil from the Santa Ynez field in federal waters off the Coast of California. Pertinent to those activities is an offshore facility owned by Defendants at Las Flores Canyon in Santa Barbara County, California. Sable is incorporated in Delaware, and its principal executive offices are located at 845 Texas Avenue, Suite 2920, Houston, Texas 77002.

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

10.     Sable's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "SOC".

11.     Defendant James C. Flores ("Flores") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") at all relevant times.

12.     Defendant Gregory D. Patrinely ("Patrinely") served as the Company's Chief Financial Officer ("CFO") at all relevant times.

13.     Defendants Flores and Patrinely are collectively referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law

3

principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Sable under *respondeat superior* and agency principles.

17.    Sable and the Individual Defendants are collectively referred to as the "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A. Background

18.    On May 19, 2015, an underground oil pipeline in Santa Barbara County ruptured, spilling over 120,000 gallons of crude oil. Over 20,000 gallons of crude oil spilled into the Pacific Ocean, creating an offshore oil slick covering more than nine square miles and killing hundreds of marine wildlife. The oil spill was California's worst since the 1960s.

19.    ExxonMobil had used the ruptured pipeline to help transport oil from their offshore oil platforms – located 5 to 10 miles off the coast of Santa Barbara County – to inland refineries. Without a pipeline to transport the oil, ExxonMobil was forced to halt its operations at the three offshore oil platforms.

20.    In 2018, a Santa Barbara County jury found Plains All American Pipeline L.P. – the operator of the ruptured pipeline – guilty of a felony and eight misdemeanors in connection with its failure to properly maintain the pipeline.

21.    In 2020, Plains entered into a consent decree with the U.S. Department of Justice, Environmental and Natural Resources Division, the U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration, the EPA, CDFW, the California Department of Parks and Recreation, the California State Lands Commission, the California Department of

Forestry and Fire Protection's Office of the State Fire Marshal, Central Coast Regional Water Quality Control Board, and Regents of the University of California (the "Consent Decree").

22.     After the Santa Barbara County Board of Supervisors refused to grant ExxonMobil permits to transport the oil by truck, an ExxonMobil subsidiary acquired the still-damaged oil pipeline in October 2022.

23.     Sable, led by CEO Jim Flores, was initially formed as several special purpose entities for the purpose of evaluating the opportunity to acquire the offshore oil platforms and the onshore processing facility and pipelines (the "SYU Assets").

24.     In November 2022, Exxon agreed to sell the SYU Assets to Sable for $643 million. The deal closed in February 2024.

25.     To fund the purchase, Exxon extended a $623 million term loan to Sable. The loan required Sable to pay a percent annual interest on January 1 of each year, but allowed Sable to elect to add any unpaid interest to the outstanding principal of the loan. Crucially, if Sable failed to restart oil production by January 1, 2026, ExxonMobil could retake ownership of the SYU Assets without any compensation to Sable.

26.     In December 2024, Sable entered into an amended loan agreement whereby it must restart production by March 1, 2026 and refinance the loan within 240 days of first production.

27.     Sable faced significant operational and federal, state, and local regulatory hurdles before it could restart oil production. Sable onshore pipelines, alone, are regulated by California Coastal Commission; the California Department of Conservation; the California Geologic Energy Management Division, the California Department of Fish and Wildlife, including the Office of Oil Spill

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Prevention and Response; the California Department of Forestry and Fire Protection, Office of the State Fire Marshal; the California Department of Parks and Recreation (State Parks); the Central Coast Regional Water Quality Control Board; the Central Valley Regional Water Quality Control Board; and the State Lands Commission.

Final Development Permits

28.    In March 2024, Sable filed applications to the Santa Barbara County Planning Commission seeking the transfer of Final Development Permits ("FDPs") from Exxon to Sable. The FDPs, initially issued by the County between 1987 and 1993, authorized the operation and maintenance of the SYU Assets.

29.    The Planning Commission approved the transfer of the FDPs to Sable in October 2024. However, environmental groups appealed that decision to the County's Board of Supervisors (the "Board"). In a February 2025 hearing, the Board vote on the transfer was a 2-2 tie. The Board required majority support to take any action, which meant the transfer was not approved.

30.    On May 8, 2025, Sable filed a federal lawsuit in the Central District of California against the County and the Board seeking to force the County to transfer the FDPs to Sable.

31.    On September 12, 2025, Judge Dolly M. Gee denied in part Sable's motion for summary judgment, holding that a majority of the Board was required to approve the transfer to of FDPs to Sable. *See Sable Offshore Corp. v. Cnty. of Santa Barbara*, No. CV 25-4165-DMG (AGRx), 2025 WL 2674260, at *1 (C.D. Cal. Sept. 12, 2025). Judge Gee also ordered the Board to hold another vote within 60 days.

32.    On November 3, 2025, the Board voted 4-to-1 to deny the transfer of the FDPs to Sable.

6

<u>California Coastal Commission</u>

33.   In September 2024, the California Coastal Commission (the "CCC")
issued a Notice of Violation, finding that Sable was engaging in construction
activities without a permit in violation of the California Coastal Act and Santa
Barbara County's Local Coastal Program.

34.   On February 11, 2025, the CCC issued another Notice of Violation
concerning Sable's unpermitted offshore development activity. After Santa
Barbara County declined to act on the CCC's notices, Sable told the CCC that its
work on the pipeline does not require any further authorization from the CCC. In
response, on February 16, 2025, the CCC sent a letter to Sable warning them to
"immediately cease all unpermitted development activities."

35.   On February 18, 2025, after Sable failed to respond, the CCC issued
an Executive Director Cease and Desist Order and a notice of intent to commence
cease and desist order, restoration order, and administrative order proceedings.
Sable ignored the order and continued its unpermitted activities.

36.   On February 18, 2025, Sable filed a petition against the CCC in Santa
Barbara County Superior Court for declaratory relief and damages (Case No.
25CV00974) (the "CCC Action").

37.   On April 10, 2025, the CCC issued a cease and desist order requiring
Sable to halt all repair and maintenance work that requires coastal development
permits, a restoration order, and an $18 million administrative penalty against
Sable (the "April 10 Orders"). The April 10 Orders required Sable to submit
complete coastal development permit applications within 30 days for (i) all
unpermitted development conducted onshore and offshore, and (ii) prospective
authorization for any proposed development activities that have not yet been
completed but that are contemplated in Sable's current plans.

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

38.     On April 16, the CCC filed a cross-complaint against Sable requesting a temporary restraining order to restrain further violation of the April 10 Orders and for issuance of an order to show cause why a preliminary injunction should not issue.

39.     On May 28, 2025, Judge Thomas P. Anderle granted the CCC's application for a preliminary injunction, which enforces the April 10 cease and desist order and enjoins Sable's violations of the Coastal Act. Judge Anderle found that the CCC made a prima facie showing of violation of the Coastal Act and of the cease and desist order. Specifically, the CCC presented evidence (i) "of grading and removal of materials, reconstruction of a 'structure,' and change in the intensity of the use of land with respect to Sable's repair and maintenance activities; (ii) "that Sable has not obtained a CDP for Sable's repair and maintenance activities"; (iii) "it issued a [cease and desist order] prohibiting further work with respect to Sable's repair and maintenance activities"; and (iv) "that Sable has continued its repair and maintenance activities notwithstanding the CDO." Judge Anderle also found that the balance of harms weighed in favor of an injunction despite Sable's argument that granting a temporary restraining order "would cause substantial economic loss to Sable."

40.     On October 15, 2025, Judge Thomas Anderle ruled in favor of the CCC, finding that the CCC had not abused its discretion in issuing the April 10 Orders. Judge Anderle found that, contrary to Sable's assertions, Sable's development work was not authorized by a 1986 permit from the County and that the CCC had the authority to issue a cease and desist order given the County's failure to act on Sable's violations.

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Office of State Fire Marshal

41.    Pursuant to the Consent Decree, Sable also required approval from the California Office of State Fire Marshal ("OSFM") before restarting use of the onshore pipelines.

42.    The Consent Decree requires OSFM approval of restart plans for each of the Pipelines (the "Restart Plans") prior to returning the onshore pipelines to service. Prior to the potential restart of operations, OSFM will review the startup plan and perform on-site inspections of the pipelines to verify compliance to the plan. After the pipeline operator fulfills all other necessary requirements, OSFM finalizes the specific requirements of the restart plan, ensuring they meet or exceed those mandated by the Consent Decree.

43.    On August 1, 2024, OSFM granted Sable's request to extend the deadline to complete its implementation of the Restart Plans to July 1, 2025. In granting the extension, OSFM stated that "[i]t is imperative that [Sable] successfully completes the proposed retrofit construction by this new deadline."

44.    On December 17, 2024, issued certain state waivers for the onshore pipelines.

45.    On March 13, 2025, California State Fire Marshal Daniel Berlant stated at a town hall that permitting and violation issues with all other state agencies must be resolved before his office will sign off on a restart. "They need to agree that all rules have been followed," he said, according to the Santa Barbara Independent. OSFM's website also states that "Sable must also secure all necessary approvals from all other state and federal agencies before putting the pipeline into operation."

46.    In April 2025, the Center for Biological Diversity brought an action against the California Department of Forestry and Fire Protection in Santa Barbara

County Superior Court (Case Nos. 25CV02244 and 25CV02247), alleging that OSFM failed to conduct an adequate environmental review of Sable's pipeline work. On June 3, 2025, Judge Donna Geck issued a temporary restraining order preventing OSFM from granting further authorizations and prohibiting Sable from restarting use of the pipelines.

47.    On July 18, 2025, Judge Geck issued a preliminary injunction "enjoin[ing] the restart of the Las Flores Pipelines . . . until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart." Environmental groups can then file another challenge within that 10-day period.

48.    On September 11, 2025, Sable submitted a Restart Plan to OSFM.

49.    On October 22, 2025, OSFM sent a letter to Sable stating that ***Sable had still not completed the required repairs to the damaged pipeline***. The letter stated that "OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart. . . . The above findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law."

<u>Santa Barbara County Criminal Charges</u>

50.    On September 16, 2025, the Santa Barbara County's District Attorney charged Sable with five felony violations of the California Water Code (the "Criminal Complaint") for allegedly discharging dredged or fill material into creeks and wetlands that are considered "waters of the United States." The Criminal Complaint also charged Sable with 16 misdemeanor violations of the California Fish and Game Code. The alleged criminal activity occurred between October 2024 and April 2025.

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Water Quality Control Board Complaint

51.     On October 3, 2025, the California Regional Water Quality Control Board filed a civil complaint (the "Water Board Complaint") against Sable alleging "numerous violations of its obligation to notify the Regional Water Board of proposed waste discharges and obtain the appropriate regulatory requirements, thereby preventing the Regional Water Board from assuring best management practices are employed to avoid, minimize and mitigate impacts to water quality."

52.     The Water Board Complaint details Sable's repeated refusal to cooperate with the regulator or comply with applicable regulations. In August 2024, Sable assured the Water Board that it "conducts environmental surveys for all work locations as part of its site evaluation and understands the regulatory requirements and processes for water qualification certificates involving both U.S. and state waters."

53.     The Water Board informed Sable in November 2024 that it was conducting pipeline maintenance without the required permit. In December 2024, after Sable failed to respond, the Water Board issued directive identifying the specific site where Sable was engaged in unpermitted pipeline repairs. That same day, the Water Board issued a Notice of Violation for Unauthorize Discharge of Waste to Sable. In January 2025, after Sable still failed to respond, the Water Board issued an order requiring Sable to submit "a detailed assessment" of Sable's excavation work and how it could affect the quality of state and federal waters. Sable eventually sent "piecemeal and belated responses" to the notices in March and April 2025, providing "incomplete information with little meaningful detail regarding the extensive excavation, repair and backfilling conducted as part of the Repair Plan." The Water Board determined that Sable's response "made clear it did not perform meaningful assessment of the environmental impact of its excavation campaign."

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

54.    The Water Board Complaint states that Sable management intentionally misled the Water Board in order to impede the permitting process: "At the time of its inadequate submissions in March and April of 2025, Sable management knew full well additional excavation and repair work would be ongoing. However, instead of identifying sites where Sable was planning to carry out activities resulting in earthen waste discharges that could affect water quality as required by the Section 13267 Order, Sable chose to limit its response to work done as of the March 10, 2025 due date of the Technical Report (which ironically was not met). This cynical approach to the Regional Water Board's regulatory permitting requirements was obviously taken to avoid any potential delay in getting the sites permitted and any associated Regional Water Board review that might impact the July 1, 2025 deadline for Sable's completion of repairs imposed by the Fire Marshal."

55.    On July 24, 2025, the Water Board issued a Notice of Violation for Failure to Report that "identified twenty-seven sites where Sable's excavation and repair activities could affect water quality not previously addressed." The Water Board determined that "there is no excuse for Sable's failure to timely provide a Technical Report with this information in response to the Section 13267 Order."

56.    Sable responded to the July notice on August 13, 2025, admitting there were "nine sites requiring waste discharge requirements that it had previously either overlooked or made incorrect determinations regarding the impact of the excavations on water quality."

57.    As described below, Sable repeatedly misled investors about the regulatory hurdles the company faced, the status of its repairs, and its timeline for restarting oil production and recommencing commercial sales.

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## B. Materially False and Misleading Statements Issued During the Class Period

58.    On May 19, 2025, before the market opened, the Company issued a press release entitled "Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in June 2025." (the "May 19 Press Release").

59.    The May 19 Press Release stated that, "as of May 15, 2025, [Sable] has restarted production at the Santa Ynez Unit ("SYU") and has begun flowing oil production to Las Flores Canyon ("LFC") and that "Sable has now completed its anomaly repair program on the Onshore Pipeline as specified by the Consent Decree."

60.    The May 19 Press Release further stated that "Sable expects to fill the ~540,000 barrels of crude oil storage capacity at LFC by the middle of June 2025 and subsequently recommence oil sales in July 2025."

61.    The May 19 Press Release also quoted Defendant Flores as stating that "[Sable Offshore] is proud to have safely and responsibly achieved first production at the Santa Ynez Unit" and is "very grateful for the cooperation and partnership from our local community and regulatory bodies as we seek to provide energy security to the State of California."

62.    In a statement to the Los Angeles Times, published on May 20, 2025, a spokesperson for Sable, stated "It's our position the lawsuits are without merit and will not impact the project."[2] In a statement to Courthouse News, published on

---

[2] https://www.latimes.com/california/story/2025-05-20/offshore-oil-production-resumes-santa-barbara

May 23, 2025, the same spokesperson asserted that "All the work Sable has performed is fully permitted and approved."[3]

63.    The statements in ¶¶ 58-62 were materially false and misleading at the time they were made because, contrary to Defendants' representations, Sable had not restarted oil production. Further, Sable's completed and ongoing work was neither fully permitted nor fully approved. Regulators had repeatedly informed Sable that it lacked the necessary permits to complete its repairs or restart production and that the pending lawsuits concerning Sable's unpermitted work were both meritorious and consequential to Sable's ability to restart production. Similarly, Defendant Flores's statement thanking "regulatory bodies" for their "cooperation and partnership" created the false impression that Sable had been cooperating with regulators. Finally, Defendants' statement that Sable expects to fill the ~540,000 barrels of crude oil storage capacity at LFC by the middle of June 2025 and subsequently recommence oil sales in July 2025 created the false impression that such completion dates were plausible. Those dates were implausible because Sable had not finished its repairs, obtained the necessary permits, or resolved outstanding litigation – all of which were necessary steps to restarting production and recommencing sales

64.    After the release of the May 19 Press Release, Sable stock climbed from a closing price of $28.86 per share on May 16, 2025 to $33.02 per share on May 19, 2025, a 14.4% climb in share price.

65.    Defendants then used the share price appreciation following the May 19 Press Release to conduct a secondary public offering at a higher offering price per share than would have otherwise been possible.

---

[3] https://courthousenews.com/one-decade-after-disaster-drilling-returns-to-santa-barbara/

66.    On May 22, 2025, Sable filed with the SEC a prospectus on Form 424B5 (the "Prospectus"), specifying that the Company was offering 8,695,654 shares of common stock at $29.50 per share, higher than the last closing price before the May 19 press release.

67.    The Prospectus stated, in relevant part, that "[o]n May 15, 2025, Sable initiated oil production from six wells on Platform Harmony at SYU and began flowing oil production to Las Flores Canyon ("LFC") at an initial rate of approximately 6,000 barrels of oil per day." The Prospectus further stated that "Sable expects to initiate production from the additional 44 wells on Platform Heritage and the additional 26 wells on Platform Hondo in July 2025 and August 2025, respectively."

68.    The Prospectus also stated that Sable had completed its repairs to the damaged onshore pipelines: "On May 18, 2025, Sable completed anomaly repairs on Line 324 (formerly known as Line 901), which extends from the Las Flores Station on the California coast to the Gaviota Pump Station in Santa Barbara County, California, and Line 325 (formerly known as Line 903), which extends from the Gaviota Pump Station to Pentland Station in Kern County, California, the point of sale. With the completion of such repairs, ***Sable has now completed its anomaly repair program on the Onshore Pipeline*** as specified by a Consent Decree . . . ." The Prospectus further stated that "[u]nder the terms of the Senior Secured Term Loan, the restart of production on May 15, 2025 is expected to trigger the springing maturity date resulting in the loans thereunder maturing on January 9, 2026."

69.    The statements in ¶¶ 67-68 were materially false and misleading at the time they were made because, contrary to Defendants' representations, Sable had not restarted oil production. Further, Sable's completed and ongoing work was

neither fully permitted nor fully approved. Regulators had repeatedly informed Sable that it lacked the necessary permits to complete its repairs or restart production and that the pending lawsuits concerning Sable's unpermitted work were both meritorious and consequential to Sable's ability to restart production.

## C. **THE TRUTH BEGINS TO EMERGE**

70.    On May 23, 2025, Eleni Kounalakis, the Lieutenant Governor of California and chair of the California State Lands Commission wrote a letter (the "May 23 Letter") to Sable's Vice President of Environmental & Government Affairs, Steve Rusch.

71.    Upon information and belief, the May 23 Letter was not published on the internet for the general public to view until May 28, 2025.

72.    The May 23 Letter stated the following, in part:

I am writing to express my serious concerns regarding Sable Offshore Corp.'s [May 19 Press Release, as discussed above], which you sent to Commission staff on the same day. ***The press release appears to mischaracterize the nature of recent activities, causing significant public confusion and raising questions regarding Sable's intentions***. ***Your press release also implies that Sable has restarted operations at the Santa Ynez Unit (SYU). However, Commission staff has informed me that the limited volume oil flows are the result of well-testing procedures required by the Bureau of Safety and Environmental Enforcement prior to restart.*** These activities ***do not constitute a resumption of commercial production*** or a full restart of the SYU. Characterizing testing activities as a restart of operations ***is not only misleading but also highly inappropriate – particularly given that Sable has not obtained the necessary regulatory approvals to fully resume operations at SYU***.

I am also concerned that as Exxon's designated operator, Sable was required to communicate with Commission staff before initiating any oil flow through the offshore pipeline, even in this limited capacity. ***Sable's failure to clearly and timely communicate these activities to the Commission undermines trust of Sable's motives, demonstrates***

16

*a lack of understanding of the significant concerns held by many regarding the resumption of activities*, and raises serious questions about Sable's willingness to be a transparent operator.

Commission staff's letter dated May 9, 2025, *made clear that failure to comply with applicable regulatory requirements or to resolve any outstanding regulatory issues could constitute a breach of the Commission's leases*. Any attempt to restart commercial operations at the SYU without final regulatory approvals *may place the company in violation of its lease terms and jeopardize the status of Sable's holdover lease*.

As Chair of the State Lands Commission, it is my expectation that Sable will resolve all pending legal challenges and litigation with other state agencies prior to the full restart of operations. *The willful disregard for the directives of regulatory agencies does not engender trust or confidence in Sable's willingness to serve as a responsible partner, and could weigh significantly into considerations on the future assignment of the SYU leases from Exxon to Sable*.

73.     The May 23 Letter also warned that "Sable was required to communicate with Commission staff before initiating any oil flow through the offshore pipeline, even in this limited capacity" and that "[a]ny attempt to restart commercial operations at the SYU without final regulatory approvals may place the company in violation of its lease terms and jeopardize the status of Sable's holdover lease." Lt. Governor Kounalakis added that "it is my expectation that Sable will resolve all pending legal challenges and litigation with other state agencies prior to the full restart of operations. *The willful disregard for the directives of regulatory agencies does not engender trust or confidence in Sable's willingness to serve as a responsible partner, and could weigh significantly into considerations on the future assignment of the SYU leases from Exxon to Sable*."

74.     On May 28, 2025, Judge Anderle issued a preliminary injunction in the CCC Action enjoining Sable from continuing its unpermitted maintenance and repair activities on the onshore pipelines. Judge Anderle held that the CCC made

a prima facie showing that Sable had violated the Coastal Act and the CCC's April 10 cease and desist order.

75.    On May 28, 2025, during market hours, KEYT, a local news organization in Santa Barbara, California (a subsidiary of News-Press & Gazette Company), published an article entitled "Santa Barbara County Judge issues preliminary injunction against Sable Offshore as the company announces completion of pipeline tests." The article stated the following, demonstrating that Sable Offshore's claim to have restarted production in California was false:

> Sable Offshore announced that it has completed all required hydrotesting of onshore pipelines necessary to transport oil across Santa Barbara County, ***but the Houston-based company suffered a setback regarding repair work on along the coast in court Wednesday***.

> The announcement of pipeline work comes as representatives of Sable Offshore and the California Coastal Commission met Wednesday about the pending litigation between the two entities.
>
> *        *        *
>
> Wednesday morning, Santa Barbara County ***Judge Thomas Anderle granted a preliminary injunction requested by the California Coastal Commission against Sable Offshore for alleged violations of The California Coastal Act***.

> The injunction ***could impact Sable's ability to do future repairs or maintenance until its legal battle with the state regulator is settled***. Linda Krop with the Environmental Defense Center ***questioned Sable's assertions that it has completed all necessary repairs in an interview Wednesday with Your News Channel.***

> She shared that this is ***the first time a judge has ruled that Sable Offshore is violating the law instead of state regulators and environmental groups***.

> Krop, whose organization opposes restarting oil production and has been involved in multiple lawsuits related to the project, ***says Sable's***

*attorney told the judge that granting the injunction would harm the company*.

"If Sable really has completed all the repairs, they would be fine with this injunction," argued Krop. "The injunction only applies to repairs on the pipeline. So why does Sable care about this injunction if it's really completed the repairs?"

*    *    *

A California Coastal Commission spokesperson sent a statement in response to Your News Channel's inquiries stating, "*Sable has consistently ignored California law, as confirmed by the court's decision today [Wednesday] to halt work on this aging oil pipeline in Santa Barbara. This fly-by-night oil company has repeatedly abused the public's trust, racking up millions of dollars in fines and causing environmental damage along the treasured Gaviota Coast*."

76.    On May 28, 2025, during market hours, Investing.com published an article entitled "Sable Offshore Corp stock sinks following court injunction." It stated the following:

> Shares of Sable Offshore Corp (NYSE:SOC) tumbled 14% after the *California Coastal Commission was granted a preliminary injunction against the company's pipeline repair and maintenance activities within the coastal zone in unincorporated Santa Barbara County*. The court's decision, which aligns with the Coastal Act's *strict regulations on coastal development, has raised concerns about potential project delays and additional costs for Sable Offshore.*
>
> *The legal proceedings stem from allegations that Sable Offshore Corp did not obtain the necessary coastal development permits (CDPs) for their ongoing repair and maintenance work on the Las Flores Pipelines*. Despite Sable's claims that the work was authorized under existing permits from the County of Santa Barbara, *the court found a prima facie case for the Coastal Commission, indicating that the activities constituted a violation of the Coastal Act*.
>
> The injunction *stops Sable from continuing any development* associated with the return to service of the Las Flores Pipelines CA-324 and CA-325 unless they secure a new, operative CDP or other form of Coastal Act authorization. The company had resumed repair

19

and maintenance activities earlier in February 2025, following confirmation from the County that the activities were authorized under existing permits.

The court's ruling highlights the ongoing tension between regulatory compliance and operational progress within the energy sector. Sable Offshore Corp's stock movement reflects investor concerns over the potential impact of regulatory hurdles on the company's ability to complete essential maintenance work and resume operations.

77.    On this news, the price of Sable stock fell by $5.04 per share, or 15.3%, on heavy trading volume to close at $27.89 per share on May 28, 2025.

78.    On June 3, 2025, Santa Barbara County Superior Court Judge Donna Geck issued a temporary restraining order preventing OSFM from granting further authorizations and preventing Sable from restarting use of the pipelines. Sable had opposed the temporary restraining order. Steve Rusch, Sable's Vice President, Regulatory & Environmental Affairs, stated in a sworn declaration to the court that Sable is "required to meet specific deadlines in order to thereafter conduct operations at the Pipelines, which is critical to the livelihood of [Sable's] business," and that "*[i]f a TRO is issued, Plaintiffs will be forced to shut down repair and maintenance activities, which will require Plaintiffs to incur significant economic damages.*" Rusch further swore that issuing the TRO would force Sable "to absorb costs amounting to approximately $423,100 per day, or approximately $2,500,000 per week" and "lay off approximately 75 workers."

79.    On this news, the price of Sable stock fell by $5.14 per share, or 17.6%, on heavy trading volume to close at $24.04 on June 3, 2025.

80.    On May 27, 2025, Sable filed a Form 8-K with the SEC. The 8-K, signed by Defendant Patrinely, stated that Sable "successfully hydrotested all segments of Line 324 and Line 325 (collectively, the 'Onshore Pipeline'), satisfying the final operational condition to restart of the Onshore Pipeline as

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

outlined in the Consent Decree" and that "no more repairs are required to the Onshore Pipelines prior to restart."

81.    On May 28, 2025, the Santa Barbara Independent quoted Steve Rusch as stating "Today's court ruling was about the maintenance and repair of the Las Flores Pipeline System. As of this morning, that work, including all hydrotesting of the lines, has been successfully completed." Rusch — who previously worked for ExxonMobil, the prior owner of the plant — added, "We look forward to overturning today's decision, though it has no bearing on Sable's plans to recommence oil sales by July." On June 3, 2025, Rusch stated to news outlet Noozhawk that "[t]he court decision does not impede Sable's preparations for restarting the flow of oil. Restart of the Las Flores Pipeline System is governed by a federal consent decree."

82.    The statements in ¶¶ 80-81 were materially false and misleading at the time they were made because, contrary to Defendants' representations, the preliminary injunction prevented Sable from restarting the pipelines, and the statement is directly contradicted by Sable's representations to the Superior Court that the preliminary injunction would cause significant economic damage to Sable by delaying the restart of the pipelines. Additionally, Sable had not (and still has not) completed its required repairs to the onshore pipelines as required by the Consent Decree.

83.    On October 15, 2025, Judge Thomas Anderle ruled in favor of the CCC in the CCC Action, finding that the CCC had not abused its discretion in issuing the April 10 Orders. Judge Anderle found that, contrary to Sable's assertions, Sable's development work was not authorized by a 1986 permit from the County and that the CCC had the authority to find that Sable was in violation

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of the Coastal Act and to issue a cease and desist order given the County's failure to act on Sable's violations.

84. On this news, the price of Sable stock fell by $3.56 per share, or 20.1%, to close at $14.13 on heavy trading volume on October 15, 2025.

85. On October 15, 2025, Sable issued a press release on its website entitled "Sable Offshore Corp. Statement on California Coastal Commission Litigation." The press release stated, in relevant part, that "**the ruling would have no impact on the resumption of petroleum transportation through the Las Flores Pipeline System**. Additionally, oil and gas production from the federal Santa Ynez Unit and the flow of petroleum from the Santa Ynez Unit to the Las Flores Canyon processing facilities or to a potential Offshore Storage & Treating Vessel ("*OS&T*") would be unaffected by rulings in the Coastal Commission litigation." (emphasis in original).

86. The October 15, 2025 press release also quoted Defendant Flores stating, in relevant part: "Although the tentative ruling is disappointing, it has **no impact** on Sable's business strategy of either resuming petroleum transportation through the Las Flores Pipeline System or selling its Santa Ynez Unit production through an OS&T." (emphasis in original)

87. The statements in ¶¶ 85-86 were materially false and misleading at the time they were made because, contrary to Defendants' representations, the October 15 ruling prevented Sable from performing the necessary repairs and maintenance work required to restart oil production and resume commercial sales.

88. On October 31, 2025, Hunterbrook Media ("Hunterbrook") reported that Defendant Flores "told a select group of investors in October that the company would likely have to raise up to $200 million in equity by the end of 2025." The company had not publicly disclosed that Sable required an imminent equity raise,

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

which would dilute the value of existing shares. Sable's need to raise additional equity contradicted Defendants' repeated claims that regulatory and judicial orders concerning the Company's ability to make repairs and restart production would have an effect on the Company's ability to timely resume commercial sales. Hunterbrook published a 38-minute recording of the conversation between Defendant Flores and investors. On the recording, Flores stated "We're supposed to be on production in September, right? We're not gonna be on production in September, so we're gonna have to bridge a little to the financing. We'll need some type of injection somewhere in the $100 to $150 to $200 million dollar range."

89.    On this news, the price of Sable Offshore stock fell by $2.37 per share, or 18.5%, on heavy trading volume to close at $10.46 on October 31, 2025.

90.    On October 31, 2025, the Company falsely denied the Hunterbrook report. Sable stated to Hunterbrook that "based upon information provided to us we believe that the alleged recording was either AI generated or otherwise altered."

91.    The statement in ¶ 90 was materially false and misleading at the time it was made because, contrary to Defendants' representations, the Hunterbrook report accurately reported that Defendant Flores was selectively providing material non-public information to investors and that Sable imminently needed to raise to hundreds of millions of dollars to continue operations.

92.    On November 3, 2025, the Company issued a press release effectively confirming the Hunterbrook report. The press release disclosed that Sable had entered into an amended loan agreement with ExxonMobil that would become effective once the company raises at least $225 million in equity contributions. The press release further stated that the amendment extends the maturity date of the loan by one year, to March 31, 2027, and increases the annual interest rate for the loan from ten percent to fifteen percent. Further, the Company announced that "the

Company's Board of Directors formed a Special Committee of independent directors to undertake an independent investigation of the allegations contained in an October 31, 2025 report published by Hunterbrook, which contains audio recording of a call that took place in October 2025." Finally, the press release stated that Sable was no longer pursuing use of the pipelines as its primary course for delivering oil, and that it would instead pursue an "Offshore Storage and Treating Vessel" strategy.

93.    On November 4, 2025, the Santa Barbara County Supervisors voted 4-1 to deny the transfer of permits from ExxonMobil to Sable. Supervisor Steve Lavagnino, who previously voted in favor of transferring the permits to Sable in February 2025, voted against the transfer. Lavagnino explained that he changed his mind because of Sable's repeated refusal to cooperate with regulators and follow the law – which Sable had repeatedly, and falsely, denied. As the Santa Maria Sun reported:

> "[T]he landscape has changed dramatically since February," he said during the hearing. "To me, the following are facts, not emotions: Since February, Sable has been charged criminally 21 times, with five of those charges being felonies."
>
> He clarified that although September's charges from the Santa Barbara County District Attorney's Office have not been adjudicated, "they are still part of the evidence" that puts Sable's ability to comply with county standards while operating the Santa Ynez Unit into question.
>
> Among the 21 criminal counts, the five felony violations are centered on three waterways—Asphaltum Creek, Nojoqui Creek, and Arroyo Quemado—which the county District Attorney accused Sable of knowingly polluting during excavation and repair work tied to its Santa Ynez Unit efforts.
>
> "I have many friends in the oil industry, and I will continue to support efforts to access our natural resources, but it has to be done responsibly

24

by operators who put safety above profits," Lavagnino said. "***The evidence in this case is overwhelming. There is something wrong with the strategy of Sable's leadership. Trying to simply bulldoze through the permitting process has not been helpful and is not the way we expect businesses in Santa Barbara County to conduct themselves***."

94.    On this news, the price of Sable stock fell by $3.19 per share, or 30.5%, on heavy trading volume to close at $7.27 on November 3, 2025. The price of Sable stock continued to fall on November 4, 2025, as the market digested the news, falling an additional $1.37 per share, or 18.8%, on heavy trading volume to close at $5.90 on November 4, 2025.

95.    During the Class Period, as detailed herein, Defendants' false representations and omissions of material facts about Sable's business caused Sable stock to trade at artificially inflated prices and deceived purchasers of the securities. As Defendants' fraud and the previously-concealed, material, adverse information was revealed to the market, the price of Sable stock fell precipitously.

96.    Defendants' false and misleading statements concealed material risks from the public, including the truth concerning Sable's compliance with applicable laws and regulations, Sable's progress towards restarting oil production and commercial sales, Sable's cooperation with regulators, and Sable's financial position. Through Defendants' and other public disclosures, the market became aware of these previously undisclosed risks and/or these risks materialized. As a result, the price of Sable stock fell precipitously.

**D.  Additional Facts Supportive of Scienter**

97.    The Company's sole asset is the SYU Assets. The Company has no revenue or cash flows from its operations, nor will it generate any revenue or cash flows from its operations until it restarts production of the SYU Assets. The Company has experienced losses from operations and has had negative cash flows

from operations since its inception and will continue to incur losses until it can restart production of the SYU Assets. Accordingly, the Company is entirely reliant on its cash on hand and capital raises to continue its operations. The Company reported in its 2024 Form 10-K that it had approximately 161 employees.

98. Defendants were under existential pressure to rush Sable's repair and maintenance work to meet its July 1, 2025 deadline to complete its implementation of the Restart Plans with OSFM. Sable ignored its legal obligations under state laws and the notices from regulators of Sable's violations.

99. Defendants were also pressured by Sable's cash crunch. Without revenue, Sable was forced to repeatedly raise funds from investors in order to continue its operations. Defendants misled investors about the true state of Sable's operations and regulatory compliance to artificially inflate its stock price at the time of its equity raises.

100. Defendants faced further existential pressure from the term loan with ExxonMobil. If Sable failed to restart production and repay the loan by the term loan deadlines, ExxonMobil could foreclose on substantially all of Sable's assets and the assets of its subsidiaries. Once Sable declared that it had restarted oil production on May 15, 2025, Sable reported that the loan would mature on January 9, 2026.

101. Defendant Flores has decades of experience in the oil production business and has a comprehensive understanding of Sable's regulatory hurdles and operations. Indeed, Sable's term loan agreement from ExxonMobil requires that Defendant Flores remain "directly and actively involved in the day-to-day management" of Sable. The Company's 2025 Proxy Statement stated: "The board of directors believes that Mr. Flores' knowledge of the daily operations of and familiarity with the Company and industry put him in the best position to provide

leadership to the board of directors on setting the agenda, emerging issues facing the Company and the upstream oil and gas industry, and strategic opportunities."

102.    The Wall Street Journal reported that Flores's venture paid $204 million in cash out of the total $1.1 billion Sable was expected to pay to ExxonMobil for the SYU Assets. The Wall Street Journal reported that Flores would "make tens of millions of dollars if he can" restart the commercial oil sales.

103.    Prior to forming Sable, Flores served as CEO and President of Sable Permian Resources, LLC ("Sable Permian"), where Patrinely served as CFO. Sable Permian filed for voluntary bankruptcy in June 2020.

104.    The October 31 Hunterbrook report disclosed that Defendant Flores regularly shared material non-public information with selective investors. Such selective disclosures potentially violate Regulation FD, which is designed to ensure fair disclosure. Hunterbrook reported leaked group chats among Sable investors:

> "I spoke to Jim this morning. An announcement is coming today after market closes. It could be an 8K or press release," Mickelson wrote to a group of Sable investors, in one example, on September 29. Later that afternoon, just after 5pm, Sable filed the 8-K — a form companies use to disclose material events to the public — disclosing its new strategy to circumvent California regulators.
>
> The stock initially shot up 8% in after-hours trading after the news, before closing down the following day.
>
> . . .
>
> This incident wasn't necessarily an aberration.
>
> "I believe this beyond any doubt: These guys definitely have first hand communication from Jim and they are being fed information from Jim and giving it to other group members. There is a hierarchy to the insiders," a member of the chat opined to Hunterbrook, referring to certain other members of the group whom he did not name. "There are people that are very close to Jim and Jim is giving real information to. Then there's people that think they're close to Jim who he is giving fraudulent information to."

. . .

Numerous messages from recent months reviewed by Hunterbrook show Mickelson claiming to have frequently communicated with Flores, receiving details about company developments from the CEO — whom he sometimes called "BJF" for "Big Jim Flores."

## V.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

105.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

106.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

107.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

108.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

109.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

110.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

111.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

112.    Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

113.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants

omitted material information in their Class Period statements in violation of a duty
to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

114.   Plaintiffs repeat and realleges each and every allegation contained
above as if fully set forth herein.

115.   This Count is asserted against Defendants is based upon Section 10(b)
of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder
by the SEC.

116.   During the Class Period, Defendants, individually and in concert,
directly or indirectly, disseminated or approved the false statements specified
above, which they knew or deliberately disregarded were misleading in that they
contained misrepresentations and failed to disclose material facts necessary in
order to make the statements made, in light of the circumstances under which they
were made, not misleading.

117.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that
they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material
facts necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a
fraud or deceit upon plaintiffs and others similarly situated in connection with
their purchases of the Company's securities during the Class Period.

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

118.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

119.   The Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiffs and the Class.

120.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

121.   Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

122.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

123.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

124.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

125.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

126.   As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly

any public statements issued by the Company which had become materially false or misleading.

127.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

128.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)    awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

## **<u>JURY TRIAL DEMANDED</u>**

2          Plaintiffs hereby demand a trial by jury.

3

4     Dated: December 8, 2025          **THE ROSEN LAW FIRM, P.A.**

5                                      *<u>/s/ Daniel Tyre-Karp</u>*
                                       Daniel Tyre-Karp (pro hac vice)
6                                      275 Madison Ave., 40th Floor
                                       New York, NY 10016
7                                      Telephone: (212) 686-1060
                                       Facsimile: (212) 202-3827
8
                                       Email: dtyrekarp@rosenlegal.com
9

10

11                                     Laurence M. Rosen (SBN 219683)
                                       355 South Grand Avenue, Suite 2450
12                                     Los Angeles, CA 90071
                                       Telephone: (213) 785-2610
13                                     Facsimile: (213) 226-4684
14                                     Email: lrosen@rosenlegal.com

15
                                       *Lead Counsel for Plaintiffs*
16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS