1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LATHAM & WATKINS LLP
Colleen C. Smith (SBN 231216)
  *colleen.smith@lw.com*
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400

Kristin N. Murphy (SBN 268285)
  *kristin.murphy@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235

*Counsel for Defendants Sable Offshore Corp.,
James C. Flores, and Gregory D. Patrinely*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

TRACY JOHNSON, Individually and on behalf of all others similarly situated,

            Plaintiff,

      v.

SABLE OFFSHORE CORP., JAMES C. FLORES, and GREGORY D. PATRINELY,

            Defendants.

Case No. 2:25-cv-06869-SVW-PVC

**DEFENDANTS SABLE OFFSHORE CORP., JAMES C. FLORES, AND GREGORY D. PATRINELY'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**

CLASS ACTION

Judge: Hon. Stephen V. Wilson
Hearing Date: February 9, 2026
Time: 1:30 p.m.

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2        PLEASE TAKE NOTICE THAT on February 9, 2026, at 1:30 p.m., or at such

3    later date and time as the Court may order, in the Courtroom of the Honorable

4    Stephen V. Wilson, Courtroom 10A, United States District Court, Central District

5    of California, located at the First Street Courthouse, 350 W. 1st Street, 10th Floor,

6    Los Angeles, California 90012, Defendants Sable Offshore Corp., James C. Flores,

7    and Gregory D. Patrinely will, and hereby do, move for an Order dismissing the

8    Second Amended Class Action Complaint (the "Complaint," Dkt. No. 77).  This

9    Motion is made pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and

10    the Private Securities Litigation Reform Act, on the grounds that the Complaint fails

11    to state a claim upon which relief can be granted.

12        This Motion is made following the conference of counsel pursuant to Local

13    Rule 7-3, which took place on December 15, 2025, and is based on this Notice of

14    Motion and Motion, the accompanying Memorandum of Points and Authorities,

15    Request for Judicial Notice, Declaration of Kristin N. Murphy, and exhibits thereto,

16    the Court's record on this matter, the arguments of counsel, and other evidence and

17    argument that may be presented prior to the Court's decision.

18

19    Dated: January 5, 2026

20                          **LATHAM & WATKINS LLP**

21                       By:  */s/ Kristin N. Murphy*

22                          Kristin N. Murphy (SBN 268285)
                      650 Town Center Drive, 20th Floor

23                          Costa Mesa, CA 92626
                      Telephone: (714) 540-1235

24                          Email: kristin.murphy@lw.com

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Colleen C. Smith (SBN 231216)
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Email: colleen.smith@lw.com

*Counsel for Defendants*
*Sable Offshore Corp., James C.*
*Flores, and Gregory D. Patrinely*

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................. 1

II.   BACKGROUND ................................................................................... 2

    A.    Sable Purchases and Repairs Oil-Related Assets in Santa
Barbara ...................................................................................... 2

    B.    Legal Battles Emerge About Restarting the Onshore
Pipelines ................................................................................... 3

    C.    Sable Begins Flowing Oil and Updates Its Investors ................ 4

    D.    Sable Suffers Unexpected Setbacks ......................................... 5

    E.    A Short Seller Issues a Report and Other Developments
Occur ........................................................................................ 6

III.  LEGAL STANDARD ........................................................................... 7

IV.   ARGUMENT ....................................................................................... 8

    A.    Plaintiffs Fail to Plead Falsity ................................................. 8

        1.    No Falsity for Statements About Restarting Oil
Production (Stmts. 1-2, 5, 8, and 11) ............................ 9

        2.    No Falsity for Projections About Production,
Which Are Protected by the Safe Harbor (Stmts. 4
and 9) ............................................................................ 10

        3.    No Falsity for Statements About Repairs and Tests
(Stmts. 3, 10, 13-15) .................................................... 12

        4.    No Falsity for Opinions and Puffery Statements
(Stmts. 3, 6-7, 10, 12-19) ............................................ 13

    B.    Plaintiffs Fail to Plead Scienter .............................................. 16

        1.    No Scienter Based on "Mere Motive and
Opportunity" ................................................................ 17

        2.    No Scienter Based on Public Offerings ......................... 18

3.    No Scienter Based on Title and Day-to-Day Operations ........................................................ 18

4.    No Scienter Based on the Hunterbrook Short Report ........................................................... 19

5.    The Non-Culpable Inference Is Far More Compelling ........................................................ 19

C.    Plaintiffs Fail to Plead Loss Causation ................................................. 20

1.    No Loss Causation from the Letter on May 28, 2025 ........................................................... 20

2.    No Loss Causation from Developments on May 28, June 3, October 15, and November 4, 2025 ..................... 21

3.    No Loss Causation on October 31 and November 3, 2025 ...................................................... 23

V.    CONCLUSION ......................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adamo v. Nextdoor Holdings, Inc.*,
2025 WL 3238205 (N.D. Cal. Nov. 20, 2025)....................................................17

*Anshen v. Facebook*,
2017 WL 5635021 (C.D. Cal. Oct. 4, 2017) .....................................................20

*Applestein v. Medivation, Inc.*,
561 Fed. Appx. 598 (9th Cir. 2014) ..................................................................17

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .............................................................................................1

*Espy v. J2 Glob.*,
99 F.4th 527 (9th Cir. 2024).............................................................................21

*Grobler v. Neovasc Inc.*,
2016 WL 6897760 (D. Mass. Nov. 22, 2016)...................................................15

*Hamano v. Activision Blizzard, Inc.*,
2019 WL 7882076 (C.D. Cal. Oct. 17, 2019) ..................................................17

*Hoang v. ContextLogic, Inc.*,
2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) ..................................................22

*In re BofI Holding, Inc. Sec. Litig.*,
302 F. Supp. 3d 1128 (S.D. Cal. 2018) .......................................................14, 15

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020)........................................................................21, 23

*In re Cisco Sys. Inc. Sec. Litig.*,
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ..................................................12

*In re Cloudera, Inc. Sec. Litig.*,
121 F.4th 1180 (9th Cir. 2024)...............................................................8, 10, 25

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010)...........................................................................11

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

CASE NO. 2:25-cv-06869-SVW-PVC
MOTION TO DISMISS SECOND AMENDED
CLASS ACTION COMPLAINT

*In re Hansen Nat. Corp. Sec. Litig.*,
   527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................................. 19

*In re Illumina, Inc. Sec. Litig.*,
   2025 WL 2739655 (S.D. Cal. Sept. 26, 2025) ....................................................... 20

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) .................................................................... 7, 23, 25

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) .............................................................................. 16

*In re Philip Morris*,
   89 F.4th 408 (2d Cir. 2023) ......................................................................... 14, 15

*In re Sorrento Therapeutics, Inc. Sec. Litig.*,
   97 F.4th 634 (9th Cir. 2024) ................................................................................ 10

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) .............................................................. 11

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) ............................................................................... 20

*Karam v. Corinthian Colls., Inc.*,
   2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) .................................................... 18

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ......................................................................... 20, 24

*Markette v. XOMA Corp.*,
   2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) .................................................... 14

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .......................................................... 7, 12, 16, 18

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ......................................................................... 21, 23

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ............................................................................... 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ............................................................................. 13, 15, 16

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014).......................................................................... 8, 20

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  2012 WL 1868874 (N.D. Cal. May 22, 2012) ................................................. 18

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014).................................................................. 11, 15

*Prodanova v. H.C. Wainwright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021).................................................................. 17, 20

*In re Rigel Pharms. Inc. Sec. Litig.*,
  697 F.3d 869, 884 (9th Cir. 2012)................................................................. 18

*Rok v. Identiv, Inc.*,
  2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ...................................................... 24

*Rubke v. Capitol Bancorp Ltd.*,
  551 F.3d 1156 (9th Cir. 2009)....................................................................... 15

*Sneed v. Talphera, Inc.*,
  147 F.4th 1123 (9th Cir. 2025)................................................................... 8, 10

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001)......................................................................... 13

*Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
  2011 WL 1253250 (D. Ariz. Mar. 31, 2011) ................................................... 9

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ................................................................................ 16, 19

*Wallack v. Idexx Laboratories, Inc.*,
  2013 WL 1562523 (S.D. Cal. Apr. 11, 2013) ................................................. 21

*Webb v. SolarCity Corp.*,
  884 F.3d 844 (9th Cir. 2018)................................................................... 16, 18

*Wenzel v. Semiconductor Mfg. Int'l Corp.*,
  2021 WL 12312024 (C.D. Cal. Nov. 18, 2021) ............................................... 22

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022)...................................................................... 8, 11

*Zamir v. Bridgepoint Educ., Inc.*,
    2018 WL 1258108 (S.D. Cal. Mar. 12, 2018)......................................................19

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...............................................................18, 25

**STATUTES**

15 U.S.C.
    § 78t ......................................................................................................25
    § 78u-4(b)(1)......................................................................................8, 13
    § 78u-4(b)(2)(A) ...................................................................................8
    § 78u-5(c)(1) .........................................................................................11

**RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................................7

## I. INTRODUCTION

On May 19, 2025, Sable Offshore announced that it had begun flowing oil from its offshore platform near Santa Barbara, California to its onshore storage and processing facility. This was an important step in Sable's ongoing effort to re-commercialize an oil field unit that had not transported petroleum for ten years. Weeks later, Sable encountered unexpected hurdles. In a case involving the Coastal Commission, a judge issued a preliminary injunction barring future development work; in another case, a judge temporarily restrained the fire marshal from issuing Sable further authorizations. The Santa Barbara County Board of Supervisors then voted against transferring permits from the unit's prior owner to Sable.

Unsurprisingly, the market reacted negatively to these new developments which introduced potential additional delays, costs, and litigation. But these stock drops based on bad news were not securities fraud. Securities laws do not "provide investors with broad insurance against market losses." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Congress enacted the Private Securities Litigation Reform Act ("PSLRA") to bar cases like this one, where investors rely on fraud-by-hindsight to try to recover for the downside risk of their investments. Here, Plaintiffs fail to plead the required elements of falsity, scienter, and loss causation.

*Falsity.* Plaintiffs' core theory is that "contrary to Defendants' representations, Sable had not restarted oil production." ¶ 69. A conclusory, one-sentence denial fails to plead falsity as a matter of law. Plaintiffs even *concede* the accuracy of Sable's May 19 statement when they acknowledge that Sable initiated "limited volume oil flows" from its offshore platform, exactly as it told investors. ¶ 72. Stripped of this headline allegation, Plaintiffs attempt to cobble together a theory of fraud from unsupported accusations that Sable "misled investors about the regulatory hurdles the company faced, the status of its repairs, and its timeline for restarting oil production and recommencing commercial sales." ¶ 57. But Plaintiffs do not plead particularized facts showing that any statement was false or misleading

when made.  Other statements can be dismissed for the additional (independent) reasons that they are forward-looking, puffery, or opinions that are not actionable.

***Scienter***.  Plaintiffs' scienter allegations—that Defendants intended to deceive investors or acted deliberately recklessly—are thinner still.  Plaintiffs ask the Court to infer that Defendants must have intentionally misled the market because they were under "existential pressure" to restart oil production.  ¶¶ 98, 100.  But the Ninth Circuit consistently rejects such speculative, unsupported theories.  Despite the high pleading standard for fraud, Plaintiffs allege no contemporaneous facts suggesting that any Defendant knew that a statement was false or misleading.  To the contrary, the pleaded facts show that Sable was engaging with regulators, litigating novel administrative issues, and adjusting its business strategy as circumstances evolved.  Viewed holistically, the more cogent inference is non-culpable: Defendants believed in their plans, communicated risks to the market, and reported developments to investors as they occurred.

***Loss Causation***.  Plaintiffs also fail to plead loss causation with the necessary specificity.  Plaintiffs allege that Sable's stock price dropped after a variety of regulatory, litigation, and political setbacks, not after any revelation of fraud.

When Defendants pointed out these fatal defects in their motion to dismiss the first amended complaint, Plaintiffs chose not to oppose and instead filed this marginally different second amended complaint.  This Complaint—Plaintiffs' third attempt to state a claim—continues to fall far short of what the PSLRA and Rule 9(b) require.  The Complaint should be dismissed, this time with prejudice.

## II.    BACKGROUND

### A.    Sable Purchases and Repairs Oil-Related Assets in Santa Barbara

In February 2024, Sable bought three types of oil-related assets from Exxon Mobil located in or near Santa Barbara, California.  ¶¶ 9, 23-24.

1. <u>Offshore Leases and Other Assets (the Santa Ynez Unit)</u>: The Santa Ynez Unit consists of offshore drilling platforms in federal waters and related wells,

pipelines, and facilities. ¶¶ 9, 19; *see* Ex. 1 at 11.

2. <u>Onshore Storage & Processing (Las Flores Canyon)</u>: Oil is flowed from the offshore drilling platforms via pipeline to Sable's onshore facility in Las Flores Canyon for processing. ¶¶ 23, 59; Ex. 1 at 11.

3. <u>Onshore Pipelines (the Las Flores Pipelines)</u>: After processing, the onshore Las Flores Pipelines are intended to transport oil to inland pipeline infrastructure that further transports oil to refineries. ¶¶ 19, 68; Ex. 1 at 11.

Exxon Mobil loaned Sable $623 million to fund this deal. ¶ 25. If Sable did not "Restart Production" by March 1, 2026, Exxon Mobil could retake ownership of the assets. ¶¶ 25-26; *see also* Ex. 2 at 176 (defining "Restart Production" as "ninety (90) days after the resumption of actual production from [the Santa Ynez Unit]").

After the deal closed, Sable undertook repair and maintenance work as needed. ¶¶ 42, 59, 68; *see* Exs. 3, 4. Most of the work focused on repairing the onshore Las Flores Pipelines. *See id*. In 2015, one location along the Las Flores Pipelines ruptured, resulting in an oil spill. *See* ¶ 18. The pipelines' prior owner entered into a consent decree with the United States and the State of California ("Consent Decree"). *See* ¶ 21; Ex. 3. The Consent Decree provided a path to resume petroleum transportation through the Las Flores Pipelines. Ex. 3, App'x B, D. It required that the pipelines' owner repair "anomalies"[1] along the pipelines and to submit a "Restart Plan" confirming that all repairs were complete. Ex. 3 at 261-62, 276-283; *see* ¶ 41. As the new owner, Sable began certain pipeline repair work.

**B.    Legal Battles Emerge About Restarting the Onshore Pipelines**

As Sable drew closer to resuming oil production from the Santa Ynez Unit, multiple organizations sued to try to prevent (or postpone) Sable's efforts.

*<u>The California Coastal Commission Litigation</u>*: Plaintiffs allege that the California Coastal Commission regulates activities associated with the Las Flores

---

[1] A pipeline anomaly refers to a pipeline segment that "deviat[es] from its original configuration," often because of metal losses. Ex. 4 at 286; Ex. 3 at 263.

1    Pipelines.   ¶ 27.   The Commission issued notices starting in September 2024
2    claiming that Sable's anomaly repair and other work violated the California Coastal
3    Act.   ¶¶ 33-36.   On February 18, 2025, Sable sought declaratory relief that the
4    Commission lacked authority to issue the notices because, in part, the Commission
5    delegated authority to regulate the activities associated with repairs to Santa Barbara
6    County, and the County informed Sable that its "'anomaly repair work' . . . is
7    authorized by [Sable's] existing permits."   Ex. 4 at 287-88, 327-28; *see also* ¶ 76.
8    The Commission then issued a cease and desist order—purportedly "requiring Sable
9    to halt all repair and maintenance work that requires coastal development permits"—
10   and in April moved for a preliminary injunction to enforce its order.   ¶¶ 37-39.

11        *The State Waivers Litigation*: On April 15, 2025, environmental groups filed
12   two lawsuits against the Office of the State Fire Marshal (which the Complaint
13   alleges had to approve the "Restart Plan" for the onshore pipelines, ¶ 42) and others,
14   naming Sable as the real party in interest.   *See* ¶ 46; Exs. 5-6.   These plaintiffs
15   alleged that the Fire Marshal improperly approved certain "State Waivers" without
16   allowing for sufficient public notice and without conducting an adequate
17   environmental review under the California Environmental Quality Act ("CEQA").
18   ¶¶ 44, 46; Exs. 5-6.   The plaintiffs asked the court to enjoin the restart of the onshore
19   pipelines and require more public hearings and CEQA review.   Exs. 5-6.

20        *Development Permit Application*: Exxon Mobil transferred various permits to
21   Sable as part of the asset sale.   *See* ¶ 28; Ex. 2 at 122.   Santa Barbara County's
22   Planning Commission approved the transfer, but environmental groups appealed that
23   approval to the Santa Barbara County Board of Supervisors.   ¶ 29.[2]

24        **C.    Sable Begins Flowing Oil and Updates Its Investors**
25        On May 15, 2025, Sable began flowing oil produced at one of its offshore
26   platforms to its onshore storage and processing facility at Las Flores Canyon.   *See*
27   ¶¶ 58-59; Ex. 7 at 429.   On May 19, Sable reported this development in a press
28

---

[2] Plaintiffs reference other litigation but fail to plead its relevance.   ¶¶ 50-56.

release with a headline starting: "Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit." ¶ 58; *see* Ex. 7 at 429. Sable reported the flow rate of oil and disclosed projections about the future of its wells. ¶ 60; Ex. 7 at 429.

Sable reported that, while it had "completed its anomaly repair program on the Onshore Pipeline[s] as specified by the Consent Decree," the onshore Las Flores Pipelines had not yet been fully tested. ¶ 59; *see* Ex. 7 at 429 (as of May 19 only "[s]even of the eight sections of the Onshore Pipeline[s] have been successfully hydrotested"). As a result, Sable was "flowing oil production to Las Flores Canyon," but not transporting oil beyond its storage and processing facility through the onshore Las Flores Pipelines. *Id.* Sable's press release made clear that Sable had not begun selling oil: "The [Santa Ynez Unit] assets discussed in this press release have not sold commercial quantities of [oil] since . . . June of 2015 . . ." *Id.* at 430. It also warned that "[t]here can be no assurance that the necessary permits will be obtained that would allow the Onshore Pipeline[s] to recommence transportation and allow the [Santa Ynez Unit] assets to recommence sales." *Id.*

On May 22, 2025, Sable issued a prospectus for a public stock offering, which reiterated that Sable "initiated oil production from six wells. . . at [the Santa Ynez Unit]" and "began flowing oil production to Las Flores Canyon." ¶¶ 67-68; Ex. 8 at 444. Given that Sable restarted production, it said it expected its loan with Exxon Mobil would mature in early 2026. ¶ 68; Ex. 8 at 456. The May 22 prospectus repeated that Sable "completed its anomaly repair program on the Onshore Pipeline as specified by a Consent Decree." ¶ 68; Ex. 8 at 445. Like the May 19 press release, the prospectus contained robust risk factors and warnings. Ex. 8 at 456-465.

On May 28, 2025, Sable filed a Form 8-K reporting that it completed the final hydrotest for the onshore Las Flores Pipelines. ¶ 80; Ex. 13. Sable told investors that "no more repairs are required to the Onshore Pipelines prior to restart." *Id.*

### D.    Sable Suffers Unexpected Setbacks

Plaintiffs allege that on May 28, 2025, the public learned of a letter sent by

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

Eleni Kounalakis, California Lt. Governor and California State Lands Commission chair, to Sable.  *See* ¶¶ 70-71.  The letter acknowledged "oil flows" from the Santa Ynez Unit and reported Kounalakis's understanding that the flows resulted from "well-testing procedures."  ¶ 72.  It expressed "concerns" about the May 19 press release and asserted that parts were "misleading" because Sable had "not obtained the necessary regulatory approvals to fully resume operations."  *Id.*

In the ensuing days and weeks, Sable confronted setbacks in its ongoing litigation.  Also on May 28, 2025 (soon after Sable finished repairs required by the Consent Decree and the final hydrotest), the Coastal Commission Litigation court issued a preliminary injunction that stopped "Sable from continuing any development associated with the return to service of the Las Flores Pipelines . . ." ¶¶ 39, 74-76.  On June 3, 2025, the State Waivers Litigation court issued a temporary restraining order that prevented the Fire Marshal "from granting further authorizations and preventing Sable from restarting use of the pipelines."  ¶ 78.

Sable had finished repairing and testing the onshore pipelines as of May 28, so it explained to the public that the injunction had "no bearing on Sable's plans to recommence oil sales by July."  ¶ 81; *see* ¶¶ 85.  In September 2025, Sable submitted to the Fire Marshal updates to its 2024 Restart Plan.  ¶ 48; *see* Ex. 1 at 14.

### E.    A Short Seller Issues a Report and Other Developments Occur

On October 31, 2025, Hunterbrook Media—an organization that self-identifies as an affiliate of short sellers who seek to profit from corporate misfortunes—published an article about Sable ("Hunterbrook Short Report").  ¶ 88; Ex. 9 at 557-59.  The Hunterbrook Short Report published what it characterized as a leaked audio recording involving Sable CEO James Flores and a "select group of investors" from October, allegedly concerning Sable's need for an equity infusion, and argued that such "selective disclosures potentially violate" SEC rules.  ¶¶ 88, 104; *see* Ex. 9 at 541.  Hunterbrook Media disclaimed any "representation regarding the completeness or timeliness" of the information it reported, and it noted that the

information it sourced from third parties "has not been independently verified, and its accuracy or completeness is not guaranteed." Ex. 9 at 559.

On November 3, 2025, Sable issued a press release with three updates. ¶ 92; *see* Ex. 10. *First*, Sable announced that its Board of Directors formed a Special Committee to "undertake an independent investigation of the allegations contained in" the Hunterbrook Short Report. ¶ 92; Ex. 10 at 565. *Second*, Sable announced that it amended the loan agreement with Exxon Mobil, and that the amendment would be effective after Sable raised additional capital. *Id.* *Third*, Plaintiffs allege Sable announced that it was "no longer pursuing use of the [onshore] pipelines as its primary course for delivering oil," and would instead pursue an "'Offshore Storage and Treating Vessel' strategy." ¶ 92. Plaintiffs allege that the next day, on November 4, 2025, the Santa Barbara County Supervisors voted to "deny the transfer of permits from ExxonMobil to Sable," and one supervisor criticized Sable. ¶ 93.

In December 2025 (after the class period ended), Sable disclosed in an SEC filing that the federal government determined that the Las Flores Pipelines are interstate pipelines and therefore subject to "exclusive [federal] regulatory authority." Ex. 15 at 623, 629. Sable disclosed in a subsequent filing that the federal government approved Sable's Restart Plan for the onshore pipelines. Ex. 16 at 637.

## III.    LEGAL STANDARD

"To plead a claim under § 10(b) and rule 10b-5, a plaintiff must allege: '(1) a material misrepresentation or omission [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.'" *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022). Under the PSLRA, "plaintiffs in private securities fraud class actions face formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6)." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008). Plaintiffs must "specify each statement alleged to have been misleading [and] the

reason or reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(1)(B), (2)(A). Similarly, Rule 9(b)'s "heightened pleading requirements" mean that Plaintiffs must allege each element of falsity, scienter, and loss causation with particularity. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604-05 (9th Cir. 2014).

## IV.    ARGUMENT

Plaintiffs' central theory is that "Sable had not restarted oil production" when it said it had. ¶ 63. But Plaintiffs articulate no facts in support of that theory. Instead, they chronicle a set of regulatory and litigation "hurdles" and "setback[s]" Sable encountered *after* it began flowing oil from the Santa Ynez Unit to its onshore storage and processing facility in May 2025. ¶¶ 27, 75. Facing and promptly reporting unexpected challenges and developments is not securities fraud.

### A.    Plaintiffs Fail to Plead Falsity

The PSLRA "prescribes an 'exacting' standard, under which a 'litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false,' is insufficient." *In re Cloudera, Inc. Sec. Litig.*, 121 F.4th 1180, 1187 (9th Cir. 2024). "For a statement to be false or misleading, it must 'directly contradict what the defendant knew at that time' or 'omit[] material information.'" *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022). The Court must also "look at 'the context surrounding the statement,'" because a "reasonable investor cares about a statement's 'surrounding text, including hedges, disclaimers, and apparently conflicting information.'" *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025).

Plaintiffs challenge nineteen statements made between May 19 and October 31, 2025. None is actionable because Plaintiffs fail to plead particularized facts showing that any of the nineteen statements was false or misleading. Two statements (Stmts. 4 and 9) also fail to state a claim because they fall within the PSLRA's safe

harbor for forward-looking statements.  And twelve statements (Stmts. 3, 6, 7, 10, 12-19) are opinion statements or puffery that are not adequately pleaded as false.

### 1.    No Falsity for Statements About Restarting Oil Production (Stmts. 1-2, 5, 8, and 11)

Sable disclosed on May 19, 2025 that it "restarted production at the Santa Ynez Unit" and had "begun flow[ing] oil production to Las Flores Canyon," the onshore storage facility.  *See* ¶¶ 58-59 (Stmts. 1-2); *see also* ¶ 61 (Stmt. 5) (Sable "is proud to have safely and responsibly achieved first production").  Three days later, on May 22, Sable reiterated in its prospectus that it had "initiated oil production" from the Santa Ynez Unit and "began flowing oil production to Las Flores Canyon" at a rate of about "6,000 barrels of oil per day."  *Id.* ¶ 67 (Stmt. 8); *see also* ¶ 68 (Stmt. 11) (part of risk factor stating "restart of production on May 15" was "expected" to trigger the maturity date for Sable's loan from Exxon Mobil).

Plaintiffs do not plead facts showing that any of these statements was false or misleading.  The Complaint contains no allegations that oil was *not* flowing from Sable's offshore platform to onshore storage, no allegations that Sable's wells were *off* when Sable said they were on, and no factual allegations that Sable's statements were false.  Indeed, Plaintiffs acknowledge that there were "limited volume oil flows" starting on May 15, ¶ 72, which is what Sable told investors when it stated it had begun flowing oil to its storage facility at a specified rate.  *See* Ex. 7 at 429 (only 6 of 102 wells initiated production; only 1 of 3 platforms initiated production).

Rather than plead contradictory facts, Plaintiffs present the Court with the bare conclusion that "Sable had not restarted oil production."  ¶¶ 63, 69.  "Rote repetition of [a] conclusory allegation . . . does not satisfy the PSLRA's particularity requirement."  *Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 2011 WL 1253250, at *24 (D. Ariz. Mar. 31, 2011).  Plaintiffs do not allege how Sable's activities were not a "Restart of Oil Production," either under an ordinary meaning or as that term is understood by the market and in the industry.  ¶ 58.  *See*

*Cloudera*, 121 F.4th at 1189 (if relevant terms "lack a plain or ordinary meaning," plaintiff must "'plead facts' supporting his definitions of those terms").

The May 19 press release and May 22 prospectus both made clear that additional tests, approvals, and steps were necessary before Sable could *fully* resume production and begin *selling* oil. It is of no moment that Plaintiffs allege that "pending lawsuits" could prove "consequential to Sable's ability to restart production" or that Sable "lacked the necessary permits to . . . restart production" ¶ 63, as these allegations do not contradict what Sable said: that it had begun flowing oil to its onshore storage facility. Sable in fact warned investors that environmental groups could "be successful in delaying or preventing us from obtaining the required approvals through litigation." Ex. 8 at 459. Sable also warned that there was "no assurance that the necessary permits will be obtained" that would allow the "assets to recommence sales." Ex. 7 at 430. The Ninth Circuit's reminder to examine "the context surrounding the statement" to "decide whether a misstatement or omission can mislead" is especially apt here in showing that Sable's disclosures were accurate. *Sneed*, 147 F.4th at 1131; *see also In re Sorrento Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 641-42 (9th Cir. 2024) (affirming dismissal when "[a] fair reading of the press release and the articles" showed only promising experimental results).

### 2.    No Falsity for Projections About Production, Which Are Protected by the Safe Harbor (Stmts. 4 and 9)

Plaintiffs next challenge projections in the May 19 press release and May 22 prospectus: (1) Sable's projection that it "expects to fill the ~540,000 barrels of crude oil storage capacity at [Las Flores Canyon] by the middle of June 2025"; (2) that Sable expected to "recommence oil sales in July 2025"; and (3) that Sable "expects to initiate production from the [two] additional [offshore platforms] . . . in July 2025 and August 2025." ¶ 60 (Stmt. 4), ¶ 67 (Stmt. 9). Plaintiffs contend that such completion dates were "implausible." ¶ 63.

These projections are quintessential forward-looking statements protected by

the PSLRA's statutory safe harbor. 15 U.S.C. § 78u-5(c)(1). The PSLRA provides that forward-looking statements cannot support a fraud claim if either (1) the statements are identified as forward-looking and accompanied by meaningful cautionary language, *or* (2) "the plaintiff fails to show that the statement was made with actual knowledge that it was false or misleading." *Weston Fam. P'ship*, 29 F.4th at 620. Sable's projections fall within both safe harbor provisions.

A projection is "by definition a forward-looking statement." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). And Sable told investors that its "expectations" are "'forward-looking statements' within the meaning of the [PSLRA]" in both its May 2025 press release and prospectus. Ex. 7 at 430; *see* Ex. 8 at 439. Sable's projections included meaningful cautionary statements. Sable stated that "regulatory changes," "litigation," and its "ability to comply with laws and regulations" could cause its "[a]ctual results [to] differ materially from those described in the forward-looking statements." Ex. 7 at 430; *see also* Ex. 8 at 456 ("no assurance that we will be successful in . . . recommenc[ing] oil sales in a timely manner"), 459 (environmental litigation risk factor). These statements foreclose liability under Ninth Circuit law. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical*, 759 F.3d 1051, 1059 (9th Cir. 2014) (affirming dismissal of forward-looking statements accompanied by less specific warnings than Sable's). Even absent this language, the safe harbor would still apply because Plaintiffs fail to plead "in 'great detail' specific facts sufficient to demonstrate a strong inference that defendants made the forward-looking statements . . . with actual knowledge that they were false." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1071 (N.D. Cal. 2001); *see infra* § IV.B (failure to plead scienter).

Claims based on Statements 4 and 9 also fail because Plaintiffs have pleaded no contradictory facts. Plaintiffs contend that Sable's projections were "implausible because Sable had not finished its repairs, obtained the necessary permits, or resolved outstanding litigation." ¶ 63. Plaintiffs fail to specify how unspecified

repairs or permits related to the challenged projections.  Nor do Plaintiffs explain
how "outstanding litigation" undercut Sable's projections.  ¶ 63.  When Sable made
its projections, no courts had issued rulings on the preliminary injunction or
temporary restraining order that Plaintiffs claim would affect Sable's future
operations.  *See In re Cisco Sys. Inc. Sec. Litig.,* 2013 WL 1402788, at *6 (N.D. Cal.
Mar. 29, 2013) (requiring challenged statements to be "false or misleading when
made"); *see also* ¶¶ 75-78 (PI and TRO issued on May 28 and June 3).[3]

### 3.    No Falsity for Statements About Repairs and Tests (Stmts. 3, 10, 13-15)

Similarly, Plaintiffs fail to plead facts showing that statements about Sable's
pipeline repairs and tests were false.  In the May press release and prospectus, Sable
told investors that it had "completed its anomaly repair program on the Las Flores
Onshore Pipeline as specified by the Consent Decree."  ¶ 59 (Stmt. 3); ¶ 68
(Stmt. 10).  On May 28, 2025, Sable stated that it had "successfully hydrotested" the
Las Flores Pipelines, "satisfying the final operational condition to restart of the
Onshore Pipeline as outlined in the Consent Decree," and that "no more repairs are
required" under the Consent Decree.  ¶ 80 (Stmts. 13, 14); ¶ 81 (Stmt. 15) (similar).

Plaintiffs do not allege how these statements were false or misleading.
Plaintiffs instead provide a conclusory denial of each without alleging specific,
contradictory facts.  *See* ¶ 63 ("Sable had not finished its repairs"); ¶ 82 ("Sable had
not (and still has not) completed its required repairs").  There are no allegations that
Sable failed its hydrotest, and no explanation of what repairs remain unfinished.
Plaintiffs cannot satisfy the PSLRA's requirement that plaintiffs "specify . . . the
reason or reasons why the statement is misleading," by simply disagreeing with
Defendants.  15 U.S.C. § 78u-4(b)(1)(B); *see Metzler*, 540 F.3d at 1070 ("vague"
"explanation of how and why the statements were false" is insufficient).

---

[3] Plaintiffs do not challenge the portion of Statement 11 about the "expected" impact
of oil restart, but in any event this is also a protected forward-looking statement.

In a paragraph about the June 3, 2025 ruling in the State Waivers Litigation, Plaintiffs attempt a "gotcha" by purporting to cite a declaration from Sable—stating a temporary restraining order would force Sable to "shut down repair and maintenance activities"—presumably as evidence that Sable's earlier statements that it "completed" repairs were false. ¶ 78 (citing Ex. 12 at 577). But the Complaint misleadingly omits that the declaration describing Sable's ongoing "repair and maintenance activities" was filed in April 2025 (a month before the Class Period) when Sable's repair work was underway. Ex. 12 at 574, 577.[4] Then in May 2025, Sable reported that it completed the repairs required by the Consent Decree. ¶¶ 59, 80. While the Court must accept Plaintiffs' well-pleaded allegations as true, the Court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (internal citation omitted). The Court should reject Plaintiffs' misleading suggestion that Sable's declaration supports that repairs were unfinished as of June.

### 4. No Falsity for Opinions and Puffery Statements (Stmts. 3, 6-7, 10, 12-19)

Many statements should also be dismissed because they are inactionable opinion statements. The Supreme Court set forth stringent pleading requirements when a plaintiff alleges that an opinion is false or misleading. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). To challenge an opinion statement, Plaintiffs must allege: (1) that the speaker subjectively did not hold the stated opinion at the time the statement was made; (2) that the statement contained an embedded statement of fact that was false; or (3) the statement omitted a material fact necessary not to make the opinion statement misleading. *Id*. at 185-91. This is "no small task for an investor." *Id*. at 194.

---

[4] Plaintiffs also incorrectly state this declaration was filed in the State Waivers Litigation. ¶ 78. It was not. It was filed in the Coastal Commission Litigation in connection with an unrelated motion. Ex. 12.

Statements 3, 6-7, 10, and 12-19 represent Sable's opinions because they "inherently reflect the speaker's assessment of and judgment about the underlying circumstances." *See Markette v. XOMA Corp.*, 2017 WL 4310759, at *4 (N.D. Cal. Sept. 28, 2017); *see In re Philip Morris Int'l Inc.*, 89 F.4th 408, 418 (2d Cir. 2023) ("language like 'we believe' or 'we think' is *sufficient – not necessary –* to render a statement one of opinion."). Plaintiffs fail to plead that any of these opinion statements is actionable under *Omnicare*, and these statements should be dismissed.

Relationship with Regulators (Stmt. 6) and Pending Litigation (Stmts. 7, 15-18): These statements reflect Sable's positive reflection on regulatory bodies (Stmt. 6), its "position" that litigation against it was "without merit" (Stmt. 7), and its genuine belief that court decisions would not impact its "plans," "preparations," "resumption of petroleum transportation," or "strategy" (Stmts. 15-18). Plaintiffs do not allege that Sable did not hold these opinions or that they contain omitted facts. Ninth Circuit courts regularly find similar statements inactionable as opinions. *See, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1147 (S.D. Cal. 2018) (favorable description of litigation is "prototypical opinion-based puffery"), *rev'd and remanded on other grounds*, 977 F.3d 781 (9th Cir. 2020) (affirming dismissal of statements about "great regulatory relations" because those "vague assurances reflect [defendant's] opinions and predictions, which are not actionable").

Plaintiffs also do not allege the falsity of these statements. They plead no facts contradicting Sable's description of the Coastal Commission Litigation as not impacting Sable's plans, when, as Sable disclosed, it had already completed its repairs when it made these statements. *See, e.g.*, Ex. 14 at 619 ("The anomaly repair program . . . was completed in May 2025 . . .").[5] Nor do Plaintiffs plead facts to contradict Sable's view that a temporary order in the State Waivers Litigation would

---

[5] Plaintiffs confuse the Coastal Commission Litigation and the State Waivers Litigation when they argue that the May 28 preliminary injunction in the former "prevented Sable from restarting the pipelines." ¶ 82. This is inconsistent with the facts the Complaint pleads about the May 28 PI, which related to alleged "violations of the Coastal Act," ¶¶ 39, 74-76, not "restarting the pipelines." ¶ 82; *cf.* ¶ 47.

not "impede Sable's *preparations*" for commercial production and that Restart was governed by the Consent Decree.  ¶ 81 (emphasis added); *see also* ¶ 82 (no allegations about how Statement 16 was false or misleading).  Plaintiffs plead that the State Waivers Litigation court confirmed the next month that the restart could occur once certain conditions were met.  ¶ 47.[6]

Two statements are also inactionable puffery: Sable's CEO's comment that Sable was "very grateful for the cooperation and partnership from [its] local community and regulatory bodies," (Stmt. 6), and a spokesperson's description of lawsuits as "without merit," (Stmt. 7).  These are optimistic statements that cannot be objectively verified and therefore cannot support a fraud claim.  *See Intuitive Surgical*, 759 F.3d at 1060 ("'feel good' speak" is "non-actionable puffing"); *In re BofI*, 302 F. Supp. 3d at 1147 (dismissing challenges to similar statements).[7]

<u>Repairs Complete (Stmts. 3, 10, 13-15) and Authorized by Permits (Stmt. 12)</u>: Sable's claims that it had completed the repairs and tests required by the Consent Decree also reflect its opinions.  Plaintiffs' allegations do not contradict Sable's genuine belief that it had completed the repairs required by the Consent Decree. Although Plaintiffs allege that the Fire Marshal (in October 2025) "identified a requirement" that Sable had not yet met before the Fire Marshal could approve Sable's Restart Plan, ¶ 49, that says nothing about whether (in May 2025 when Sable made the challenged statements) Sable believed it had completed repairs required by the Consent Decree.[8]  *See Omnicare*, 575 U.S. at 186 (sincere opinion is not

---

[6] Statements about litigation (including describing litigation as "without merit") are also forward-looking and inactionable.  *See Grobler v. Neovasc Inc.*, 2016 WL 6897760, at *3 (D. Mass. Nov. 22, 2016) (stating litigation was "without merit" and "baseless" was "undoubtedly forward-looking" prediction that "could only be invalidated by reference to the ultimate outcome").  And the court orders were "in the public domain," making Sable's opinions about those rulings inactionable.  *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162-63 (9th Cir. 2009).

[7] Statement 5 (that Sable was "proud") is also inactionable puffery.

[8] The federal government subsequently approved Sable's Restart Plan.  Ex. 16; *cf. Philip Morris*, 89 F.4th at 414  (when a challenged opinion "is ultimately endorsed by" a government agency "such statements are per se reasonable") (cleaned up).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1  actionable "regardless whether an investor can ultimately prove the belief wrong").

2  As for Sable's opinion about its permits, Plaintiffs have likewise not alleged facts

3  that would meet the *Omnicare* requirements, nor that would otherwise show falsity.

4  While Plaintiffs allege that "[r]egulators had repeatedly informed Sable" that it

5  lacked permits, Plaintiffs simultaneously acknowledge that Santa Barbara County

6  told Sable that its repair work "was authorized under existing permits" and that Sable

7  repeatedly explained its belief that the Coastal Commission lacked permitting

8  authority over its repair and maintenance activities.  ¶¶ 69, 76, 83; Ex. 4 at 327 (letter

9  from County stating Sable's "repair work is authorized by the existing permits").

10  An opinion is not misleading just because the defendant "knows, but fails to disclose,

11  some fact cutting the other way.  Reasonable investors understand that opinions

12  sometimes rest on a weighing of competing facts."  *Omnicare*, 575 U.S. at 189-90.

13  <u>Hunterbrook Recording (Stmt. 19)</u>:  Plaintiffs do not allege how Sable's

14  opinion that "*we believe* that the alleged recording was either AI generated or

15  otherwise altered" is actionable.  *See* ¶ 90 (emphasis added).

16  Plaintiffs fail to plead facts that any of these statements are contradicted by

17  information known to Defendants at the time they were made.  *See* ¶¶ 63, 69, 82,

18  87, 91.  Claims based on each of these statements should be dismissed.

19  **B.    Plaintiffs Fail to Plead Scienter**

20  The Complaint should also be dismissed for the additional and independent

21  reason that Plaintiffs fail to plead scienter—that is, "intent to deceive, manipulate,

22  or defraud" or "deliberate recklessness."  *Webb v. SolarCity Corp.*, 884 F.3d 844,

23  851 (9th Cir. 2018); *see In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th

24  Cir. 2014) ("the standard for recklessness is actually much closer to one of intent").

25  Plaintiffs must plead a "strong inference" of scienter that is "cogent and at least as

26  compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v.*

27  *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  And Plaintiffs must allege

28  "contemporaneous" information, not hindsight.  *See Metzler*, 540 F.3d at 1066; *see*

1    *also Adamo v. Nextdoor Holdings, Inc.*, 2025 WL 3238205, at *4 (N.D. Cal. Nov.

2    20, 2025) (no "specific 'contemporaneous statements or conditions'" established

3    scienter).   Rather than plead particularized allegations supported by confidential

4    employee witness statements, internal reports, or other contemporaneous facts, the

5    Complaint provides a grab-bag of conclusory, unsupported scienter allegations.

6    ¶¶ 97-104.  Each scienter theory fails. *See Hamano v. Activision Blizzard, Inc.*, 2019

7    WL 7882076, at *3 (C.D. Cal. Oct. 17, 2019) (Wilson, J.) ("Inferring scienter from

8    these sparse allegations would require impermissible speculation.").

9                  **1.    No Scienter Based on "Mere Motive and Opportunity"**

10    Plaintiffs primarily rest their scienter theory on baseless speculation: that

11    because Sable faced "existential pressure" to restart operations at its "sole asset"

12    before Exxon Mobil could foreclose on its loan, the Court should infer that

13    Defendants intentionally misled the market about Sable's operations and progress.

14    ¶¶ 97-98, 100.  The Ninth Circuit has consistently held that to "meet the PSLRA's

15    high burden for pleading scienter, a complaint cannot rely on 'mere motive and

16    opportunity.'" *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108

17    (9th Cir. 2021).  But that is what the Complaint offers: a theory that Defendants must

18    have acted with scienter because they were allegedly under "pressure."   This

19    "entirely speculative" inference "does not rise to the required strong inference."

20    *Applestein v. Medivation, Inc.*, 561 Fed. Appx. 598, 601 (9th Cir. 2014).

21    The Complaint lacks any of the hallmarks of specific motive allegations that

22    courts have found may support an inference of scienter.  It does not plead that any

23    defendant sold shares "before the company discloses negative information," or

24    indeed any stock sales at all. *Prodanova*, 993 F.3d at 1108.  Instead, Plaintiffs allege

25    in conclusory terms that the "Wall Street Journal reported that Flores would 'make

26    tens of millions of dollars if he can' restart the commercial oil sales." ¶ 102.  The

27    Ninth Circuit rejects this argument:  "If simple allegations of pecuniary motive were

28    enough to establish scienter, virtually every company in the United States . . . could

be forced to defend securities fraud actions." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) (cleaned up); *see also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *23 (N.D. Cal. May 22, 2012) ("sheer fact that Defendants had performance-based compensation packages does not support an inference of scienter"), *aff'd*, 759 F.3d 1051 (9th Cir. 2014).

### 2.     No Scienter Based on Public Offerings

Plaintiffs also argue that one can infer that Statements 1-7 were made with scienter because Defendants wanted to raise Sable's stock price before the May 22 public offering (or other offerings, which are not identified). ¶¶ 65, 99.  Allegations of "routine corporate objectives such as the desire to obtain good financing" are "not 'specific' or 'particularized'" enough to establish a strong inference of scienter. *Webb*, 884 F.3d at 856.  "[T]o hold otherwise would support a finding of scienter for any company that seeks to enhance its business prospects." *In re Rigel Pharms. Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012); *Webb*, 884 F.3d at 856 ("Surely every company that goes public wants to . . . maintain a high share price afterward in order to finance acquisitions and expand.").

### 3.     No Scienter Based on Title and Day-to-Day Operations

Plaintiffs also cannot establish a strong inference of scienter merely by alleging that Flores, Sable's CEO, had "a comprehensive understanding of Sable's regulatory hurdles and operations" and played a role in "day-to-day management" of Sable.  ¶ 101.  "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068; *see Karam v. Corinthian Colls., Inc.*, 2012 WL 8499135, at *12 (C.D. Cal. Aug. 20, 2012) (rejecting scienter allegations that "Defendants knew of the alleged fraud by virtue of their positions" and "had an incentive to commit fraud" based on the "executive compensation structure").  And Plaintiffs link no specific scienter allegations to CFO Patrinely.

### 4.    No Scienter Based on the Hunterbrook Short Report

The third-party allegation by Hunterbrook that Flores "potentially violate[d] Regulation FD" by "regularly shar[ing] material non-public information with selective investors" is *not* "supportive of scienter." ¶ 104.  No case law supports that an amorphous third-party accusation of "potential" violations of SEC rules—from an author who made "[n]o representation regarding the completeness or timeliness of this information," Ex. 9 at 559—is sufficient to plead scienter with particularity. Even when allegations of SEC rule violations come from the SEC itself, that has been insufficient to plead scienter.  *See Zamir v. Bridgepoint Educ., Inc*., 2018 WL 1258108, at *17 (S.D. Cal. Mar. 12, 2018) ("several district courts have found the existence of an investigation, standing alone, insufficient to support scienter"); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) ("the mere existence of [an] investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or its senior management").

### 5.    The Non-Culpable Inference Is Far More Compelling

When viewed as a whole, the "plausible, nonculpable explanations" far outweigh any possible inference of fraud.  *Tellabs*, 551 U.S. at 324.  The Ninth Circuit has rejected a theory of scienter based on allegations, like these, that defendants knew a milestone was unachievable, or at least unachievable "on the timeline defendants were telling the market," in order to "keep the stock price high for a time and then face the inevitable fallout." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020).  That theory "does not make a whole lot of sense." *Id.*

Even when viewed in the light most favorable to Plaintiffs, their allegations show that Sable believed in its plans but faced disappointing, unexpected third-party developments while working in a highly regulated, politically polarizing industry. Sable adjusted its strategy in response to evolving circumstances, as it openly engaged with regulators and litigated novel administrative issues.  At each step, Sable kept investors informed, including advising potential investors of the risks

1   inherent to its business. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425

2   (9th Cir. 1994) ("detailed risk disclosure . . . negates an inference of scienter"). That

3   is exactly what a public company and its executives are supposed to do. Plaintiffs'

4   theory that these facts show an intent to mislead the market is "divorced from

5   common experience." *Prodanova*, 993 F.3d at 1107.

6   **C.     Plaintiffs Fail to Plead Loss Causation**

7   "Rule 9(b) applies to all elements of a securities fraud action, including loss

8   causation." *Anshen v. Facebook*, 2017 WL 5635021, at *4 (C.D. Cal. Oct. 4, 2017)

9   (Wilson, J.) (quoting *Apollo*, 774 F.3d at 605)). Where, as here, Plaintiffs try to

10  show loss causation through purported corrective disclosures, Plaintiffs must plead

11  with particularity that "the defendant's fraud was '*revealed* to the market and *caused*

12  the resulting losses.'" *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).

13  Plaintiffs do not meet this standard. To start, Plaintiffs do not "specify which

14  misrepresentations the [] disclosures supposedly correct, leaving it to Defendants

15  and this Court to guestimate the connections," which on its own is "grounds for

16  dismissal." *In re Illumina, Inc. Sec. Litig.*, 2025 WL 2739655, at *3 (S.D. Cal. Sept.

17  26, 2025); *see* ¶¶ 70-96. Instead, they allege a mashup of alleged partial revelations

18  followed by alleged misstatements with no cohesive through-line.

19  There are also fundamental flaws with Plaintiffs' six corrective disclosure

20  dates. The Complaint alleges only one date on which Sable issued an allegedly

21  corrective statement. On the other dates, it alleges third parties made unproven

22  accusations or the public learned of litigation and local government developments,

23  and Sable's stock price dropped "on this news." ¶¶ 77, 79, 84, 89, 94. None of these

24  dates qualifies as a loss-causing event that could support alleged securities fraud.

25  **1.     No Loss Causation from the Letter on May 28, 2025**

26  Plaintiffs allege that the "truth" supposedly began to emerge on May 28, 2025,

27  when the contents of the letter from Lt. Governor Kounalakis to Sable expressing

28  "serious concerns" about Sable's May 19 press release were supposedly published.

¶¶ 71-73.[9]  This was not a corrective disclosure.

While critical in tone, this letter did not correct any statements in the May 19 press release (or May 22 prospectus).  The letter instead *confirmed* that Sable had restarted oil production, which Kounalakis characterized as "limited volume oil flows."  ¶ 72.  She alleged that Sable had failed to "timely communicate these activities" in light of its obligation to tell Commission staff "before initiating any oil flow through the offshore pipeline," *id.*, which would make no sense if (as the Complaint alleges) "Sable had not restarted oil production," ¶ 63.  *Cf. Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (plaintiffs must trace their loss "back to 'the very facts about which the defendant lied'").

The letter merely expressed concerns and warned future actions could jeopardize Sable's lease, but this "generalized criticism" is not a corrective disclosure.  *Espy v. J2 Glob.*, 99 F.4th 527, 541 (9th Cir. 2024) (third party report criticizing defendants' accounting was "untethered from [plaintiff's] allegations in the second amended complaint").  The letter noted there had not been a "resumption of *commercial* production or a full restart" of the Santa Ynez Unit, but Sable already made these facts clear in the press release and prospectus.  ¶ 72 (emphasis altered); *see supra* Section V.A.4.  *Cf. In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) ("A corrective disclosure, though, must by definition reveal new information to the market that has not yet been incorporated into the price.").

## 2. No Loss Causation from Developments on May 28, June 3, October 15, and November 4, 2025

The Complaint fares no better in its allegations about May 28, June 3, October 15, and November 4.  Plaintiffs allege that on these dates, the public learned of court rulings and a county supervisor vote affecting Sable.  A "simple revelation

---

[9] Plaintiffs allege "[u]pon information and belief," the letter was published on May 28, citing no source.  ¶ 71.  "Allegations 'based on information and belief usually do not satisfy the degree of particularity required under Rule 9(b).'" *Wallack v. Idexx Laboratories, Inc.,* 2013 WL 1562523, at *6 (S.D. Cal. Apr. 11, 2013).

of 'bad news' does not establish loss causation." *Wenzel v. Semiconductor Mfg. Int'l Corp.,* 2021 WL 12312024, at *10 (C.D. Cal. Nov. 18, 2021).

*May 28, 2025 and October 15, 2025*: Plaintiffs alleges that the court in the Coastal Commission Litigation issued a preliminary injunction on May 28 to enforce the Commission's cease and desist order for alleged violations of the Coastal Act. ¶¶ 39, 74-75.  The injunction was a "setback" in Sable's ongoing "legal battle with the state regulator." ¶ 75.  It enjoined Sable "from *continuing*" maintenance and repair activities that the Complaint alleges were "unpermitted." ¶ 74 (emphasis added); ¶ 76.  But it by no means revealed that "Sable Offshore's claim to have restarted production in California was false." ¶ 75.

Nor did the issuance of the preliminary injunction reveal as false Sable's statement that it "completed its anomaly repair program on the Onshore Pipeline[s]." *See* (Stmts. 3, 10).  As the Complaint pleads, the preliminary injunction "could impact Sable's ability to do *future repairs*." ¶ 75 (emphasis added).  Likewise, the court's ruling on October 15 that the Commission "had not abused its discretion" in issuing the prior cease and desist order did not correct any statements. ¶ 83.  The May and October rulings came out against Sable's "claims that the [repair and maintenance] work was authorized under existing permits"—a position that Plaintiffs admit "follow[ed] confirmation from the County." ¶ 76.  That finding did not render false any prior statements that Sable believed that all work was permitted.

*June 3, 2025*: Similarly, the temporary restraining order in the State Waivers Litigation was not a corrective disclosure (nor do Plaintiffs even identify what it corrected). ¶ 78.  The order temporarily prevented the Fire Marshal "from granting *further* authorizations" about the onshore pipelines and prevented Sable "from restarting use of the pipelines." *Id.* (emphasis added).  This was another adverse development in ongoing litigation between Sable and environmental groups.  But "[t]o be corrective, the disclosure must 'relate back to the misrepresentation and not to some other negative information about the company.'" *Hoang v. ContextLogic,*

1 *Inc.*, 2023 WL 6536162, at *27 (N.D. Cal. Mar. 10, 2023).

2  *November 4, 2025*: Finally, the Santa Barbara County Supervisors vote on

3 November 4, 2025 "to deny the transfer of permits from ExxonMobil to Sable" was

4 not a corrective disclosure. ¶ 93.[10] Plaintiffs do not even try to allege what earlier

5 alleged misstatements this event supposedly corrected, nor how a vote by

6 government actors could correct a company's statements.

7  Court rulings and a vote by a county board are the ultimate examples of

8 unpredictable events. Plaintiffs cannot rely on these developments to show that the

9 "defendant's misstatement, as opposed to some other fact, *foreseeably* caused the

10 plaintiff's loss." *First Solar*, 881 F.3d at 753 (emphasis added and internal citation

11 omitted). It was not foreseeable that courts would rule or supervisors would vote as

12 they did, nor do Plaintiffs plead any facts that these events corrected prior statements.

13   **3. No Loss Causation on October 31 and November 3, 2025**

14  The news events on October 31 and November 3 were also not corrective

15 disclosures. These came in the last week of the alleged class period, but Plaintiffs

16 fail to specify which challenged statements in the prior six months were corrected.

17  On October 31, Hunterbrook Media purported to publish a leaked recording

18 of a call involving CEO Flores and certain investors, in which Flores allegedly

19 discussed Sable's need to raise up to $200 million in additional equity by 2025. ¶ 88;

20 Ex. 9. The Ninth Circuit has repeatedly rejected corrective disclosures based on

21 third-party short-seller articles that "included disclaimers from the authors stating

22 that they made 'no representation as to the accuracy or completeness of the

23 information set forth in this article.'" *In re BofI*, 977 F.3d at 797; *see* Ex. 9 at 559

24 (same language by Hunterbrook); *Nektar*, 34 F.4th at 840 (the "nature of the report"

25 means that "it is not plausible that the market would perceive" a short seller's

26 allegations as "revealing false statements"). Even if this were not the case, that

27

---

28 [10] Plaintiffs have not alleged that the November 4 vote occurred during trading hours
such that it could have affected the closing stock price that day. ¶ 93.

1  Hunterbrook alleged "potential violations" of SEC rules was also not corrective.

2  The "announcement of an investigation, without more, is insufficient to establish

3  loss causation," because "it simply puts investors on notice of a *potential* future

4  disclosure of fraudulent conduct." *Loos*, 762 F.3d at 890.

5      Sable's Board then promptly formed a Special Committee to investigate the

6  allegations in the Hunterbrook Short Report. This did not "effectively confirm[]"

7  the Hunterbrook allegations, ¶ 92, nor does it qualify as a disclosure corrective of

8  anything. *See Rok v. Identiv, Inc.*, 2017 WL 35496, at *17-18 (N.D. Cal. Jan. 4,

9  2017) (disclosure that company had "formed a Special Committee to investigate" a

10  former employee's complaint "does not support loss causation because it merely

11  announced an internal investigation").

12      Nor did references to Sable's alleged financing needs in the Hunterbrook

13  Short Report on October 31 or Sable's November 3 press release about amending

14  the Exxon Mobil loan reveal fraud. As Plaintiffs acknowledge, the additional equity

15  needs were prompted by unexpected delays to the project. *See* ¶ 88. Plaintiffs fail

16  to explain how these changing circumstances corrected any prior alleged

17  misstatements. They perplexingly allege that the alleged revelation of additional

18  equity needs "contradicted Defendants' repeated claims that regulatory and judicial

19  orders concerning the Company's ability to make repairs and restart production

20  *would* have an effect on the Company's ability to timely resume commercial sales,"

21  but they do not point to any statements by Defendants that said this. *Id.* (emphasis

22  added). The Complaint fails to plead how a statement allegedly made in an undated

23  October call about a need to "bridge a little to the financing," *id.*, corrects any

24  challenged statements—including that the October 15 ruling would not impact

25  Sable's "business strategy" of "the resumption of petroleum transportation" (Stmts.

26  16, 17), much less statements made months earlier in May and June.

27      Sable's statement in the November 3 Press Release that it was "actively

28  evaluating and pursuing" an offshore storage and treating strategy for the Santa Ynez

1  Unit, Ex. 10 at 565, likewise did not correct any prior statements.  Sable had

2  previously told investors that this was one of two options it was considering.

3  ¶¶ 85-86; *see* Ex. 11 at 571.  The announcement that Sable then viewed offshore

4  storage and treating as its "main path," Ex. 10 at 565, was a change in business

5  strategy, not a revelation of fraud.  *See Cloudera*, 121 F.4th at 1189 ("statements

6  made at the end of the class period about the challenges [the company] had faced"

7  "do not by themselves 'make the earlier, cheerier statement a falsehood'").

8      Finally, the Complaint's allegations cannot be saved by reframing them as a

9  "zone of risk" theory—that is, that "the market became aware of [] previously

10 undisclosed risks and/or these risks materialized," causing losses.  ¶ 96.  The Ninth

11 Circuit has not adopted this theory of loss causation.  *Nektar*, 34 F.4th at 838 n.6.

12 The Ninth Circuit has "continued to require securities fraud plaintiffs to allege that

13 the defendant lied about 'the very facts' causing the plaintiffs' losses."  *Id.* ("it is

14 unclear in any event that courts employing the 'zone of risk' theory require any lesser

15 showing").  But in any event, Plaintiffs do not plead any undisclosed risks; to the

16 contrary, and as discussed, Sable disclosed a myriad of risks.  That is proper

17 disclosure, not fraud.[11]

18 **V.    CONCLUSION**

19      This is Plaintiffs' third attempt to state a claim.  They continue to provide the

20 Court with conclusory, error-ridden pleadings that fall far short of the pleading

21 standard.  Because Plaintiffs "failed to add the requisite particularity," the Court

22 should dismiss with prejudice.  *Zucco*, 552 F.3d at 1007 (affirming denial of further

23 leave to amend where "deficiencies in [the] Second Amended Complaint" were "'a

24 strong indication that the plaintiffs have no additional facts to plead'").

25

26

27

28 [11] Because Plaintiffs fail to plead a primary violation of section 10(b), the section
20(a) claims also fail.  *See* 15 U.S.C. § 78t; *Zucco*, 552 F.3d at 990.

1    Dated: January 5, 2026

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**LATHAM & WATKINS LLP**

By:  */s/ Kristin N. Murphy*
Kristin N. Murphy (SBN 268285)
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
Email: kristin.murphy@lw.com

Colleen C. Smith (SBN 231216)
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Email: colleen.smith@lw.com

*Counsel for Defendants*
*Sable Offshore Corp., James C.*
*Flores, and Gregory D. Patrinely*

1

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel of record for Defendants Sable Offshore Corp.,
James C. Flores, and Gregory D. Patrinely certifies that this brief contains 25 pages,
which:

    __   complies with the word limit of L.R. 11-6.1.

  <u>X</u>  complies with the page limit set by court order dated August 4, 2025 (Dkt.
No. 10).


Dated: January 5, 2026                         By: <u>*/s/ Kristin N. Murphy*</u>
                                               Kristin N. Murphy (SBN 268285)
                                               650 Town Center Drive, 20th Floor
                                               Costa Mesa, CA 92626
                                               Telephone: (714) 540-1235
                                               Email: kristin.murphy@lw.com

                                               Colleen C. Smith (SBN 231216)
                                               12670 High Bluff Drive
                                               San Diego, CA 92130
                                               Telephone: (858) 523-5400
                                               Email: colleen.smith@lw.com

                                               *Counsel for Defendants*
                                               *Sable Offshore Corp., James C.*
                                               *Flores, and Gregory D. Patrinely*