Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
Email: lrosen@rosenlegal.com
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610

*Counsel for Lead Plaintiff and the Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY JOHNSON, Individually and On Behalf of All Others Similarly Situated, | Case No: 2:25-cv-06869-SVW-PVC |
| Plaintiff, | CLASS ACTION |
| v. | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT** |
| SABLE OFFSHORE CORP., JAMES C. FLORES, and GREGORY D. PATRINELY, | JUDGE:  Hon. Stephen V. Wilson |
| Defendants. | DATE:   February 9, 2026 |
| | TIME:   1:30 p.m. |

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................1

II.     FACTUAL BACKGROUND.............................................................................1

        A.     Sable's Business.........................................................................................1

        B.     Sable's Immense Regulatory Hurdles.....................................................2

III.    ARGUMENT......................................................................................................3

        A.     The SAC Adequately Pleads That Defendants Made Material
               Misrepresentations...................................................................................3

               1.     The May 19 Press Release and May 22 Prospectus Misled
                      Investors.........................................................................................4

               2.     Defendants Repeatedly Misled Investors About Sable's Repair
                      Work and Its Permits to Conduct Such Work............................8

               3.     Defendants Misled Investors By Downplaying the Impact of
                      Sable's Legal and Regulatory Problems....................................10

               4.     Defendants Misled Investors About Hunterbrook.....................12

        B.     Plaintiffs Adequately Allege Scienter....................................................14

               1.     Core Operations Establishes Strong Inference of Scienter.......14

               2.     Defendants Knew Or Had Access To Contrary Information......16

               3.     Defendants Had Motive and Opportunity to Commit Fraud......17

                      a.     Defendants Inflated Stock Price Before Secondary
                             Offerings............................................................................17

               4.     The Inference of Scienter Is At Least As Compelling as
                      Defendants' Suggested Inference...............................................19

        C.     Plaintiffs Adequately Allege Loss Causation........................................21

        D.     Plaintiffs Adequately Allege Control Person Liability.........................24

IV.     CONCLUSION................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AMI - Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*,
  2025 WL 899959 (N.D. Cal. Mar. 24, 2025) ...................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................3

*Axonic Cap. LLC v. Gateway One Lending & Fin.*,
  2019 WL 4138024 (C.D. Cal. May 22, 2019)...................................................20

*Azar v. Yelp, Inc.*,
  2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ..................................................16

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...............................................................7, 16, 17

*Blake v. Canoo Inc.*,
  2025 WL 2992263 (C.D. Cal. Oct. 22, 2025) .............................................15, 16

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ....................................................................................4, 22

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023)..........................................................................10, 12

*Glazer Cap. Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ...............................................................................9

*Gompper v. VISX, Inc.*,
  298 F.3d 893 (9th Cir. 2002) ...............................................................................8

*In re Amgen Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ..................................................22

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020).......................................................................22, 23

*In re BofI Holding, Inc. Sec. Litig.*,
  2017 WL 2257980 (S.D. Cal. May 23, 2017) ........................................................25

*In re Convergent Techs. Sec. Litig.*,
  948 F.2d 507 (9th Cir. 1991) ................................................................................6

*In re Daou Sys., Inc.*,
  411 F.3d 1015 (9th Cir. 2005) ............................................................................14

*In re Dermtech, Inc. Sec. Litig.*,
  2025 WL 1618193 (S.D. Cal. June 5, 2025) ..........................................................6

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
  97 F.4th 1171 (9th Cir. 2024) .............................................................................24

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ........................................................................3, 22

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  78 F. Supp. 3d 1215 (N.D. Cal. 2015) ................................................................16

*In re PG&E Corp. Sec. Litig.*,
  2025 WL 2781745 (N.D. Cal. Sept. 30, 2025) ...............................................10, 16

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ..............................................................................19

*In re Semtech Corp.*,
  2025 WL 2884810 (C.D. Cal. Oct. 7, 2025) ........................................................18

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) .........................................................................15, 20

*In re WageWorks, Inc., Sec. Litig.*,
  2020 WL 2896547 (N.D. Cal. June 1, 2020) .......................................................24

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................................3

*Lambert v. Baker Tilly Hong Kong Ltd.*,
  2016 WL 6272465 (C.D. Cal. May 23, 2016) .......................................................22

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016)......................................................................22

*Lopez v. Smith*,
   203 F.3d 1122 (9th Cir. 2000)......................................................................25

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ........................................................................................4

*New Mexico State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011)......................................................................20

*Nguyen v. Radient Pharms. Corp.*,
   2011 WL 13141630 (C.D. Cal. Oct. 26, 2011) ............................................19

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004)......................................................................17

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ...........................................................................4, 10, 14

*Osher v. JNI Corp.*,
   183 F. App'x 604 (9th Cir. 2006)..................................................................25

*Prodanova v. H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021)......................................................................15

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014).....................................................................9, 17

*Roberti v. OSI Sys., Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)..............................................17

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008)........................................................................20

*S.E.C. v. Platforms Wireless Int'l Corp.*,
   559 F. Supp. 2d 1091 (S.D. Cal. 2008) .......................................................17

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016)........................................................................14

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Sneed v. Talphera, Inc.*,
   147 F.4th 1123 (9th Cir. 2025) ................................................................. 7

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ................................................................. 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................. 3, 14, 20

*Thant v. Rain Oncology Inc.*,
   2025 WL 588994 (N.D. Cal. Feb. 24, 2025) ................................. 7, 8

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ................................................................. 4

*Webb v. Solarcity Corp.*,
   884 F.3d 844 (9th Cir. 2018) ................................................................. 18

**<u>Statutes</u>**

15 U.S.C. § 78u-4(b)(1)(B) ................................................................. 4

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## I.    INTRODUCTION

Defendants Sable Offshore Corp. ("Sable" or the "Company"), CEO James Flores, and CFO Gregory Patrinely misled investors throughout the Class Period (May 19, 2025 to November 4, 2025) about Sable's progress in restarting commercial oil production off the coast of Santa Barbara ten years after a disastrous oil spill. Defendants began the Class Period by creating the false impression that it restarted oil production and would soon begin selling oil, but it was just a ruse to inflate Sable's stock price for a secondary offering three days later. Over the following five months, Defendants continued to insist that oil sales were just around the corner, state and local regulators could be safely ignored, Sable had completed necessary repairs and obtained necessary permits, and adverse legal decisions would have no effect on the resumption of oil sales.

Through a series of corrective disclosures, investors learned the truth: Sable had not finished its repairs, had been violating state laws while ignoring regulators, and the adverse court decisions precluded oil sales. To top it off, CEO Flores told a select group of investors that the Company needed to raise hundreds of millions of dollars by the end of the year, the Company falsely claimed a leaked recording of the call was fake, and Defendants finally came clean with another equity raise.

Plaintiffs adequately allege each element of securities fraud, and the Court should deny Defendants' Motion (ECF 81, the "Motion").

## II.    FACTUAL BACKGROUND

### A.    Sable's Business

On May 19, 2015, an underground oil pipeline in Santa Barbara County ruptured, spilling over 120,000 gallons of crude oil. ¶18.[1] The oil spill was California's worst since the 1960s. After ExxonMobil spent nearly a decade trying to

---

[1]    Unless otherwise stated, all paragraph ("¶") references are to Plaintiffs' Second Amended Class Action Complaint for Violation of the Federal Securities Laws ("SAC"), and all internal citations and quotations are omitted.

obtain the permits to restart production, it sold the offshore oil platforms and the onshore processing facility and onshore and offshore pipelines (the "SYU Assets") to Sable. ¶¶19-23. Sable borrowed the vast majority of the purchase price from Exxon, and Exxon could retake ownership if Sable failed to restart production by 2026. ¶¶24-25.

### B.    Sable's Immense Regulatory Hurdles

Sable faced significant operational and federal, state, and local regulatory hurdles before it could restart oil production.

In February 2025, the Santa Barbara County Board of Supervisors ("County Board") voted 2-2 to deny the transfer of pipeline operation permits from Exxon to Sable. ¶¶28-29. Sable sued in federal court, and the Board eventually denied the transfer again in November 2025. ¶¶30-32.

The California Coastal Commission issued a Notices of Violation against Sable in September 2024 and February 2025, finding that Sable was engaging in construction activities without a permit in violation of the California Coastal Act and Santa Barbara County's Local Coastal Program. ¶¶33-34. After being ignored, the Coastal Commission issued a cease a desist order and eventually successfully sued to enforce the order. ¶¶35-40.

Sable also required approval from the California Office of State Fire Marshal before restarting use of the onshore pipelines. ¶41. An April 2025 lawsuit by environmentalists led to an injunction prohibiting Sable from restarting use of the onshore pipelines. ¶¶44-47. In October 2025, the Fire Marshal found that Sable had yet to complete the required repairs for restart. ¶49.

On October 3, 2025, the California Regional Water Quality Control Board (the "Water Board") filed a civil complaint against Sable alleging "numerous violations of its obligation to notify the Regional Water Board of proposed waste discharges and obtain the appropriate regulatory requirements, thereby preventing the Regional

Water Board from assuring best management practices are employed to avoid, minimize and mitigate impacts to water quality." ¶¶51-55.

## III.   ARGUMENT

Courts assess Rule 12(b)(6) motions by considering the complaint[2] in its entirety, "accept[ing] all factual allegations . . . as true" and construing them in the light most favorable to plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint should not be dismissed if it contains a "sufficient factual matter [that], accepted as true, 'state[s] a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must be mindful that "a district court ruling on a motion to dismiss is not sitting as a trier of fact" and "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

A plaintiff asserting claims asserted under Section 10(b) of the Securities Exchange Act must plead six elements: a misrepresentation or omission of material fact, scienter, a connection with the purchase of sale of a security, reliance, economic loss, and loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Defendants challenge only falsity, scienter, and loss causation.

### A.   The SAC Adequately Pleads That Defendants Made Material Misrepresentations

To plead falsity under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement [or omission] is misleading." 15 U.S.C. § 78u-4(b)(1)(B). The allegations

---

[2] Defendants ask that the Court take judicial notice of certain documents. ECF 82. To the extent the Court takes notice of these documents, it may only take notice of the fact that statements in those documents were made, and any attempt by Defendants to use these exhibits to defeat Plaintiffs' adequately pled claims is improper and highly discouraged by the Ninth Circuit. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (recognizing a "concerning pattern in securities cases" by defendants to improperly exploit judicial notice "to defeat what would otherwise constitute adequately stated claims at the pleading stage").

must identify who made the allegedly misleading statements and what statements were misleading, state where and when the statements were made, and explain why the statements were misleading. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

"Disclosure [of material information] is required… when necessary 'to make… statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). "[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015).

The SAC meets these criteria and adequately pleads falsity.

### 1. The May 19 Press Release and May 22 Prospectus Misled Investors

On May 19, 2025 – the ten year anniversary of the disastrous 2015 Refugio Oil Spill – Sable announced that the restart of oil production and the imminent resumption of oil sales. ¶58. In a press release entitled "Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in July 2025", Sable triumphantly declared that "as of May 15, 2025, [Sable] has restarted production [] and has begun flowing oil production to Las Flores Canyon." ¶¶58-59. Importantly, the press release stated that "Sable has now completed its anomaly repair program on the Onshore Pipeline as specified by the Consent Decree" and that "Sable expects to fill the ~540,000 barrels of crude oil storage capacity at LFC by the middle of June 2025 and subsequently recommence oil sales in July 2025." ¶¶59-60.

This announcement materially misled investors by creating the false impression that Sable was ramping up oil production and would soon begin to sell oil. ¶63. Unbeknownst to investors, the "flowing oil production" was nothing more than a minor, mandatory test. ¶72. Moreover, Sable was not about to recommence oil

sales: it had not finished its repair work or testing, it had not received the permits to perform the work, and it had not received the required approvals from necessary regulators. ¶63. Indeed, regulators had repeatedly informed Sable that it lacked the necessary permits to complete its repairs or restart production. ¶¶33-38; 51-54. The Coastal Commission issued Notices of Violation against Sable in September 2024 and February 2025 detailing Sable's illegal and unpermitted construction activities on the pipelines. ¶¶33-34. After Sable refused to cooperate, the Coastal Commission issued a cease and desist order requiring Sable to halt all relevant repair and maintenance work. ¶¶37. Sable also had no ability to obtain the necessary Final Development Permits, which the County Board had refused to transfer from Exxon to Sable in February 2025. ¶¶ 28-29.

Just as Defendants had planned, the misleading press release inflated Sable's stock price by over 14 percent, closing at $33.02 on May 19, 2025. ¶64. Sable quickly shifted to the second step of its plan: conducting a secondary with an inflated share price to raise about $250 million. ¶66; *see also* ECF 81-10 at 2. The May 22, 2025 Prospectus for Sable's secondary offering repeated the same misleading statements that Sable made in the May 19 press release. ¶¶67-68.

On May 23, 2025, Eleni Kounalakis, the Lieutenant Governor of California and chair of the California State Lands Commission, wrote a letter (the "May 23 Letter") to Sable's Vice President of Environmental & Government Affairs, Steve Rusch stating that Sable's press release "mischaracterize[d] the nature of recent activities, causing significant public confusion and raising questions regarding Sable's intentions." ¶¶70-72. Lt. Gov. Kounalakis continued, explaining that Sable's press release "also implies that Sable has restarted operations at the Santa Ynez Unit" despite the fact that "the limited volume oil flows are the result of well-testing procedures required by the Bureau of Safety and Environmental Enforcement prior to restart and "do not constitute a resumption of commercial production or a full restart of the SYU." ¶72. Importantly, Lt. Gov Kounalakis concluded that

"*[c]haracterizing testing activities as a restart of operations is not only misleading* but also highly inappropriate – particularly given that Sable has not obtained the necessary regulatory approvals to fully resume operations at SYU." *Id*. (emphasis added).

The Motion asserts that the challenged statements in the May 19 press release and May 22 Prospectus were not misleading because Sable did, in fact, conduct a well test on May 15, 2025. Motion at 9-10. But even if Defendants' statements were literally true, they are still actionable because they created a false impression. *See, e.g., In re Dermtech, Inc. Sec. Litig.*, 2025 WL 1618193, at *4 (S.D. Cal. June 5, 2025) ("[A]n issuer's public statements cannot be analyzed in complete isolation. Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.") (quoting *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991)). The SAC plausibly alleges that a reasonable investor could have interpreted these statements to mean that Sable would continue producing oil and imminently begin selling oil. ¶63.

The Motion correctly notes that a court must "examine 'the context surrounding the statement' to 'decide whether a misstatement or omission can mislead'". Motion at 10 (quoting *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025)). But the Motion then fails to grapple with the actual context surrounding these statements. Defendants did not merely announce that Sable had completed a well test; they announced that Sable had restarted oil production, finished its anomaly repairs, would fill its onshore tanks by mid-June; and would begin selling oil in July. ¶¶58-62. A reasonable investor could understand these statements, in context, to mean that Sable had reached a new milestone and would imminently begin selling oil. Indeed, the press release quoted Defendant Flores as stating that "[t]his milestone

achievement is a result of a tremendous amount of effort from all of Sable's employees, contractors, Board of Directors, stakeholders, and suppliers." ECF 81-9. A reasonable investor could plausibly interpret these announcements, taken together, as something more than a well-test.

The Motion also contends that the statements were not misleading because Sable warned investors that "environmental groups could 'be successful in delaying or preventing us from obtaining the required approvals through litigation' and that "there was 'no assurance that the necessary permits will be obtained'". Motion at 10. But general warnings that the Company's plans might not succeed are insufficient. *See Thant v. Rain Oncology Inc.*, 2025 WL 588994, at *6 (N.D. Cal. Feb. 24, 2025) (denying dismissal of claim concerning literally true statement about drug trial – despite the fact that the defendant "repeatedly and emphatically disclosed that its Phase 3 trial might fail" because of atypically high risk that the trial would fail).

Finally, the Court need only decide whether Plaintiffs' proposed interpretation is plausible, not whether Plaintiffs' interpretation is more plausible than Defendants' interpretation. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (reversing dismissal of 10(b) claim where the plaintiffs' interpretation of a challenged statement was "just as likely" as the defendants' interpretation); *Thant v. Rain Oncology Inc.*, 2025 WL 588994, at *6 (N.D. Cal. Feb. 24, 2025) ("when there are multiple plausible interpretations, the obligation to draw inferences in favor of plaintiffs mean that courts must choose the interpretation most favorable to plaintiffs"). At the pleading stage, a court can only weigh competing inferences when evaluating scienter – not falsity. *See Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### 2. Defendants Repeatedly Misled Investors About Sable's Repair Work and Its Permits to Conduct Such Work

Defendants repeatedly misled investors by stating that (i) Sable had completed all of the repair work and testing necessary to restart the operation of the onshore pipelines and begin selling oil; and (ii) all of the repair and maintenance work Sable performed was fully permitted and approved. At the start of the Class Period, on May 19, 2025, Sable told investors that it "completed its anomaly repair program on the Onshore Pipeline as specified by the Consent Decree." ¶59; *see also* ¶68 (same statement in May 22, 2025 Prospectus). On May 23, 2025, Courthouse News published a statement by a Sable spokesperson stating that "[a]ll the work Sable has performed is fully permitted and approved." ¶62. On May 28, 2025, Sable stated that it had "successfully hydrotested all segments of [the onshore pipeline), satisfying the final operational condition to restart of the Onshore Pipeline" and that "no more repairs are required to the Onshore Pipelines prior to restart." ¶¶80-81.

These statements materially misled investors: Sable had not completed its required repair work or testing, and Sable did not have the necessary permits to complete the repair work. First, as explained above, the Coastal Commission repeatedly informed Sable that it was performing unpermitted repair and maintenance work and issued a cease and desist order in April 2025 requiring Sable to halt its unpermitted work and immediately seek the required permits. Second, the Water Board repeatedly also repeatedly informed Sable from November 2024 through April 2025 that Sable was engaged in unpermitted pipeline repairs. ¶¶53-57. Third, the Fire Marshal confirmed in a letter to Sable on October 22, 2025 that Sable still had not completed the anomaly repairs required under the Consent Decree. ¶49.[3]

---

[3] The full letter, which is incorporated into the SAC by reference, is available at https://s202.q4cdn.com/300304768/files/doc_news/2025/10/OSFM-Letter-to-Sable.pdf. The letter explains that Sable failed to meet an anomaly repair required under item 9 of the State Waivers concerning a 180-day repair condition for tool sizing and tolerance. Letter at 1-2 ("The State Waivers require all such anomalies to be remediated, including tool tolerance. According to OSFM records, Sable has not

The Motion states that the SAC fails to allege how the repairs remained unfinished. Motion at 12. This assertion is nonsensical given that the Motion later concedes that "Plaintiffs allege that the Fire Marshal (in October 2025) 'identified a Requirement' that Sable had not yet met before the Fire Marshal could approve Sable's Restart Plan." Motion at 15.

Alternatively, the Motion contends that the challenged statements that Sable's repairs were both completed and fully permitted were "inactionable statements of opinion." Motion at 15. The Motion is mistaken – the challenged statements are not opinions, and they are actionable even if they were opinions.

First, Sable's statement that "[a]ll the work Sable has performed is fully permitted and approved" (¶62) is a statement of fact, not a statement of opinion. Courts. It is black letter law in this Circuit that "[s]tatements of legal compliance are pled with adequate falsity when documents detail specific violations of law that existed at the time the warranties were made." *Reese v. Malone*, 747 F.3d 557, 578 (9th Cir. 2014), *overruled by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); see also *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 742 (9th Cir. 2008) (falsity adequately pleaded for the defendant's statement that it was "in compliance in all material respects with the provisions of Section 13(b) of the Exchange Act" because the complaint cited a later SEC cease and desist order stating that company violated Section 13(b) of the Exchange Act). The recent decision in *In re PG&E Corp. Sec. Litig.*, 2025 WL 2781745, at *17 (N.D. Cal. Sept. 30, 2025) is particularly instructive. In *PG&E*, the plaintiffs challenged statements that "PG&E meets or exceeds regulatory requirements" and that "PG&E follows all applicable federal and state vegetation clearance requirements." *Id*. The court found that these statements were not non-actionable statements of opinion; they were objectively verifiable statements of fact.

---

satisfied this condition in the State Waivers. The above findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law."

*Id*. Further, the court found that the complaint adequately alleged they were materially misleading because PG&E was later found to have been violating applicable regulations throughout the class period. *Id*. The same is true, here. The Coastal Commission and Water Board repeatedly informed Sable that it was performing unpermitted repair work. ¶¶33-38, 51-57. Further, Judge Anderle granted the Coastal Commission's application for a preliminary injunction, finding that the Commission presented evidence that "that Sable has not obtained a [permit] for Sable's repair and maintenance activities" and "that Sable has continued its repair and maintenance activities notwithstanding the [cease and desist order]." ¶39. In October, Judge Anderle again ruled that Sable's work was unpermitted and had not been authorized by the County's 1986 permit. ¶40.

Second, even if these statements were opinions, they would still be actionable because they did not "fairly align" with information Defendants possessed at the time they made the statements. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) ("These concrete assurances did not 'fairly align[ ] with the information in [defendant's] possession at the time' and are therefore actionable") (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015)).

### 3. Defendants Misled Investors By Downplaying the Impact of Sable's Legal and Regulatory Problems

On May 28, 2025, Judge Thomas P. Anderle granted the Coastal Commission's application for a preliminary injunction, which enforced the Commission's April 10 cease and desist order. ¶39. The order enjoined Sable from continuing its unpermitted maintenance and repair activities on the onshore pipelines. and enjoins Sable's ongoing repair and maintenance work in violations of the Coastal Act. ¶74. In response to the May 28 order, Sable's Steve Rusch stated that the decision "has no bearing on Sable's plans to recommence oil sales by July." ¶81.

On June 3, 2025, Judge Donna Geck issued a temporary restraining order preventing the Fire Marshal from granting further authorizations and prohibiting Sable from restarting use of the pipelines. ¶¶46, 78. In response, Rusch stated on behalf of Sable that "[t]he court decision does not impede Sable's preparations for restarting the flow of oil. Restart of the Las Flores Pipeline System is governed by a federal consent decree." ¶81.

These statements materially misled investors because the rulings materially impacted Sable's ability to start using the onshore pipelines and begin oil sales. Judge Anderle's ruling prohibited Sable from performing ongoing maintenance or repairs on the pipelines, which would inevitably delay any planned oil sales. ¶82. Further, Rusch, himself, submitted a declaration in opposition to the Coastal Commission injunction stating that granting the injunction would cause Sable irreparable harm by preventing it from performing ongoing maintenance or repairs. ¶78; ECF 81-14 at 4.[4] The Motion contends that this statement was true because Sable had already finished its repair work. Motion at 13, 14. Tellingly, the Motion is silent about the ongoing *maintenance*, which Sable would need to perform in order to actually *operate* the pipelines. ¶78. The Motion also asserts that the June 3 Order – which prevented Sable from restarting use of the pipelines – did not "impede Sable's preparations for restarting the flow of oil" through those same pipelines. Motion at 14-15. The Motion is too cute by half.[5]

---

[4] The SAC mistakenly alleged that Rusch issued this declaration in the Fire Marshall litigation. As the Motion correctly notes, Rusch issued the declaration in the Coastal Commission litigation. Motion at 13 & n.4.

[5] The Motion asserts in a footnote that its misstatements were "reasonable" because a federal agency purported to approve it restart plan after the Class Period. Motion at 15 & n.8. But the federal agency endorsed none of Sable's actual alleged misstatements, and Judge Donna Geck has already declined to lift the injunction blocking Sable from restarting the onshore pipelines. *See* https://www.independent.com/2026/01/07/santa-barbara-judge-keeps-sable-injunction-in-place-as-company-confirms-no-oil-in-pipelines/. At the hearing, an attorney for Sable represented that each day Judge Geck's June 3, 2025 injunction

On October 15, 2025, Judge Thomas held that the Coastal Commission had not abused its discretion in issuing the April 10 Orders. Judge Anderle found that, contrary to Sable's assertions, Sable's development work was not authorized by a 1986 permit from the County and that the CCC had the authority to find that Sable was in violation of the Coastal Act and to issue a cease and desist order given the County's failure to act on Sable's violations. ¶83. In response, Sable issued a press release stating that "the ruling would have no impact on the resumption of petroleum transportation through the Las Flores Pipeline System." The press release also quoted Defendant Flores stating that the ruling "has no impact on Sable's business strategy of either resuming petroleum transportation through the Las Flores Pipeline System or selling its Santa Ynez Unit production through an OS&T." ¶85.

Similarly to the May 28 Order, the October 15 Order continued to preclude Sable from performing the necessary repairs or maintenance to restart or operate the pipelines. Even if these statements were opinions – which they are not – they would still be actionable because they did not "fairly align" with information Defendants possessed at the time they made the statements. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023).

### 4. Defendants Misled Investors About Hunterbrook

On October 31, 2025, Hunterbrook Media ("Hunterbrook") reported that Defendant Flores "told a select group of investors in October that the company would likely have to raise up to $200 million in equity by the end of 2025." ¶88. The company had not publicly disclosed that Sable required an imminent equity raise which would dilute the value of existing shares. *Id.* Hunterbrook published a 38-minute recording of the conversation between Defendant Flores and investors. On the recording, Flores stated "We're supposed to be on production in September, right? We're not gonna be on production in September, so we're gonna have to bridge a

---

remains in place costs the Houston-based company millions. At the time, Sable assured investors that the injunction "does not impede Sable's preparations for restarting the flow of oil." ¶81.

little to the financing. We'll need some type of injection somewhere in the $100 to $150 to $200 million dollar range." *Id*.

Later that day, the Company falsely denied the Hunterbrook report. Sable stated to Hunterbrook that "based upon information provided to us we believe that the alleged recording was either AI generated or otherwise altered." ¶90.

The Motion asserts, without explanation, that the SAC fails to allege how this statement is actionable. Motion at 16. But the SAC plainly alleges that the statement was false because Hunterbrook accurately reported that Defendant Flores was selectively providing material non-public information to investors and that Sable imminently needed to raise to hundreds of millions of dollars to continue operations. ¶91. On November 3, 2025, the Company issued a press release effectively confirming the Hunterbrook report. ¶92. The press release disclosed that Sable had entered into an amended loan agreement with ExxonMobil that would become effective once the company raises at least $225 million in equity contributions. *Id*. The press release further stated that the amendment extends the maturity date of the loan by one year, to March 31, 2027, and increases the annual interest rate for the loan from ten percent to fifteen percent. *Id*. Further, the Company announced that "the Company's Board of Directors formed a Special Committee of independent directors to undertake an independent investigation of the allegations contained in an October 31, 2025 report published by Hunterbrook, which contains audio recording of a call that took place in October 2025." *Id*.

As the Supreme Court explained in Omnicare, a statement of opinion is actionable if it omits facts "for example, the fact that the speaker failed to conduct any investigation—that rebut the recipient's predictable inference." *Omnicare,* 575 U.S., at 191. Defendants' statement that "we believe that the alleged recording was either AI generated or otherwise altered" implies that Defendants conducted an investigation. Had Sable performed even a minimal amount diligence – including asking Defendant Flores about the recording – they would have learned that the

recording was real and that Sable did need to raise hundreds of millions of dollars, just as they publicly announced a few days later. ¶92.[6]

**B.    Plaintiffs Adequately Allege Scienter**

Plaintiffs allege facts raising a strong inference of scienter, which not only includes knowledge, "but also deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). The "inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322– 23. A "strong inference" is raised when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference" of nonfraudulent intent. *Id.* at 310. The scienter inference "need not be irrefutable . . . or even the most plausible," and no "smoking-gun" is required. *Id.* at 324–26. "'[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Capstone Turbine Corp. Sec. Litig.*, 2018 WL 836274, at *5 (C.D. Cal. Feb. 9, 2018) (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)).

Crucially, Defendants fail to offer any competing non-fraudulent inference. Instead of identifying any plausible innocent explanation, Defendants improperly seek to "attack individual allegations in isolation," which "cannot overcome the overwhelming evidence drawn from a holistic view." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012).

**1.    Core Operations Establishes Strong Inference of Scienter**

"The core operations theory . . . presumes that 'corporate officers have knowledge of the critical core operation of their companies." *Prodanova v. H.C.*

---

[6] The Motion's assertion that projected actions are inactionable under safe harbor (Motion at 10-11) is wrong. See, e.g., *Rain Oncology*, 2025 WL 588994, at *6 (statement that "we anticipate commencing a pivotal Phase 3 trial in LPS in the second half of 2021" was literally true, but misleading because it omitted failure to satisfy Phase 2 bypass criteria").

*Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021).  "There are three circumstances under which core operations allegations can support a strong inference of scienter: (1) when they, along with other allegations, support a cogent and compelling inference of scienter, (2) when they are themselves particular and suggest that the defendants had actual access to the disputed information, and (3) in the rare circumstances when they are not particularized, but the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Blake v. Canoo Inc.*, 2025 WL 2992263, at *15 (C.D. Cal. Oct. 22, 2025) (quoting *Prodanova*, 993 F.3d at 1111).

Here, it would be absurd to suggest that Defendants Flores and Patrinely were unaware of repair, maintenance, and regulatory hurdles of the pipelines. Defendants are experienced oil executives (¶¶101, 103) who formed Sable for one purpose: to acquire the SYU Assets, repair the pipelines, and obtain regulatory approval to restart the pipelines and oil production (¶23). These assets were Sable's only assets. ¶97.

The status of Sable's repairs to the pipeline, the requirements of the Consent Decree, and Sable's regulatory battles with the Coastal Commission, the Water Board, environmental groups, the County Board, and the Fire Marshal were all well known facts to Sable's management because they determined the fate of the Company. *See AMI - Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*, 2025 WL 899959, at *6 (N.D. Cal. Mar. 24, 2025), *motion to certify appeal denied*, 2025 WL 2578281 (N.D. Cal. Sept. 5, 2025) ("Because the FAN Agreement was 'existential' to Google in 2017, it is a fair inference that the CEO of Google—who admits that he reviews 'at a high level [ ] all the important decisions' Google makes—would have been aware of the basic terms of the FAN Agreement at the time it was being negotiated."). Courts have found a strong inference of scienter based on the core operations theory in less obvious situations. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987, 989 (9th Cir. 2008) (finding it "hard to believe that [the CEO and CFO] would not have known about stop-work orders that allegedly halted tens

of millions of dollars of the company's work"); *Blake v. Canoo Inc.*, 2025 WL
2992263, at *16 (C.D. Cal. Oct. 22, 2025) (core operations pled where "allegations
regarding the importance of the engineering services pipeline to Canoo's three-
pronged, phased go-to-market strategy, it would be absurd to suggest that the
Individual Defendants, Kranz, Balciunas, and Aquila, were not aware of the collapse
of the pipeline in December 2020"); *In re PG&E Corp. Sec. Litig.*, 2025 WL
2781745, at *21 (N.D. Cal. Sept. 30, 2025) ("the Officer Defendants must have
known of a prominent issue like wildfire regulatory violations that would expose
PG&E to severe financial penalties and potentially threaten its viability as a going
concern"); *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *20 (N.D. Cal. Nov. 27, 2018)
(allegations showing that local advertising program was "a central component of
Yelp's operations" and was "prominent enough that it would be absurd to suggest
that top management was unaware of the" adverse facts); *In re Montage Tech. Grp.
Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1227 (N.D. Cal. 2015) ("it would be absurd to
suggest" that management did not know their largest distributor was a related party,
where their transactions accounted for 71% of the company's revenue).

In short, Sable's progress and setbacks in obtaining regulatory approvals "were
prominent enough that it would be absurd to suggest that top management was
without knowledge of the matter." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d
982, 989 (9th Cir. 2008).[7]

### 2. Defendants Knew Or Had Access To Contrary Information

"The most direct way to show both that a statement was false when made and
that the party making the statement knew that it was false is via contemporaneous
reports or data, available to the party, which contradict the statement." *Nursing Home
Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). The
SAC alleges that Defendants knew or were reckless in not knowing about the

---

[7] The SAC adequately alleges scienter against Sable because "[t]he scienter of a
corporation can be imputed from that of its officers." *S.E.C. v. Platforms Wireless
Int'l Corp.*, 559 F. Supp. 2d 1091, 1096 (S.D. Cal. 2008).

regulatory hurdles Sable faced or that their statements would mislead investors.

In the Ninth Circuit, "an assertion that defendants were unaware of the alleged issues can be 'directly contradicted by the fact that [they] specifically addressed it in [their] statement[s].'" *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) (quoting *Reese*, 747 F.3d at 571). "By making 'detailed factual statement [s], contradicting important data to which [the Individual Defendants] had access, a strong inference arises that [they] knowingly misled the public as to its clear meaning.'" Here, Defendant Flores and the Company repeatedly issued detailed statements minimizing Sable's regulatory hurdles and legal setbacks.

Sable's term loan agreement from ExxonMobil requires that Defendant Flores remain "directly and actively involved in the day-to-day management" of Sable. The Company's 2025 Proxy Statement stated: "The board of directors believes that Mr. Flores' knowledge of the daily operations of and familiarity with the Company and industry put him in the best position to provide leadership to the board of directors on setting the agenda, emerging issues facing the Company and the upstream oil and gas industry, and strategic opportunities." ¶101.

### 3. Defendants Had Motive and Opportunity to Commit Fraud
#### a. Defendants Inflated Stock Price Before Secondary Offerings

The Company has no revenue or cash flows from its operations, nor will it generate any revenue or cash flows from its operations until it restarts production of the SYU Assets. The Company has experienced losses from operations and has had negative cash flows from operations since its inception and will continue to incur losses until it can restart production of the SYU Assets. Accordingly, the Company was entirely reliant on its cash on hand and capital raises to continue its operations. Defendants misled investors about the true state of Sable's operations and regulatory compliance to artificially inflate its stock price at the time of its equity raises.

The recent decision in *In re Semtech Corp.*, 2025 WL 2884810, at *10 (C.D. Cal. Oct. 7, 2025) is instructive. In *Semtech*, the plaintiffs alleged scienter "primarily"

by pointing to the defendant's "significant debt position that it substantially solved with a stock offering." *Id*. The court agreed, finding that the plaintiffs alleged a strong inference of scienter, in large part, by alleging that the defendant's "debt had become an 'existential threat,' and Defendants 'sought to delay the release of the bad news that Semtech's FY2026 ACC revenue opportunity had evaporated until after a planned December 2024 public offering of stock.'" *Id*. Defendants did the same here – issuing a misleading press release touting that Sable had restarted oil production just three days before issuing a secondary offering raising $250 million.

The Motion asserts that courts cannot find an inference of scienter based on public offerings. Motion at 18. Defendants misunderstand the case law. The cases the Motion cites do not involve companies in existential crises. *See Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) ("We also credit the allegation that there is a strong incentive to present an appearance of profitability and to keep stock prices high in the months immediately preceding and following a company's IPO", but "motive to boost the company's profitability and stock prices in the months surrounding the company's IPO are not 'specific' or 'particularized,' as our precedents require"); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) (no scienter merely because the defendants "were seeking a partner and were planning to raise capital in a stock offering"). In contrast, "a demonstration of a desire to raise company financing, combined with the 'red flags' of a company's financial condition, is sufficient to plead scienter." *Nguyen v. Radient Pharms. Corp.*, 2011 WL 13141630, at *6 (C.D. Cal. Oct. 26, 2011).

Finally, the Wall Street Journal reported that Flores's venture paid $204 million in cash out of the total $1.1 billion Sable was expected to pay to ExxonMobil for the SYU Assets and that Flores would "make tens of millions of dollars if he can" restart the commercial oil sales. ¶102.

Sable also faced another deadline that existentially threatened the Company. On August 1, 2024, the Fire Marshal granted Sable's request to extend the deadline

to complete its implementation of the Restart Plans to July 1, 2025. ¶43.In granting the extension, the Fire Marshal stated that "[i]t is imperative that [Sable] successfully completes the proposed retrofit construction by this new deadline." *Id*. The Water Board's complaint states that Sable management intentionally misled the Water Board as a stalling tactic so that it could meet the July 1, 2025 deadline: "At the time of its inadequate submissions in March and April of 2025, Sable management knew full well additional excavation and repair work would be ongoing. However, instead of identifying sites where Sable was planning to carry out activities that could affect water quality, as required by the Section 13267 Order, Sable chose to limit its response to work done as of the March 10, 2025 due date of the Technical Report (which ironically was not met). ***This cynical approach to the Regional Water Board's regulatory permitting requirements was obviously taken to avoid any potential delay in getting the sites permitted and any associated Regional Water Board review that might impact the July 1, 2025 deadline for Sable's completion of repairs imposed by the Fire Marshal.***" ¶54.  (emphasis added)

### 4. The Inference of Scienter Is At Least As Compelling as Defendants' Suggested Inference

The SAC pleads a strong inference of scienter. However, even if each individual scienter allegations are insufficient, the Court must "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (reversing dismissal and finding a strong inference of scienter). The holistic review must consider even "[v]ague or ambiguous allegations" because "federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

Defendants impermissibly contest scienter by attacking each scienter allegation in isolation. Motion at 17-19. The Supreme Court has explicitly rejected this type of argument, holding that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. "Viewed in isolation, any one allegation may not compel an inference of scienter. However, when we consider the allegations holistically, the inference that [defendants] were deliberately reckless as to the truth of their financial reports and related public statements is at least as compelling as any opposing inference." *VeriFone*, 704 F.3d at 698–99 (overturning district court's dismissal and finding scienter); *see also Axonic Cap. LLC v. Gateway One Lending & Fin.*, 2019 WL 4138024, at *11 (C.D. Cal. May 22, 2019) ("although no one allegation, standing alone, is sufficient to create a strong inference of scienter, a "holistic" review of the same allegations does create a strong inference of intentional conduct or deliberate recklessness").

Defendants do not, and cannot, suggest any non-fraudulent inference to compete with the strong inference of fraud pleaded by the SAC. The Motion asserts that the non-fraudulent inference is that "Sable believed in its plans but faced disappointing, unexpected third-party developments" and that "[a]t each step, Sable kept investors informed, including advising potential investors of the risks inherent to its business." Motion at 19-20. But Sable repeatedly misled investors about the significance of those "disappointing" developments, including telling investors that the May 28, June 3, and October 15 court decisions would have no effect on Sable's planned restart. ¶¶

The Motion also claims that Sable "openly engaged with regulators." The SAC is replete with allegations showing that Sable repeatedly ignored and misled regulators. Sable ignored the Coastal Commission's notices of violation and cease and desist orders. ¶¶33-40. Sable also misled the Water Board about its compliance, providing "incomplete information with little meaningful detail regarding the

extensive excavation, repair and backfilling conducted as part of the Repair Plan." ¶¶ 52-53. The Water Board determined that Sable's response "made clear it did not perform meaningful assessment of the environmental impact of its excavation campaign" despite assurances otherwise. ¶¶51-56.

Sable's repeated bad faith interactions with regulators ultimately convinced one of their allies on the County Board to switch his vote against transferring permits to Sable. ¶93. Supervisor Steve Lavagnino, who previously voted in favor of transferring the permits to Sable in February 2025, voted against the transfer. *Id.* Lavagnino explained that he changed his mind because of Sable's repeated refusal to cooperate with regulators and follow the law – which Sable had repeatedly, and falsely, denied. As the Santa Maria Sun reported: "[T]he landscape has changed dramatically since February," he said during the hearing. "To me, the following are facts, not emotions: Since February, Sable has been charged criminally 21 times, with five of those charges being felonies. I have many friends in the oil industry, and I will continue to support efforts to access our natural resources, but it has to be done responsibly by operators who put safety above profits," Lavagnino said. "The evidence in this case is overwhelming. There is something wrong with the strategy of Sable's leadership. Trying to simply bulldoze through the permitting process has not been helpful and is not the way we expect businesses in Santa Barbara County to conduct themselves." *Id.*

The more plausible inference is that Sable repeatedly misled investors and state regulators in a desperate attempt to keep the Company afloat until it could be saved by the federal government.

### C.    Plaintiffs Adequately Allege Loss Causation

To plead loss causation, the Supreme Court simply requires "some indication of the loss and the causal connection" to the alleged fraud. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiffs need only allege that the decline in stock price was proximately caused by a revelation of fraudulent activity rather than by

changing market conditions, changing investor expectations, or other unrelated factors. *Lambert v. Baker Tilly Hong Kong Ltd.*, 2016 WL 6272465, at *2 (C.D. Cal. May 23, 2016). "[S]o long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead*, 536 F.3d at 1057. In fact, "[t]he misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a 'substantial cause.'" Id. at 1055. A corrective disclosure need not be a mirror image of the earlier representation. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 n.3 (9th Cir. 2020). "The ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). "A plaintiff may also establish loss causation by alleging that the defendant's misrepresentations concealed a risk that materialized and played some part in diminishing the value of the security." *In re Amgen Sec. Litig.,* 2014 WL 12585809, at *20 (C.D. Cal. Aug. 4, 2014).

The SAC alleges that each of the alleged corrective disclosures are directly tied to the alleged misstatements and omissions. The Motion fails to undermine these allegations.

First, the Motion baselessly asserts that the corrective disclosures fail because several come from third parties rather than directly from Sable. Motion at 20. Tellingly, The Motion does not cite to any authority to support this assertion. "[A] corrective disclosure need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency" and "can instead come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020).

Second, the Motion contends the May 28 letter from Lt. Governor Kounalakis is not corrective because it merely "confirmed Sable had restarted oil production." Motion at 20-21. The letter explicitly explains the misleading impression left by

Sable's May 19 press release, stating that the "press release appears to mischaracterize the nature of recent activities, causing significant public confusion and raising questions regarding Sable's intentions" by implying "that Sable has restarted operations, despite the reality that "the limited volume oil flows are the result of well-testing procedures required by the Bureau of Safety and Environmental Enforcement prior to restart." The letter explicitly states that "[c]haracterizing testing activities as a restart of operations is not only misleading but also highly inappropriate."

Third, the Motion asserts that the May 28, June 3, and October 15 court rulings were not corrective disclosures because they were merely "bad news." Motion at 21-23. The May 28 ruling held that the Coastal Commission had presented prima facie evidence that Sable was performing unpermitted work, which directly corrected Sable's May 23 statement that "[a]ll the work Sable has performed is fully permitted and approved." ¶62, 76. As the May 28, 2025 Investing.com article stated: "Despite Sable's claims that the work was authorized under existing permits from the County of Santa Barbara, the court found a prima facie case for the Coastal Commission, indicating that the activities constituted a violation of the Coastal Act." ¶76. The October 15 ruling further established that Sable had ignored regulatory orders and performed unpermitted work. ¶¶83-84. The June 3 order, preventing the Fire Marshal from granting authorizations and Sable from restarting the pipelines, corrected Sable's statements that the lawsuit was without merit and that its anomaly repair program was complete. ¶¶59, 62, 78.

Fourth, the November 4 corrective disclosure was a materialization of the risk of Sable's repeated dishonest interactions with regulators – of which Sable repeatedly both denied both the existence and the consequences. ¶¶93, 96 ("The evidence in this case is overwhelming. There is something wrong with the strategy of Sable's leadership. Trying to simply bulldoze through the permitting process has not been helpful and is not the way we expect businesses in Santa Barbara County to conduct

themselves."); *see also In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *5
(N.D. Cal. June 1, 2020) ("under a 'materialization of the risk' theory, plaintiff may
allege that 'the very facts about which defendant lied' caused the injuries. Any kind
of proximate cause satisfies this requirement").

Finally, the October 31 and November 3 reports were both corrective. ¶¶ 88-
89, 92. The October 31 Hunterbrook Report showed that Sable's need to raise
additional equity contradicted Defendants' repeated claims that regulatory and
judicial orders concerning the Company's ability to make repairs and restart
production would have an effect on the Company's ability to timely resume
commercial sales. ¶88. The November 3 press release confirmed the Hunterbrook
report and revealed that Sable's October 31 statement denying the Hunterbrook report
was false. ¶92. The Motion claims that short seller reports cannot serve as corrective
disclosures; this is not true. *See In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th
1171, 1187 (9th Cir. 2024) (short seller report was corrective disclosure).

### D.    Plaintiffs Adequately Allege Control Person Liability

Plaintiffs have adequately pleaded control person liability under Section 20(a)
by alleging primary violations and that Defendants were in positions of control. ¶¶21-
23; *see In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *21 (S.D. Cal. May
23, 2017).

## IV.    CONCLUSION

The Motion should be denied in its entirety. Alternatively, if the Court grants
any portion of the Motion, Plaintiff respectfully requests leave to amend.[8]

Dated: January 12, 2026              **THE ROSEN LAW FIRM, P.A.**

---

[8] *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (holding that leave to
amend should be freely granted unless "the pleading could not possibly be cured by
the allegation of other facts"); *Osher v. JNI Corp.*, 183 F. App'x 604, 605 (9th Cir.
2006) ("[l]eave to amend is to be granted with extreme liberality in securities fraud
cases, because the heightened pleading requirements imposed by the PSLRA are so
difficult to meet").

*/s/ Daniel Tyre-Karp*
Daniel Tyre-Karp (pro hac vice)
275 Madison Ave., 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: dtyrekarp@rosenlegal.com


Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 12, 2026                    /s/ Daniel Tyre-Karp
                                                                    Daniel Tyre-Karp

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record for Lead Plaintiff Jimmy Cleveland White and named plaintiffs Tracy Johnson and Jake Stewart certifies that this brief contains 24 pages, which:

__ complies with the word limit of L.R. 11-6.1.

X complies with the page limit set by court order dated August 4, 2025 (Dkt. No. 10).

Dated: January 12, 2026                    /s/ Daniel Tyre-Karp
                                           Daniel Tyre-Karp

CERTIFICATE OF SERVICE