UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| TRACY JOHNSON, | ) CASE NO: 2:25-cv-06869-SVW-PVC |
| Plaintiff, | ) CIVIL |
| vs. | ) Los Angeles, California |
| SABLE OFFSHORE CORP, ET AL, | ) Monday, February 23, 2026 |
| Defendants. | ) (2:18 p.m. to 2:58 p.m.) |

ZOOM HEARING RE:

MOTION TO DISMISS CASE (SECOND AMENDED CLASS ACTION COMPLAINT) [DKT.NO.81]

BEFORE THE HONORABLE STEPHEN V. WILSON,
UNITED STATES DISTRICT JUDGE

APPEARANCES: SEE PAGE 2

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: Daniel Tamayo

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy., Ste 1105-237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES:**

For Plaintiff: DANIEL I. TYRE-KARP, ESQ.
The Rosen Law Firm
275 Madison Ave., 40th Floor
New York, NY 10016

For Defendants:
KRISTIN NICOLE MURPHY, ESQ.
Latham & Watkins
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626

LAUREN CLAIRE BARNETT, ESQ.
Latham & Watkins
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067

COLLEEN C. SMITH, ESQ.
Latham & Watkins
12670 High Bluff Drive
San Diego, CA 92130

**Los Angeles, California; Monday, February 23, 2026; 2:18 p.m.**

**--oOo--**

**THE COURT:** *Johnson v. Sable*?

**MR. TYRE-KARP:** Yes, Your Honor.

**THE COURT:** Yeah. Okay. And would you announce your appearances.

**MR. TYRE-KARP:** This is Daniel Tyre-Karp from The Rosen Law Firm on behalf of Plaintiffs and the Putative Class.

**THE COURT:** I don't have you on the agenda. Are you -- can you give me your name again?

**MR. TYRE-KARP:** Daniel Tyre-Karp.

**THE COURT:** How do you spell that?

**MR. TYRE-KARP:** T-y-r-e hyphen K-a-r-p.

**THE COURT:** K-a-r-c?

**MR. TYRE-KARP:** K-a-r-p as in Peter.

**THE COURT:** T.

**MR. TYRE-KARP:** P as in Peter.

**THE COURT:** Kyra -- Gyra-Kart?

**MR. TYRE-KARP:** Karp. P as in Peter.

**THE COURT:** Oh, P-a-r-k?

**MR. TYRE-KARP:** K-a-r-p.

**THE COURT:** Oh. Gyra -- Gyra-Karp.

**MR. TYRE-KARP:** Tyre.

**THE COURT:** Gire-Park.

**MR. TYRE-KARP:** Tyre-Karp.

**THE COURT:** With a G? G? Did you say -- I'm missing what you're saying.

**MR. TYRE-KARP:** Sorry. T --

**THE COURT:** Oh, T.

**MR. TYRE-KARP:** -- as in Tom-y-r-e.

**THE COURT:** Oh, Tyre.

**MR. TYRE-KARP:** Tyre.

**THE COURT:** Okay. Karp.

**MR. TYRE-KARP:** And then hyphen --

**THE COURT:** Karp.

**MR. TYRE-KARP:** -- Karp. K-a-r-p.

**THE COURT:** And for the Defendants, it's Mr. Galdes (phonetic), Ms. Murphy, Ms. Barnette. Okay.

This is a Motion to Dismiss by the Defendants, so the way -- I'm looking at the Complaint. It has a number of statements that are claimed to be false but the one that I want to address first is the statement that they have restarted oil production at Santa Ynez and the contention that they didn't start -- and the allegation that they didn't start oil production, they just injected a test drill well and that at the least that statement, if not overtly false, is sufficiently misleading.

Who wants to address the question?

**MS. MURPHY:** I'm happy to start. It's our motion and I think --

**THE COURT:** Yeah.

**MS. MURPHY:** Sure. So, you know, I think in Plaintiffs' opposition they do sort of change their theory on this statement. Right? They agree that this statement may have been literally true and the whole text of this statement, right, we say that we restarted production in limited quantities, the fact that it was a test is entirely consistent with everything that we say --

**THE COURT:** Well, wait. You said a couple of things there. Did the company say that they started production in limited quantities?

**MS. MURPHY:** I think we identified the amount of oil that we were currently putting out at that point, yes.

**THE COURT:** But I mean would that be known to someone who invested in the company, that that was a limited amount of production?

**MS. MURPHY:** I think by comparison, yes, because we said (a) we're not selling oil now, here is how much we hope to be selling in, you know, in another month from now and here is when we hope to be selling. Right? So I think by comparison, yes, we explained --

**THE COURT:** Well, wait. You're still saying a number of things. You're saying we hope to be doing something in a month. The statement is that you -- is that Sable had restarted production and the question is is production

misleading in that it was a test well. Why wouldn't a reasonable investor conclude that if the test well -- if they knew the true statement that it was a test well, that if the test well didn't prove profitable that would be it? Why -- how do you argue the contrary? Why isn't that misleading for someone?

**MS. MURPHY:** I think because a reasonable investor had all of those other statements in context around it and would have had to read it --

**THE COURT:** What --

**MS. MURPHY:** -- in context.

**THE COURT:** What other --

**MS. MURPHY:** And then --

**THE COURT:** What other statements?

**MS. MURPHY:** The statements that, for example, they hadn't sold any oil since 2015 and that this was the very beginning of the new production of oil --

**THE COURT:** But --

**MS. MURPHY:** -- and that they were --

**THE COURT:** -- I think --

**MS. MURPHY:** -- planning to ramp up --

**THE COURT:** -- they used production and they warrant producing, producing would indicate to an investor, wouldn't it, I'm not asking you wouldn't it, but it might and would it influence an investor to think that, you know, this was -- this

was a good field, good enough that we're producing. But in effect they just had a test well that might lead to production, might not. And in later statements they say we expect to fill the 540,000 barrel crude oil capacity by the middle of so forth and then we have safely and responsibility achieved first production at Santa Ynez, et cetera. There are a lot of puffery -- there are many statements that are alleged that I agree would be in the category of puffery, but I'm not going to address those now.

Let me just ask Ms. Murphy this question. Just assume that it was a misleading statement, what is the -- how does that statement tie to a loss causation argument?

**MS. MURPHY:** That's a great question, Your Honor. I don't think it does. I mean I'm not sure -- you know, part of our whole argument here, right, is that they just identified a series of bad news or things that the market reacted negatively to and said that these are corrective of all the optimistic things that Sable, you know, said was going to happen. We don't think that's enough. We don't think that there are clear ties to the revelations that they point to back to the alleged corrective disclosures. You know, I'm not sure what exactly they say --

**THE COURT:** Okay, let me -- let me turn to the Plaintiff. Would you take the lectern.

I'll give you a chance to respond, Ms. Murphy --

**MS. MURPHY:** Sure.

**THE COURT:** -- or anyone else. I mean I think I've stated your argument with regard to the statement being misleading, correct?

**MR. TYRE-KARP:** Yes. I would elaborate a little bit. I --

**THE COURT:** Well, go ahead and elaborate --

**MR. TYRE-KARP:** Or not.

**THE COURT:** -- a little bit.

**MR. TYRE-KARP:** All right. I would just say they said that they'd begun flowing oil production and that they expect to fill the tanks by mid-June --

**THE COURT:** Was that --

**MR. TYRE-KARP:** -- which was about three weeks later.

**THE COURT:** Was that one statement at the same time they said they were beginning production and they expect -- were those statements made at the same time?

**MR. TYRE-KARP:** They're in the same paragraph, the first paragraph of the press release that was issued on May 19th.

**THE COURT:** Okay. Now let's assume that that satisfies the pleading requirements for misleading. How does that tie into a loss causation argument?

**MR. TYRE-KARP:** So on May 28th the Lieutenant Governor of California, who was also the head of the Lands

Commission, wrote a letter -- it was published on the 28th. It was actually written earlier. But the first the public noticed it was on the 28th. It explicitly said that the language that the company used in the press release and in their prospectus a few days later was misleading because it was just a well test and it was not restarting production and that the company did not have the permits to restart production, that it would be -- it was --

**THE COURT:** Wait a second. So that's another aspect of misleading because in order to -- do you need a permit for a test well?

**MR. TYRE-KARP:** It's unclear. The Lieutenant Governor said that they did not have permission to run the tests and --

**THE COURT:** But --

**MR. TYRE-KARP:** -- and flow the oil.

**THE COURT:** But I mean but is the issue as a matter of law clear about producing oil, that you need a permit?

**MR. TYRE-KARP:** Yes, it's crystal clear that --

**THE COURT:** In other words, the ambiguity is do you need a permit for a test well as contrasted to a production well? Is that what you're saying?

**MR. TYRE-KARP:** It's not just a test well, it's the flowing of the oil through the pipelines from the offshore platform.

**THE COURT:** I see. Well how -- I don't know enough about oil production but you have to -- can you test the well without running oil through a pipeline?

**MR. TYRE-KARP:** I believe there's nowhere for the oil to be stored on the platforms. It has to run -- so they have two sets of pipelines, one from the offshore platforms to a holding facility onshore and then from the onshore facility to a refinery that's further in --

**THE COURT:** My question is, in terms of a test well, can you test a well without having to have the oil from the test well run through the pipeline?

**MR. TYRE-KARP:** The Lieutenant Governor said that they did not have the permits to do that.

**THE COURT:** But he may have said that, but if the law was different than what he said then the -- then at least as far as the permit aspect of it, it wouldn't be false.

**MR. TYRE-KARP:** So there's a statement that's made in an article a few days later where the company says that all of the work they are doing is fully permitted and that is just blatantly false. There are numerous complaints from the California Coastal Commission that they did not have the permits to do the work that they were doing.

**THE COURT:** Let me then turn to the loss causation. Are you saying that the loss causation stems from this letter that the Lieutenant Governor wrote some days or weeks after the

press release and did the stock react to that letter?

**MR. TYRE-KARP:** The stock did react. It was nine days after the press release.

**THE COURT:** And how did the stock react?

**MR. TYRE-KARP:** Negatively. I can tell you exactly --

**THE COURT:** But I mean negatively, did it lose 50 cents, a dollar, or did it show some reaction?

**MR. TYRE-KARP:** It dropped $5 per share, 15.3 percent, on every trading to close at 27.89 on May 28th, 2023.

**THE COURT:** And what happened shortly thereafter? Did it regain the price?

**MR. TYRE-KARP:** It continued dropping throughout the class period as --

**THE COURT:** How far?

**MR. TYRE-KARP:** It fell to I believe $5.40 by the end of the class period.

**THE COURT:** And what was the -- what was the price of the stock at the time of this press release?

**MR. TYRE-KARP:** It was -- the press release raised the price from 28.86 to 33.02. Which was exactly what the company intended because they issued a prospectus to raise $250 million at the inflated stock price just a few days after the press release.

**THE COURT:** So in terms of loss causation, that letter from the Governor was the first wave of loss causation, correct?

**MR. TYRE-KARP:** That's correct, Your Honor.

**THE COURT:** But why did it continue to drop during the -- what is the class period again, from when to when?

**MR. TYRE-KARP:** The class period is from May to November --

**THE COURT:** Of what --

**MR. TYRE-KARP:** -- to November 4. May 19 to November 4.

**THE COURT:** What year is that again?

**MR. TYRE-KARP:** 2025, Your Honor. So it's all one year.

**THE COURT:** This year.

**MR. TYRE-KARP:** Well, last year.

**THE COURT:** Last year. Yeah. I mean November. And so what -- besides this letter, why did the stock continue to drop from it sounds like $33 to $5?

**MR. TYRE-KARP:** Yeah, so the company continued to say that it intended to restart production and that it was -- that it intended to start selling oil imminently. At first they said July 2025. That kept getting pushed back. The fact is they didn't have any of the permits they needed to restart production or to start sales. They needed final development

permits from the County Board of Supervisors, which they did not have and had no plan to get and there was no meeting scheduled. They sued the Board to try to get them to approve it. They ended up losing that and then lost the vote when they ultimately re-held it.

**THE COURT:** Do you have any evidence at this point of what the test well showed?

**MR. TYRE-KARP:** We have no evidence beyond what they said.

**THE COURT:** But the test well was in June, right?

**MR. TYRE-KARP:** May 19th, but they announced that they did it May 15th.

**THE COURT:** And then the -- and then in June they said they expect to fill the 540,000 barrels.

**MR. TYRE-KARP:** By mid-June they announced in the May 19th press release, so three weeks later.

**THE COURT:** And they said that after the Governor's letter?

**MR. TYRE-KARP:** They said it again after the Governor's letter --

**MS. MURPHY:** No, Your Honor.

**MR. TYRE-KARP:** -- but that's what they said in their May 19th press release, which was nine days before the Governor's letter became public.

**THE COURT:** About the 540,000?

**MR. TYRE-KARP:** Yes.

**THE COURT:** They said that before the Governor's letter.

**MS. MURPHY:** That's right, Your Honor.

**(Pause)**

**THE COURT:** Now, you've also sued some of the officers personally, is that right?

**MR. TYRE-KARP:** Yes, the CEO and CFO.

**THE COURT:** But I mean certainly you can sue them if you have the evidence, but you could still -- you don't have to sue them, you could just have a judgment, if you get one, against the company, correct?

**MR. TYRE-KARP:** Corporate scienter without an individual defendant to attribute to is not as clear in the Ninth Circuit as I would prefer. But I think that the --

**THE COURT:** Okay, that's the point I wanted you to address. You're saying that there is an issue between whether you can get a judgment against a corporation without corporate -- without officer scienter?

**MR. TYRE-KARP:** We don't believe that it would be a problem, but I think that there is scienter on behalf of the individual Defendants. Mr. Flores, the CEO --

**THE COURT:** Well, I mean if there's not a problem would -- who in your view was the shot caller here? The people you named as Defendants?

**MR. TYRE-KARP:** The CEO, Jim Flores, I think would be defined as the shot caller. He's the one who made most of the statements personally. The CFO also signed all of the SEC disclosures, the prospectus. And under the core operations doctrine in the Ninth Circuit and Courts within the Ninth Circuit have found that the CEO and CFO are both presumed to have been aware of significant core operations of the company that are critical to the company. And we think here, where the company had one asset, one purpose, and the only thing in the way of the company realizing its purpose was restarting oil production and selling oil was the regulatory hurdles that they faced and it would be absurd to think that the CEO, who bought these assets, founded the stack (phonetic), bought these assets solely for the purpose of restarting oil production knowing that Exxon had struggled for ten years to restart production facing these exact same issues, that he wasn't aware of the regulatory issues.

**THE COURT:** Okay, I understand. From the way you describe the case, and I'm not being facetious, why wouldn't you move immediately for summary judgment?

**MR. TYRE-KARP:** We believe that the case will grow stronger as we get discovery. As you know, in securities --

**THE COURT:** But if you get summary judgment you've won. What else do you need? Why do you need five times summary judgment, ten times, if you get a judgment in an

amount, I mean there might be a question about loss causation but in terms of the liability aspect of things, I mean where's the pushback?

**MR. TYRE-KARP:** We believe that --

**MS. MURPHY:** Your Honor, can we talk about -- I'd love to push back on core operations if we could --

**THE COURT:** No, no, just one minute.

**MS. MURPHY:** Okay.

**THE COURT:** All right? You don't think there's any pushback?

**MR. TYRE-KARP:** We believe that the documentary evidence and --

**THE COURT:** Let me hear Ms. Murphy's argument about core operations.

**MS. MURPHY:** Thank you, Your Honor.

So he said it would be absurd to suggest that management was not aware of information that contradicted their statements given their focus on this pipeline. We agree that they were focused on the pipeline. We agree that they were focused on the legislative, regulatory, you know, litigation challenges that the pipeline faced. We agree that that was the focus. What core operations requires you to do under the law under any case where core operations was found to be sufficient you have to at least allege what specific information management was supposedly aware of based on that involvement,

based on that focus. That's what Plaintiffs are missing here.

**THE COURT:** Why are they missing it? I mean you're saying that at a deposition the CEO would say he was not aware that it was a test well and --

**MS. MURPHY:** They were being told, they were being told that their work was fully permitted. They had -- this is also in the same disclosures. Plaintiffs are skipping right over this. They were being told by Santa Barbara County that they were permitted for everything that they were doing. They were --

**THE COURT:** I'm interested in what you have to say. They were being told in what way?

**MS. MURPHY:** By Santa Barbara County. They had letters. They have written documentation that all -- that they were permitted, that they were following the right protocols to get what they needed to do to restart operations, but there are environmental groups that are challenging them, there's politics at play, it's a very complicated regulated scheme that is going on here and so it got, you know, it got more complicated than they expected. And ultimately a different group took jurisdiction over this that they did not expect.

**THE COURT:** But what you're saying seems to be helpful to the Plaintiffs. The way you're describing it, Santa Barbara is describing all these difficulties and hurdles and yet they're saying that we started production and we're

going to expect to produce all of this. I mean in light of the way you described the Santa Barbara officials' response, it sounds like they know they're in for a battle of some kind with the regulators.

**MS. MURPHY:** I mean, Your Honor, that's all disclosed to the investors though. There were very robust warnings to the investors about --

**THE COURT:** Tell me -- tell me --

**MS. MURPHY:** -- all of the challenges --

**THE COURT:** When was the robust warnings made to the investors and in what way were they made?

**MS. MURPHY:** Sure. So if I could direct Your Honor to --

**THE COURT:** And give me timeframes. The important timeframe is May 15th to the middle of June --

**MS. MURPHY:** So --

**THE COURT:** -- initially.

**MS. MURPHY:** Yeah, so I think May 22nd, this is in the prospectus that we put out, this is, you know, right in the middle when we're --

**THE COURT:** Yeah.

**MS. MURPHY:** -- talking about start (phonetic).

**THE COURT:** Okay.

**MS. MURPHY:** This is Exhibit 8 to our Motion to Dismiss. These are -- I'd love to just read you a couple

examples.

So first of all, we spend three pages talking about the different litigations that we're involved in and that we're facing. We talk about, you know, the positions that the other parties are taking and the positions that we're taking and the basis from which we're taking them. Right? So we explain there are disagreements here but we think we're right and this is the reason that we think we're right so investors understand that there's, you know, there is --

**THE COURT:** Are they talking about the permits in these letters?

**MS. MURPHY:** Yes.

**THE COURT:** Okay.

**MS. MURPHY:** Absolutely. The State Waivers Litigation and the California Coastal Commission Litigation that is the subject of the alleged corrective disclosures in late May and June, that's all described here, all described. Sable says, you know, here's the positions that everyone's taking, we think we're right, we think we're going to win --

**THE COURT:** But that --

**MS. MURPHY:** -- but here's what the other side is saying.

**THE COURT:** But that was late June and the California letter was mid-June, wasn't it?

**MS. MURPHY:** No, no, this was May 22nd that all this

was done.

**THE COURT:** I see. Okay. Go ahead.

**MS. MURPHY:** And then, let's see, the risk factors. Starting on Page S13 we say risks associated with our operation, while we've satisfied most of the conditions to restart there's no assurance that we'll be successful in satisfying the remainder of the restart and be able to recommence oil sales. Then there's two additional paragraphs about all the details about why we may not be able to satisfy the conditions, the timing of returning wells to production is subject to risks that may cause delays, and initial production rates are expected to decline, our assumptions and estimates regarding costs associated with recommencing oil sales may be inaccurate --

**THE COURT:** What was --

**MS. MURPHY:** Yes.

**THE COURT:** What was the date of this prospectus?

**MS. MURPHY:** May 22nd.

**THE COURT:** That was the date of the prospectus?

**MS. MURPHY:** That's right.

**THE COURT:** And so you're saying that -- I mean when I say you're saying, I'm interpreting what you're saying -- is that even assuming that the May 15th press release arguably was misleading, that the prospectus that was used for selling stock -- was the company -- was the company --

**MS. MURPHY:** And a lot of these -- I'm sorry. A lot of these are actually in that press release that you're referencing as well.

**THE COURT:** But was -- but at the time of the press release on May 15th the company was already a public company selling stock, correct?

**MS. MURPHY:** Yes. May 19th. That's right.

**THE COURT:** May 19th. But this prospectus was with regard to a secondary offering?

**MS. MURPHY:** Correct.

**THE COURT:** And so I mean it sounds like you're making some distinction between what may have happened, even assuming the worst for your client, between May 15th and May 22nd. You seem to be saying that by May 22nd the marketplace knew -- the risks were disclosed and that the only people who may have been affected -- but actually the May 15th press release wasn't even publicly challenged until after May 22nd, correct, by the Lieutenant Governor? Is that right?

**MS. MURPHY:** Yeah, correct. That was not until --

**THE COURT:** So at the time the Governor corrected the press release of May 15th the company had already issued a prospectus which had the risks that you just described?

**MS. MURPHY:** That's right.

**THE COURT:** I see. So -- but how would that affect someone who already owned the stock and was trading the stock

on the open market? Wouldn't someone read the prospectus that was intending to buy from that offering?

**MS. MURPHY:** I mean, Your Honor, I want to be clear. Even in the May 19th press release we say there can be no assurance that the necessary permits will be obtained that would allow onshore pipelines to recommence transport and allow the SYU assets to recommence sales. We have been very clear with our investors about --

**THE COURT:** Okay --

**MS. MURPHY:** -- all of the challenges.

**THE COURT:** I’m going to get back to -- take the lectern -- I'll call you Plaintiff because I have trouble with your name.

**MR. TYRE-KARP:** That's fair. First I want to address the idea that they disclosed the risks to investors, which I think is not accurate. There is a list of --

**THE COURT:** From what I'm understanding from Ms. Murphy so far, with everything you're saying I'm going to go back and double check, but what I'm understanding so far is that within three days or so of the press release, or a week, this prospectus was made public and this prospectus contained risks which in some ways may have either contradicted or clarified whatever was misleading in the press release. That's what I digested. Tell me what you digested.

**MR. TYRE-KARP:** So the company's consistent position

is that the regulators are meaningless, their actions can be ignored, the company is going to start producing oil, it has already started flowing production and will fill the tanks in three weeks. And the reality is that they had none of the permits they needed to do any of that. That's not clear in the prospectus. They made it seem that they're cooperating with the California Coastal Commission but the Coastal Commission in their complaints against the company made very clear that the company just ignored them over and over again, that they issued a TRO to stop the company from doing the work on the pipelines --

**THE COURT:** When --

**MR. TYRE-KARP:** -- and the company just ignored them.

**THE COURT:** A little slower. When did this TRO, when was it issued? Before May 19th?

**MR. TYRE-KARP:** February, Your Honor.

**THE COURT:** February. But I mean wasn't the TRO public information?

**MR. TYRE-KARP:** They disclosed it in the prospectus and they said that it would have no effect on the company's progress in meeting its goals to start producing oil and fill up the tanks by mid-June --

**THE COURT:** So your --

**MR. TYRE-KARP:** -- and sell oil in July.

**THE COURT:** -- your view is that's not just an

opinion; that's a misleading statement.

**MR. TYRE-KARP:** Yes, Your Honor. I would look back at the Ninth Circuit case *Reese v. Malone*, the fact that the company discloses that there are discussions with regulators is insufficient to create a belief that they're in material compliance with the law. That was a BP case and the company said that they disclosed over and over again that they were working to comply with the law and that they were in continuous discussions with regulators, but it came out that they weren't working to comply with the law.

Which is the exact same thing here. Sable made no effort whatsoever to comply with the permitting regulations that existed.

**THE COURT:** Let me --

**MR. TYRE-KARP:** They just ignored them.

**THE COURT:** Let me ask you this. Why did the stock continue to drop so much with regard to the initial drop and then this drop over the period of the class action? Was something else going on that exacerbated the drop or was -- excuse me -- or was the drop just becoming more known or what was it?

**MR. TYRE-KARP:** So the company kept denying reality. They kept saying none of this will have an effect on us. We are plowing forward; we will start selling oil. Because they had to because they had one asset, they had a loan, they

loaned -- they borrowed all of the money, almost all the money used to acquire the assets, and if they couldn't restart oil production and start selling oil the loan would come do, they would have to repay the loan and give the assets back --

**THE COURT:** Okay.

**MR. TYRE-KARP:** -- and they --

**THE COURT:** I do remember that.

**MR. TYRE-KARP:** So --

**THE COURT:** Turn to another issue, the operations issue. Ms. Murphy made an argument that the law requires more than you suggested. How do you respond?

**MR. TYRE-KARP:** For the core operations argument.

**THE COURT:** Yes.

**MR. TYRE-KARP:** I think that the Complaint is very clear that we say that they were the executives, it would be absurd to suggest that they weren't aware of the progress of the pipelines and the wells, which are the only assets the company held, the entire focus of the company. They knew what the obstacles were, they knew they had not overcome those obstacles, so they knew it was false to say that they had restarted production --

**THE COURT:** But Ms. Murphy --

**MR. TYRE-KARP:** -- and would start selling oil in a few weeks.

**THE COURT:** Ms. Murphy argues that something more is

required than just that. Your position is otherwise?

**MR. TYRE-KARP:** I think that that is sufficient, but I also think that there is more because there's motive and opportunity. Here we have an existential threat to the company that they were about to run out of money, they have no revenue, they're entirely reliant on capital raises. They were about to run out of money because they couldn't sell the oil because they didn't have the permits to do it, so --

**THE COURT:** How would you make an argument on -- assuming that you're correct about liability, how would you make an argument about the drops in the stock along the way? I mean were there other -- were there press releases along the way that temporally related to the drops in stock?

**MR. TYRE-KARP:** So for example, there was a court decision finding that the Coastal Commission had made a prima facie case that the company was performing unpermitted work.

**THE COURT:** When was that?

**MR. TYRE-KARP:** That was I believe July 15th.

**THE COURT:** And what happened to the stock?

**MR. TYRE-KARP:** Let me just look.

**(Pause)**

On June 3rd -- no, it was also on May 28th, the same day that the letter was published, the California Coastal Commission was granted a preliminary injunction against the company --

**THE COURT:** I thought the stock I thought you said dropped about 15 percent.

**MR. TYRE-KARP:** Yes, on May 28th.

**THE COURT:** But then ultimately it dropped to $5 from a high of 33. How did it go from $28 to $5?

**MR. TYRE-KARP:** So the company in response to all this repeatedly said that none of this would affect them at all, that all the work was done, that -- this is a quote from May 28th from the company -- the court decision does not impede Sable's preparations for restarting the flow of oil. Restart of the pipeline system is governed by a federal consent decree.

So again they're just ignoring California regulators.

**THE COURT:** But that's all in May and the stock dropped 15 percent. Don't you have the burden of showing that there's some event that relates to a loss in the stock price? The events that you're talking about seem to be reflected in the 15 percent drop. But I'm asking you, how do you tie other events to a more extreme drop (indisc.)?

**MR. TYRE-KARP:** So on October 15th the same court that ruled that the CCC had made a prima facie case of unpermitted activities ruled in favor --

**THE COURT:** What was the stock at that time and what did it drop to?

**MR. TYRE-KARP:** So it fell 3.56 per share, which was 20 percent, and it fell to $14.

**THE COURT:** So it was what before, what was it before the --

**MR. TYRE-KARP:** So on May 28th it fell --

**THE COURT:** You're talking still back in May. I'm -- you said something about October.

**MR. TYRE-KARP:** Yes. On October 15th it fell 3.56 per share to close at $14, 14.13.

**THE COURT:** And --

**MR. TYRE-KARP:** Which was a 20 percent drop.

**THE COURT:** And -- but those are two specific ties to loss causation. How does it -- how does it -- how do you correlate events to loss causation on other drops?

**MR. TYRE-KARP:** So on October 31st there was a report by Hunterbrook which had an audio recording of the company's CEO telling a select group of investors that the company would need to raise hundreds of millions of dollars in equity. The company denied it, said that that's AI, that's not real, not a real audio recording. That was on Friday, October 31st. The next business day on Monday before the market opened the company issued a press release and held a call announcing they were raising the equity that was described in the audio call that they said was AI and not real and they said that the board of directors was opening an investigation into the CEO's comments. What's not in the Complaint, because it was after the briefing finished, the company disclosed on February 3rd

that on December 2nd the company received subpoenas from the SEC and SDNY, the DOJ, into the audio recording of the company -- or the company's CEO selectively disclosing material information to certain investors prior to them being released to the public. So clear misstatement saying that it's AI, that it's not real, clear corrective disclosure --

**THE COURT:** All right --

**MR. TYRE-KARP:** -- when they announce that they actually do need the equity raised.

**THE COURT:** This is becoming unproductive for me. I just have to go back into the record and I appreciate what you've said but I have to reexamine the case from scratch. The matter will stand submitted. I'll issue an order.

Thank you.

**MR. TYRE-KARP:** Thank you, Your Honor.

**MS. MURPHY:** Thank you, Your Honor.

**THE CLERK:** Thank you, counsel. We're going to call the next case at this time.

**(This proceeding was adjourned at 2:58 p.m.)**

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**February 28, 2026**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***